IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

LOUIS EDWARD LUTZ, JR. )
AND ALL OTHERS )
SIMILARLY SITUATED )
    Plaintiffs, )
)
v. )   CIVIL ACTION
)   FILE NO.
)
THE PRESIDENT OF THE )
UNITED STATES OF AMERICA, )
KELLOGG BROWN & ROOT, INC., )   JURY DEMANDED
    Defendants. )



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.
★ AUG 0 6 2007 ★
BROOKLYN OFFICE

CV 07 3280
GARAUFIS, J.
BLOOM, M.J.

RECEIVED
AUG 0 6 2007
PRO SE OFFICE

PLAINTIFFS' ORIGINAL COMPLAINT

Now come Plaintiff, LOUIS EDWARD LUTZ, JR. ("LOUIS LUTZ"), and all others similarly situated and complain of Defendants THE PRESIDENT OF THE UNITED STATES OF AMERICA (THE PRESIDENT) and KELLOGG BROWN & ROOT, INC, (KBR), (hereinafter collectively referred to as "Defendants) and for cause of action would show the Court as follows:

## I. INTRODUCTION

1. This is a collective Action suit to recover damages and demand corrective action be taken under The Constitution of The United States of America especially Article VI which reads "This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding. " and the treaty called "Geneva Conventions of August 12, 1949" with Protocol Additional Relating to the Protection of Victims of International Armed Conflict, adopted June 10, 1977.

2. Plaintiff, LOUIS LUTZ, and all others similarly situated, demand a jury on all issues triable to a jury.

## II. JURISDICTION AND VENUE

3. This Court has jursistiction of the claims herein.

4. This Venue allows PLAINTIFFS the greatest possibility of fairness. The issues in law are international in scope. This venue includes New York City, the most

international city in The United States. This court has within its juristiction possibly the largest group of legal counsel from which to appoint Class Counsel to handle a case dealing with international law. That Class Counsel will have the legal knowledge, administrative ability and financial resources to handle the case.

### III. PARTIES

5. Plaintiff, LOUIS LUTZ resides at 7805 Laver Ct., Fort Worth, Texas 76112.

6. Defendant, THE PRESIDENT OF THE UNITED STATES OF AMERICA The White House, 1600 Pennsylvania Avenue NW, Washington, DC 20500.

7. Defendant KELLOGG BROWN & ROOT, INC., is a validly existing Delaware corporation. This Defendant may be serviced with summons by serving its Texas registered agent, CT Corporation System, located at 1021 Main Street, Suite 1150, Houston, Texas 77002.

### IV. CLASS ALLEGATIONS

8. Plaintiff, LOUIS LUTZ files this case as an "opt-in" class action.

9. The class that Plaintiff LOUIS LUTZ seeks to represent may be described as follows:

   A. All current and former employees and/or contractors of either or both of the above named Defendants working, or who have worked, in Iraq and/or Afghanistan since September 11, 2001 whether they be citizens of The United States of America or not.

   B. All Current and former employees and/or contractors of Defendant, The President of The United States of America, would include individual contractors or employees of any company or organization, foreign or domestic under the control or payment of The Government of The United States, working, or who haved worked, in Iraq and/or Afghanistan since September 11, 2001.

   C. Current and former civilian, government service employees of The United States of America, whether they be citizens of The United States of America or not, working, or who have worked, in Iraq and/or Afghanistan since September 11, 2001.

   D. Who claim they, are being, and/or have been damaged as a result of the violation of law by defendants.

10. Plaintiff LOUIS LUTZ seeks to represent only those members of the above-described group who, after appropriate notice of their ability to opt into this action as authorized by the Court, have provided consent in writing to be represented by PLAINTIFF, LOUIS LUTZ'S counsel.

11. Those persons who chose to opt-in, hereinafter referred to as the "PLAINTIFF CLASS" will be listed on subsequent pleadings and copies of the written consents to sue will be incorporated hereby by reference.

## V. FACTS

12. Defendants employed Plaintiff LOUIS LUTZ as a U.S. Army Civilian Contractor, truck driver, in Iraq from October 3, 2004 through April 3, 2006.

13. Plaintiff LOUIS LUTZ'S only job in Iraq was as a civilian truck driver. This driving was done primarily in convoy with United States Military escorts and primarily between United States and/or coalition partners military bases.

14. It is commonly reported that 70% of United States Military casualties occur/occurred on the roads of Iraq. The roads are the primary battlefield.

15. Plaintiff LOUIS LUTZ participated in KBR orientation of prospective, civilian employees/contractors in Houston, Texas. The subject of one of the orientation briefings dealt with possible capture by enemy forces. A retired U.S. Marine officer, and KBR civilian employee, conducted that briefing instructing listeners to "Fight, Fight, Fight" if capture is imminent. Listeners were told they would be considered "Prisoners of War" if captured.

16. Plaintiff LOUIS LUTZ participated in KBR civilian, truck driver orientation at Camp Anaconda, Ballad, Iraq. One day of that orientation training was dedicated to escape and evasion. KBR safety department instructors and personnel of The U.S. Air Force conducted that training. The U.S. Air Force personnel stated that the KBR drivers would be "Prisoners of War" if captured.

17. Prior to every convoy movement KBR conducted a safety and convoy briefing at the KBR "yard". The vehicles, loads, and all equipment, including driver personal radios and vehicle radios, were checked at this time. The KBR convoy briefing was conducted by The KBR convoy commander. The KBR convoy vehicles were then driven to the "yard" or a "meet up location" of the military unit providing convoy security for that convoy. The military convoy commander conducted a convoy briefing with all participants of the convoy, civilian and military. The military convoy commander was usually an NCO, E-6 or above, and sometimes a company grade officer, lieutenant or captain. All personnel on the convoy were subject to the authority of the military commander.

18. At every KBR and/or Military Convoy Briefing the following instructions were given:

   A. In the event of that a KBR vehicle comes under attack by rock throwers, small arms or IED the driver is to:

      1. If able, immediately turn on the turn signal on the side of the vehicle from where the attack if coming. Keep that turn signal on through the area of the attack "kill zone" and turn it off once outside the area of the attack.

      2. Immediately radio the KBR convoy commander (military gun truck commanders monitored the KBR radio frequencies and heard all KBR transmissions) notifying him/her of:

   a. The driver's preassigned convoy vehicle number (i.e. "This is truck # 10" meaning this is the 10th KBR vehicle in the convoy).

   b. The nature of the attack. Location of the attacker/s, description of the attacker/s. (i.e., "Small arms fire from roof top of white house on the right side with an orange and white taxi in front of it. Attacker is wearing a blue shirt and brown turban. Attacker appears to be firing an AK47 automatic rifle.)

   c. Description of injury to driver and/or damage to vehicle, especially as it relates to the condition of the driver and the vehicle to continue out of the "kill zone".

 B. That non-convoy, civilian vehicles were to be kept out of the convoy.

   1. Military Gun Truck personnel were given specific instructions and authority as to firing warning shots, disabling shots and lethal shots.

   2. KBR truck drivers were given specific instructions:

     a. Block non-convoy, civilian vehicles from coming along side of KBR vehicle. Especially block out vehicles from coming along side the driver's side. Small arms fire on the driver's side is most effective in taking out the driver.

     b. Strike non-convoy civilian vehicles, knocking them out of the convoy. If possible, use the trailer, not the truck to do this. Using the trailer to strike the intruding vehicle keeps potential VBEDs (Vehicle Born Explosive Devices) as far away from the truck cab and driver as possible.

     c. In the event a non-convoy, civilian vehicle enters the convoy notify the KBR convoy commander. Describe vehicle and location of vehicle and details regarding occupants.

 C. KBR truck drivers were told by the military commanders, "You are the eyes and ears of the convoy. We need you to let us know what is going on out there."

19. At some military briefings the military convoy commander asked how many KBR drivers were "prior military" Usually 70% or more were "prior military". The military convoy commander would say something like "In the event the convoy is overrun, we expect you to defend yourselves and defend the convoy when weapons become available."

20. Written material sent to prospective KBR contractors, prior to orientation in Houston, stated that no camouflage or military looking clothing was allowed to be worn. Weapons of any kind were prohibited.

21. Kevlar Ballistic Combat Helmets and Body Amour issued by KBR to contractors going to Iraq was blue in color.

22. KBR drivers sometimes drove civilian looking vehicles such as white Mercedes-Benz or Volvo, Cab Over Engine Trucks. Sometimes they drove totally desert camouflaged, military vehicles. At times totally desert camouflaged, military, non-gun truck vehicles driven by military personnel were part of the convoy mixed with military vehicles or civilian vehicles driven by KBR civilians. Sometimes non KBR civilian vehicles were included in the convoy. Sometimes military troop trucks, filled with military personnel were part of the convoy.

23. The main military vehicles driven by KBR civilian drivers were:

    A. M915 Series Heavy Trucks with fuel tanker, flatbed, refrigerator or water tanker trailers.

    B. M-1070 HETS Heavy Equipment Transporter System (Oshkosh) w/M-1000 Semi-trailer. Primary function is to transport 70 ton Main Battle Tank.

    C. M1074 / M1075 Palletized Load System (PLS)

24. Armed Military personnel often road "shot-gun" in vehicles driven by civilians.

25. Civilians never rode in vehicles driven by military personnel unless for rescue or medivac purposes.

26. Military personnel never drove civilian looking vehicles.

27. Military vehicles that could be part or all of a convoy trip included:

    A. M998 High Mobility Multipurpose Wheeled Vehicle (HMMWV or Humvee)
    B. M35 series of trucks, Commonly called the "deuce and a half"
    C. M900 Series 5 Ton Truck
    D. Medium Tactical Vehicle Replacement (MTVR) or 7-Ton
    E. Stryker 8-Wheel Drive Armored Combat Vehicle
    F. M-1 Abrams Tanks
    G. M2/M3 Bradley Fighting Vehicles
    H. Helicopter Gun Ships flying Arial cover.

28. KBR personnel were unarmed. Other Possible plaintiff personnel working for companies like Blackwater U.S.A.are/were armed but wear civilian clothing. An executive of Blackwater U.S.A. testified in 2007 to a U.S. Congressional Committee that their "Rules of Engagement" were that they could "Fire (use deadly force) in self-defense and to protect the lives of Iraqi Civilians."

29. Put together, all these actions of DEFENDANTS show a willingness to blurr and disregard the Provisions of the Geneva Convention. Beyond that, DEFENDANTS were willing to lie to PLAINTIFFS as to PLAINTIFF'S status under the law. PLAINTIFF'S were told to take actions which would make them "illegal combatants" under the Geneva Convention while at the same time being told they would be considered "Prisoners of War" if captured (a designation reserved for legal combatants under the Geneva Convention.)

30. Legal papers written by two U.S. Military officers are attached to this Complaint. One paper deals with issue of "Civilians Accompanying the Armed Forces" the other with "Intermediate Levels of Recognition for Partial Compliance" Both papers recognize existing situations on the modern battlefield and the need to amend the Rules of War to make them more effective in protecting civilians.

   A. Article III of the attached legal paper by J. Ricou Heaton inclues a discussion of who is a combatant, who is a civilian and what constitutes "direct participation in hostilities". Even the most restrictive view set out by Major Heaton defines those activities as, "direct causal relationship between the activity engaged in and the harm done to the enemy at the time and the place where the activity takes place." Acting like a forward observer or like a sniper spotter for the military gun trucks and using heavy trucks as a weapon, like a tank is used as a crushing weapon, surely is included in the meaning of "direct participation in hostilities".

   B. In the attached legal paper by Eric Talbot Jensen, the author repeatedly uses the phrase, "all-or-nothing," nature of combatant status, as defined by The Geneva Conventions. While Lt. Col. Jensen mainly refers to al Qaeda, the Taliban and enemy forces in Iraq as examples of those who receive "nothing" under the current law, the same would be true for civilians with the U.S. Military in combat.

   C. On Page 223 of Lt. Col. Jensen's paper he makes a statement about combatant status, " The most important benefit is combatant immunity; there are others of great value as well, such as repatriation after the war; specific limitations on living conditions, work requirements, correspondence and relief packages, and limitations on disciplinary and judicial proceedings."

   D. On that same page, foot note number 71 quotes a statement by Gabor Rona "...noting that the United States' position would afford enemy combatants neither GPW privileges nor GCC privileges but would leave them in a 'legal black hole.'" PLAINTIFFS herein are left in that same "legal black hole".

   E. Lt. Col. Jensen makes a statement on Page 223 that is very chilling to PLAINTIFFS. He begins the paragraph by making a reference to Professor Derek Jinks and then says, "Professor Jinks has recently argued that these privileges attending combatant status are not significantly more extensive than those privileges offered to civilians under the GCC. However, the one major exception to this is the lack of criminal sanction for normally illegal acts such as killing and the destruction of property granted to combatants. Even Jinks agrees that '[i]n the end, the unique protective significance of POW staus is combatant immunity.' This blanket immunity for warlike acts that fit within the law of armed conflict turns a murderer into a soldier doing his duty to his sovereign."

   F. Out of the "legal black hole" PLAINTIFFS carry a black mark on themselves. They are are not "soldiers doing their duty" in a legal way. There is no legal place for them under the current law. Not being inside the law they are outside the law, "outlaws".

31. Attached letters dated October 1, 2006, February 14, 2007, April 24, 2007 and July 18, 2007 from Plaintiff LOUIS LUTZ to KBR, The U.S. Secretary of Defense, The U.S. Secretary of State (cc: The U.S. Attorney General) and the Defendant, THE PRESIDENT, show the effort on PLAINTIFF'S part to quietly and respectfully settle this manner. PLAINTIFF received no responses to these letters.

32. A memo and letter dated July 30, 2005 by Plaintiff, LOUIS LUTZ, is attached. The purpose of the letter to then Secretary of Defense Donald Rumsfeld was to request an increase in pay and benefits for KBR Heavy Truck Drivers in Iraq. One of justifications given for the increase was that, "It is implied on every convoy if not spoken directly, that in case our military escorts are over run, we will pick up "available" military weapons and defend the convoy." This letter is included herewith as evidence that KBR knew that their civilian drivers were being told to do combat if needed.

33. A memo dated January 25, 2002 by Alberto R. Gonzales for The President is attached hereto. In it Mr. Gonzales acknowledges that the Geneva Conventions are not suited for the modern battlefield in saying, "More importantly, as noted above, this is a new type of warfare – one not contemplated in 1949 when the GPW was framed..." and "In my judgment, this new paradigm renders obsolete Geneva's strict limitations ..." Mr. Gonzales does not recommend beginning a process to amend the current laws of war. He does, however, recommend in the fourth and second to last paragraphs that The President apply the "principles of GPW" to the conflict..." Principles support law and laws support principles. In Texas the principle for operating a motor vehicle is "Drive Friendly". No one is arrested for violating the principle.

34. A "black mark" is now on the PLAINTIFFS. The "black mark" is not a violation of principle but of law. PLAINTIFFS are a class of criminals under the Geneva Conventions. A verdict in favor of PLAINTIFFS will therefore be an acknowledgment of that fact. The court will acknowledge that, according to The International Treaty called "Geneva Conventions of August 12, 1949," as amended, this is the unfortunate condition of PLAINTIFFS. The full personal and legal ramifications on PLAINTIFFS are unknown, none appear good.

35. DEFENDANTS, having supperior knowledge of PLAINTIFF'S legal standing when accompanying the military in combat, withheld that information, giving false information, "You will be considered POWs if captured."

36. Many of the PLAINTIFFS would have volunteered to go and "support our troops", even knowing they would be considered "illegal combatants" with no GPW protection. Their sense of duty and love of country would have prevailed and the black mark of "illegal combatant" would have been just one more danger they were willing to bear. To lie to PLAINTIFFS may have been expedient for DEFENDANTS but it was unnecessary and makes it all the more hurtful to PLAINTIFFS. Enemy combatants are fighting, dying, being captured and incarcerated knowing they have no legal standing under GPW. Civilians with the U.S. military are willing to do the same. They are no less committed to the cause of their country than the enemy is committed to his cause.

37. DEFENDANTS should have made full disclosure to PLAINTIFFS letting PLAINTIFFS know that the Laws of War are indeed lagging behind the reality of the modern battle field. PLAINTIFF could have been told that Defendant, THE PRESIDENT, was working on getting the law modernized for the sake of all parties in the conflict. This was not done, in fact PLAINTIFF'S, repeated requests, over a ten month period (from October, 2006 through August, 2007) that DEFENDANTS take action to begin the process of amending the current law have been ignored.

38. DEFENDANTS have shown that they see no need to respond to PLAINTIFF's concerns and have shown that they have no need to protect the tax payers from the consequences of losing this lawsuit. DEFENDANTS could have communicated to PLAINTIFF what remedial actions were being taken and pointed out to PLAINTIFF his errors in thinking, but this has not been done. This suggests that DEFENDANT has done nothing to correct the situation. This also suggests that DEFENDANT knows that PLAINTIFF is correct in his thinking.

39. The highest function of Defendant, THE PRESIDENT, above all other duties and concerns is to, "Protect and defend The Constitution of The United States". Many elected and appointed officials, judges and all U.S. Military personnel take similar oaths, to "Support and defend The Constitution of The United States". Of all the extremely important things that these people could promise or pledge to do, they pledge simple to "Support and defend The Constitution of The United States" and to do their jobs. Article VI of The Constitution says that it (The Constitution) and "all treaties made" are the "supreme law of the land". Supporting and defending "the supreme law of the land" is the highest function of Defendant, THE PRESIDENT.

40. Each president recites the following oath, in accordance with Article II, Section I of the U.S. Constitution: "I do solemnly swear (or affirm) that I will faithfully execute the office of President of the United States, and will to the best of my ability, preserve, protect and defend the Constitution of the United States."

41. The wordings of the current oath of enlistment and oath for commissioned officers of The U.S. military are as follows:

> "I, _____, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to regulations and the Uniform Code of Military Justice. So help me God." (Title 10, US Code; Act of 5 May 1960 replacing the wording first adopted in 1789, with amendment effective 5 October 1962).

> "I, _____ (SSAN), having been appointed an officer in the Army of the United States, as indicated above in the grade of _____ do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign or domestic, that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservations or purpose of evasion; and that I will well and

faithfully discharge the duties of the office upon which I am about to enter; So help me God." (DA Form 71, 1 August 1959, for officers.)

42. It is clear that the founding fathers and framers of The Constitution decided that the nation they were founding would be a nation governed by "The rule of law" This founding principle was intended to be a safeguard against arbitrary governance. PLAINTIFFS have and continue to, "Support our Truoops" in combat. Now PLAINTIFFS seek to "support and defend the Constitution of The United States" even to their own harm. PLAINTIFFS realize that if this country is to continue to be "the land of the free" it must also be "the home of the brave"

43. PLAINTIFFS ask the court to join us in this effort.

## VI. PRAYER FOR RELIEF

44. WHEREFORE, PREMISES CONSIDERED, Plaintiff LOUIS LUTZ, and all others similarly situated respectfully request that upon final hearing, the Court grant Plaintiff LOUIS LUTZ, and all others similarly situated relief as follows:

45. $50 billion in actual damages and $50 billion in punitive damages to be paid to Plaintiffs by Defendants.

46. That the court order Defendant, THE PRESIDENT, to appoint a commission to immediately begin a process to formulate an amendment(s) to The Geneva Conventions and then negotiate with the other nations of the Earth to agree to the amendments. That, said amendment place on "civilians with the military in combat" the distinction of being "legal combatants" (and therefore legal targets for the enemy forces) and causing them to have the legal standing of "Prisoners of War" if captured. That every effort be made to make the provisions of the amendment retroactive to September 11, 2001 thus removing the "black mark" from PLAINTIFFS.

47. That Plaintiff LOUIS LUTZ be appointed to said commission by Defendant, THE PRESIDENT OF THE UNITED STATES to monitor and participate in the process.

## VII JURY DEMAND

48. Plaintiff, LOUIS LUTZ, and all others similarly situated make a formal demand for a jury trial in the matter discussed above.

## VIII  ATTORNEY'S FEES

49. Plaintiff LOUIS LUTZ, and all others similarly situated are entitled to recover attorney's fees and cost for bringing this action.

Respectfully submitted,

*[signature]*

LOUIS EDWARD LUTZ, JR.
7805 Laver Ct.
Fort Worth, TX. 76112