7805 Laver Ct.
Fort Worth, TX 76112
682-553-7060
Louis_Edward_Lutz_Jr@yahoo.com
April 24, 2007


Secretary of State Condoleezza Rice
U.S. Department of State
2201 C Street NW
Washington, DC 20520


Re: U.S. Civilians in Combat, Violation of Geneva Conventions

Dear Madam Secretary:

This letter is my last effort to privately deal with an ongoing situation before involving
legal counsel. If this fails then my next step would be to have interested legal counsel file
a suit in international court against The United States and its military contractors in Iraq.
This suit would be followed by a class action suit in Federal Court.

The damage done is this, The United States, directly and through its military contractors,
has caused civilians to become illegal combatants under the terms of the Geneva
Conventions. Having established a criminal record (according to international law) these
individuals are now subject to the consequences of their actions.

Attached are letters sent to KBR and DOD with a legal brief on the issue.

Set out in the letters is the way I desire to settle my complaint. I wish to serve The
United States by directly contributing to the process of amending the protocols to The
Geneva Conventions.

I look forward to your positive response.

Respectfully,

Louis Lutz

CC:    Attorney General Alberto R. Gonzales
       U.S. Department of Justice
       950 Pennsylvania Avenue, NW
       Washington, DC 20530-0001

Encl: Brief on Civilians in Combat

7805 Laver Ct.
Fort Worth, TX 76112
February 14, 2007

Dr. Robert M. Gates
Secretary of Defense
1000 Defense Pentagon
Washington, DC 2031-1000

Re: Civilians in Combat, The Geneva Conventions

Dear Mr. Secretary:

In a TV interview following the Congressional hearings on February 7, 2007, an executive of Blackwater USA explained the rules of engagement in Iraq. He said our military was authorized to engage offensively as well as defensively while civilians were limited to defensive engagements. Those defensive rules include authority for our armed civilians to defend Iraqi civilians.

These rules are reasonable but illegal under the Geneva Conventions.

Attached is a letter and legal brief I sent to KBR on October 1, 2006. In it I offered my services to correct the problem.

Beyond working to update the Geneva Conventions, I offered to represent The United States in talks with enemy combatant groups under Article 3 of the Geneva Conventions of 1949 which states in part:

"The Parties to the conflict should further endeavor to bring into force, by means of special agreements, all or part of the other provisions of the present Convention. "

The "Civilian Reserve Corps" presented by President Bush in his 2007 State of The Union Address is enthusiastically supported by veterans and other like minded civilians. It should be supported by our law makers in Congress as well. All such support would evaporate however when it is widely known that many of those civilians in combat are (will be) "Illegal Combatants" under our current rules of engagement.

Changing the law to harmonize with the current situation will be a drawn out process. Laws often drag behind the times. For the sake of our national defense this effort needs to begin now.

Thank you.

Respectfully,


Louis Lutz

Louis E. Lutz, Jr.
7805 Laver Ct.
Fort Worth, TX. 76112
817-446-7660
Louis_Edward_Lutz_Jr@yahoo.com
October 1, 2006


Jim Lehmann
KBR
Senior Vice President and General Counsel Legal
4100 Clinton Drive
Houston, TX 77020-6237

Re:  Status of Civilians Accompanying the Military, "Illegal Combatants"

Dear Mr. Lehmann:

The broadcast this week on "Nightline" of a video made by a KBR convoy driver in Iraq has triggered this letter. The issue raised there pales in comparison with the issue raised here.

I was a KBR convoy driver in Iraq for 18 months. I completed my contract on April 3, 2006.  My first hand experience in Iraq with The United States military lead me to conclude that they are the best, most professional military force in the world and perhaps the best ever fielded by The United States of America. Not least of all was their spirit. I never heard them complain.

What we have in our military must be preserved.  The "All Volunteer Force" is foundational I think. A reinstitution of the draft would quickly bring in the manpower needed but at the cost of destroying the morale and professional quality which our military now has.

A key to maintaining our existing combat structure is by using civilians with our military, in as many positions as possible. This is being done. The 911 attack may have pushed us to respond reasonably but not necessarily legally, in our use of civilians with the military. This is the subject of the enclosed report by U.S. Air Force Major J. Ricou Heaton.

It is my testimony, and that of every convoy truck driver in Iraq, that we were ordered by our military convoy commanders to take actions in combat situations which most people would consider "self defense".  In war however, those orders carried out, may have made us "illegal combatants", criminals under the Geneva Conventions.

In his article, Major Heaton points out that part of the problem is that civilians in the combat area are unaware that they may be considered "illegal combatants" under the Law of War. This was certainly my case. I discovered Major Heaton's article on August 28, 2006.  I was actually involved in a mediation process with KBR over other issues from Iraq when I became aware of this issue. I have since dropped that mediation in order to concentrate on this much more serious issue.

I don't know how long it will be before someone else will put together what is already public with what is actually happening on the battlefield.

In the hands of unfriendly people this information is a club. They will use it to pound away at President Bush, The Department of Defense and KBR. Actual events and possible violations of The Law of War will be taken out of context. The sharks will circle what they perceive as fresh blood in the water. Things could be blown out of proportion as photos from "Nightline" become as well known as photos from Abu Ghraib.

I was there. I am one of the offended parties. I was left in the dark by my government and KBR. I understand the anger and even rage that will come from drivers and especially from the families of drivers killed in Iraq.

How arrogant are those who would denegrate the patriotism and bravery of those drivers who knowingly risk life, limb or capture by a cruel enemy, by withholding from them information of one additional danger.

This war on terror may still be in its beginning stages. We need our military to be as strong as possible. We need KBR and other industry partners to be as strong as possible. I want to be a part of seeing to that. This will require the consent and participation of The Federal Government therefore I ask that a copy of this letter be forwarded to The Secretary of Defense.

I propose that I be hired by KBR with the specific assignment of being an industry representative on a commission or committee formed by The United States Government whose purpose is to present to the parties to The Geneva Convention an amendment/protocol to the conventions regarding civilians with the military in combat.

My initial duty would be to become an expert in this area of International Law and practice. I ask The Department of Defense to allow Major Heaton to assist me in this. My preparation work would be done primarily at New York City, Washington, D.C. and my home town of Fort Worth, TX.

I would expect to be hired immediately, to be on the committee or commision within six months and that within one year from the onset of this work the commission would have an amendment/protocol to present to the world community. By that time I will have become sufficiently expert in the field to represent The United States on the subject.

Article 3 of the Geneva Conventions of 1949 states in part:

"The Parties to the conflict should further endeavor to bring into force, by means of special agreements, all or part of the other provisions of the present Convention. "

Under this provision I further further expect and respectfully propose that The United States Government send me as a special representative to the enemy parties involved in the present conflict.

Besides showing my resolve to support our troops in a dangerous situation in Iraq I have other experience which commends me for this task.

Never the best academically, I did as a teen become one of the youngest Eagle Boy Scouts in Massachusetts. Having been drafted in 1968 I became one of the youngest graduates from The U.S. Army Engineering OCS in 1969 and served in Vietnam. Eventually I graduated "dean's list" from The University of Texas School of Business.

Most of my work experience has been in oil and gas exploration as a "landman". In 1979 I resigned my job as land manager of a substantial independent oil and gas company in Laredo, Texas to run for the U.S. House of Representatives. My other political work involved the Carter presidential campaign in Austin, Texas and county campaign manager work with the Bill Clements for Governor Campaign.

My oil and gas consulting work extended to Harken Energy, the company for which President Bush was a director. President Bush was running for Governor against Ann Richards at the time. President Bush does not know my name but would know who I am because of things that I brought up to the Chairman of Harken, things that would have affected the Bush Gubernatorial race had they come to light.

My wife Linda and I have shared 36 years together and six children. We also share like faith.

It is this faith that gives a uniqueness to my qualification to face our current enemies.

All who know our enemy know that they respect two things, courage and faith. I know I can sit with our enemies without fear. I will speak and listen with respect and wisdom.

In order for these conversations to take place I must be sent and received. Discussing the Law of War is the platform for both. The United States is completely justified in sending me under Article 3 of the Geneva Conventions. The enemy is completely justified in receiving me if for no other reason than to make complaint about what they perceive as violations of The Laws of War by The United States. What is certain is that dialog will be happening.

KBR and The United States Government has an opportunity to show good faith and solidarity with its civilian work force in the combat zone and especially its convoy truck drivers by granting my request.

I look forward to receiving your positive response within the next two weeks.

Sincerely,

Louis Lutz

# MEMO

**7/30/2005**

To:        Wayne Graham
             Foreman, Flatbed Section, KBR
             Camp Anaconda, Iraq

FROM:    Louis Lutz
             Heavy Truck Driver, KBR, Employee # 322507
             Camp Anaconda, Iraq

Attached is a letter to Secretary of Defense Donald Rumsfeld. Please forward the letter and this memo through our KBR chain of Authority to Secretary Rumsfeld.

We are thankful for the opportunity to drive with the brave members of our military.

"We Deliver", proudly.

Thank you.

Louis Lutz
KBR
APO AE 09391

E-Mail: Louis_Edward_Lutz_Jr@Yahoo.com
July 30, 2005

VIA: KBR Chain of Command/Authority

Donald H. Rumsfeld
Secretary of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

RE: Amendment to Contracts dealing with KBR Heavy Truck Drivers in Iraq

Dear Mr. Secretary:

We would first like to express our thanks for the opportunity to drive with the soldiers, sailors,
airmen and marines serving in Iraq.

They appreciate our delivering the stuff they need. We literally "Support the Troops" and they
support us.

This letter is a request by the KBR Heavy Truck Drivers in Iraq for changes in the compensation
and benefit provisions to the contracts under which we operate.

The nature of heavy truck driving in Iraq requires skills not required outside this theatre, skills that
need to be compensated for.

Convoy tactics themselves require unusual skills and personal courage from everyone on the
convoy. Here, drivers are even routinely required to change tires without pneumatic tools and to
recover disabled vehicles under hostile enemy conditions. Many drivers have "combat live saver"
certification. We are trained in combat communication, dessert survival and "escape and evasion".

It is implied on every convoy if not spoken directly, that in case our military escorts are over run,
we will pick up "available" military weapons and defend the convoy.

The contract base pay for KBR Heavy Truck Drivers is currently $36,000.00 per year. KBR is
recruiting drivers with three to five years experience. Drivers in The States with that level of
experience who are not making $45,000.00 per year are not working very hard or very smart. We
request that our base pay be increased to $48,000.00 per year. This will reflect the current market
for American truck drivers and compensate for the added skills required in Iraq.

1

We request that the life insurance death benefit be increased from the current $50,000.00 to $700,000.00. (Retroactive to the date of The KBR "LOGCAP III" contract please).

We request time and a half pay for all hours worked over 40 hours per week.

That uplift pay be paid on all hours worked not just the first 40 hours worked.

That fuel tanker drivers receive a full 10% increase in hazard/uplift pay because of the extreme danger of hauling that freight.

That pay while being held captive be twice what would have been paid.

Thank you.

Sincerely,


Louis Lutz
KBR Heavy Truck Driver
Employee ID # 322507

DRAFT
1/25/2002 – 3:30 pm

January 25, 2002

MEMORANDUM FOR THE PRESIDENT

FROM:        ALBERTO R. GONZALES

SUBJECT:     DECISION RE APPLICATION OF THE GENEVA CONVENTION ON PRISONERS OF
             WAR TO THE CONFLICT WITH AL QAEDA AND THE TALIBAN

Purpose

On January 18, I advised you that the Department of Justice had issued a formal legal opinion concluding that the Geneva Convention III on the Treatment of Prisoners of War (GPW) does not apply to the conflict with al Qaeda. I also advised you that DOJ's opinion concludes that there are reasonable grounds for you to conclude that GPW does not apply with respect to the conflict with the Taliban. I understand that you decided that GPW does not apply and, accordingly, that al Qaeda and Taliban detainees are not prisoners of war under the GPW.

The Secretary of State has requested that you reconsider that decision. Specifically, he has asked that you conclude that GPW does apply to both al Qaeda and the Taliban. I understand, however, that he would agree that al Qaeda and Taliban fighters could be determined not to be prisoners of war (POWs) but only on a case-by-case basis following individual hearings before a military board.

This memorandum outlines the ramifications of your decision and the Secretary's request for reconsideration.

Legal Background

As an initial matter, I note that you have the constitutional authority to make the determination you made on January 18 that the GPW does not apply to al Qaeda and the Taliban. (Of course, you could nevertheless, as a matter of policy, decide to apply the principles of GPW to the conflict with al Qaeda and the Taliban.) The Office of Legal Counsel of the Department of Justice has opined that, as a matter of international and domestic law, GPW does not apply to the conflict with al Qaeda. OLC has further opined that you have the authority to determine that GPW does not apply to the Taliban. As I discussed with you, the grounds for such a determination may include:

- A determination that Afghanistan was a failed state because the Taliban did not exercise full control over the territory and people, was not recognized by the international community, and was not capable of fulfilling its international obligations (e.g., was in widespread material breach of its international obligations).

- A determination that the Taliban and its forces were, in fact, not a government, but a militant, terrorist-like group.

OLC's interpretation of this legal issue is definitive. (The Attorney General is charged by statute with interpreting the law for the Executive Branch. This interpretive authority extends to both domestic and international law. He has, in turn, delegated this role to OLC. Nevertheless, you should be aware that the Legal Adviser to the Secretary of State has expressed a different view.

<u>Ramifications of Determination that GPW Does Not Apply</u>

The consequences of a decision to adhere to what I understood to be your earlier determination that the GPW does not apply to the Taliban include the following:

Positive:

* Preserves flexibility:
  o As you have said, the war against terrorism is a new kind of war. It is not the traditional clash between nations adhering to the laws of war that formed the backdrop for GPW. The nature of the new war places a high premium on other factors, such as the ability to quickly obtain information from captured terrorists and their sponsors in order to avoid further atrocities against American civilians, and the need to try terrorists for war crimes such as wantonly killing civilians. In my judgment, this new paradigm renders obsolete Geneva's strict limitations on questioning of enemy prisoners and renders quaint some of its provisions requiring that captured enemy be afforded such things as commissary privileges, scrip (i.e., advances of monthly pay), athletic uniforms, and scientific instruments.
  o Although some of these provisions do not apply to detainees who are not POWs, a determination that GPW does not apply to al Qaeda and the Taliban eliminates any argument regarding the need for case-by-case determinations of POW status. It also holds open options for the future conflicts in which it may be more difficult to determine whether an enemy force as a whole meets the standard for POW status.
  o By concluding that GPW does not apply to al Qaeda and the Taliban, we avoid foreclosing options for the future, particularly against nonstate actors.
* Substantially reduces the threat of domestic criminal prosecution under the War Crimes Act (18 U.S.C. 2441).
  o That statute, enacted in 1996, prohibits the commission of a "war crime" by or against a U.S. person, including U.S. officials. "War crime" for these purposes is defined to include any grave breach of GPW or any violation of common Article 3 thereof (such as "outrages against personal dignity"). Some of these provisions apply (if the GPW applies) regardless of whether the individual being detained qualifies as a POW. Punishments for violations of Section 2441 include the death penalty. A determination that the GPW is not applicable to the Taliban would mean that Section 2441 would not apply to actions taken with respect to the Taliban.
  o Adhering to your determination that GPW does not apply would guard effectively against misconstruction or misapplication of Section 2441 for several reasons.
    o First, some of the language of the GPW is undefined (it prohibits, for example, "outrages upon personal dignity" and "inhuman treatment"), and it is difficult to predict with confidence what actions might be deemed to constitute violations of the relevant provisions of GPW.
    o Second, it is difficult to predict the needs and circumstances that could arise in the course of the war on terrorism.
    o Third, it is difficult to predict the motives of prosecutors and independent counsels who may in the future decide to pursue unwarranted charges based on Section 2441. Your determination would create a reasonable basis in law that Section 2441 does not apply, which would provide a solid defense to any future prosecution.

Negative:

On the other hand, the following arguments would support reconsideration and reversal of your decision that the GPW does not apply to either al Qaeda or the Taliban:

Since the Geneva Conventions were concluded in 1949, the United States has never denied their applicability to either U.S. or opposing forces engaged in armed conflict, despite several opportunities to do so. During the last Bush Administration, the United States stated that it "has a policy of applying the Geneva Conventions of 1949 whenever armed hostilities occur with regular foreign armed forces, even if arguments could be made that the threshold standards for the applicability of the Conventions . . . are not met."

- The United States could not invoke the GPW if enemy forces threatened to mistreat or mistreated U.S. or coalition forces captured during operations in Afghanistan, or if they denied Red Cross access or other POW privileges.
- The War Crimes Act could not be used against the enemy, although other criminal statutes and the customary law of war would still be available.
- Our position would likely provoke widespread condemnation among our allies and in some domestic quarters, even if we make clear that we will comply with the core humanitarian principles of the treaty as a matter of policy.

- Concluding that the Geneva Convention does not apply may encourage other countries to look for technical "loopholes" in future conflicts to conclude that they are not bound by GPW either.
- Other countries may be less inclined to turn over terrorists or provide legal assistance to us if we do not recognize a legal obligation to comply with the GPW.
- A determination that GPW does not apply to al Qaeda and the Taliban could undermine U.S. military culture which emphasizes maintaining the highest standards of conduct in combat, and could introduce an element of uncertainty in the status of adversaries.

## Response to Arguments for Applying GPW to the al Qaeda and the Taliban

On balance, I believe that the arguments for reconsideration and reversal are unpersuasive.

- The argument that the U.S. has never determined that GPW did not apply is incorrect. In at least one case (Panama in 1989) the U.S. determined that GPW did not apply even though it determined for policy reasons to adhere to the convention. More importantly, as noted above, this is a new type of warfare — one not contemplated in 1949 when the GPW was framed — and requires a new approach in our actions towards captured terrorists. Indeed, as the statement quoted from the administration of President George Bush makes clear, the U.S. will apply GPW "whenever hostilities occur *with regular foreign armed forces*." By its terms, therefore, the policy does not apply to a conflict with terrorists, or with irregular forces, like the Taliban, who are armed militants that oppressed and terrorized the people of Afghanistan.
- In response to the argument that we should decide to apply GPW to the Taliban in order to encourage other countries to treat captured U.S. military personnel in accordance with the GPW, it should be noted that your policy of providing humane treatment to enemy detainees gives us the credibility to insist on like treatment for our soldiers. Moreover, even if GPW is not applicable, we can still bring war crimes charges against anyone who mistreats U.S. personnel. Finally, I note that our adversaries in several recent conflicts have not been deterred by GPW in their own mistreatment of captured U.S. personnel, and terrorists will not follow GPW rules in any event.
- The statement that other nations would criticize the U.S. because we have determined that GPW does not apply is undoubtedly true. It is even possible that some nations would point to that determination as a basis for failing to cooperate with us on specific matters in the war against terrorism. On the other hand, some international and domestic criticism is already likely to flow from your previous decision not to treat the detainees as POWs. And we can facilitate cooperation with other nations by reassuring them that we fully support GPW where it is applicable and by acknowledging that in this conflict the U.S. continues to respect other recognized standards.

3

- In the treatment of detainees, the U.S. will continue to be constrained by (i) its commitment to treat the detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of GPW, (ii) its applicable treaty obligations, (iii) minimum standards of treatment universally recognized by the nations of the world, and (iv) applicable military regulations regarding the treatment of detainees.

- Similarly, the argument based on military culture fails to recognize that our military remain bound to apply the principles of GPW because that is what you have directed them to do.

Louis Lutz
7805 Laver Ct.
Fort Worth, TX. 76112
682-553-7060
Louis_Edward_Lutz_Jr@yahoo.com
July 18, 2007

The Honorable, George W. Bush
PRESIDENT OF THE UNITED STATES OF AMERICA
The White House
1600 Pennsylvania Avenue NW,
Washington, DC 20500.

Jim Lehmann
Senior Vice President and General Counsel Legal
KELLOGG BROWN & ROOT, INC
4100 Clinton Drive
Houston, TX 77020-6237

Re: Filing of Law Suit, Lutz v President et al

Dear Mr. President and KBR:

The attached law suit will be filed within a few days if I receive no response to this letter.

Winning this law suit means that the District Court of Eastern New York will declare me
and the other members of our plaintiff class, international criminals under The Laws of
War. Not something most people strive for.

The declared verdict will not really change anything. It will just confirm what exists and
make it more public. According to the law I was an illegal combatant. My ignorance (or
ignoring) of the law will not be an excuse.

Perhaps I would have looked into the law more closely if the lure of making big, tax free
money hadn't been there. (If plaintiffs had been drafted or forced into the situation The
Geneva Convention would have given ground to disobey an unlawful order by the
government.)

In the suit I request that the court allow me to represent a large class of people. Every
civilian who worked for The U.S. Government or its contract companies in Iraq and
Afghanistan is a potential plaintiff. Conversely every contract company could be a
defendant.

Much has been published about the status of combatants fighting the coalition forces in
Iraq and Afghanistan. According to The Geneva Convention they do not have "Prisoner
of War" status because they are/were not "legal combatants".

Little has been published about the status of civilians with the military in combat. The filing of this lawsuit will spotlight the law and the facts. Neither plaintiff nor defendant is going to come out of this looking good. You and the other defendants are use to the spotlight, have chosen the spotlight. I and the other plaintiffs have not.

The initial reaction of my fellow plaintiffs will be anger. Not towards you but towards me. "What is the problem? We served honorably! You have put us on public display as criminals when we went to help our families and our country. Why could you not leave well enough alone? " They will say to me.

Later some will become angry with you. Some will see the betrayal, the concealment.

Many will maintain that we did nothing wrong. That what we did was reasonable and self defensive in nature. I will agree with them in part. The problem is that it was against the law and the law matters.

(War has rules like football has rules. According to football rules, huge men, players, can enter the field of play and knock each others heads off, no problem. A fan is not allowed on the field and if he goes onto the field and is knocked down by a player, or another fan on the field, he can not strike back and call it self-defense.)

When the verdict in this case comes in, nobody will go to jail, not in this country. As time passes, nations not so friendly to The United States may examine more closely the individuals entering with passport stamped by Iraq and Afghanistan. Limitations on freedom of travel and other negative conditions may be threatened or invoked.

The black mark is on the plaintiffs regardless of the verdict by this particular court. Perhaps we were too dumb or lazy to check things out for ourselves before we signed on. Perhaps we trusted to much.

The demand in the suit is for the payment of actual and punitive damages and an order by the court that defendants take corrective action. That action is the formation of a committee or commission to formulate changes to the protocols to The Geneva Conventions.

The attached suit, if filed, will be as shown with the addition of this letter.

I look forward to your immediate response.

Respectfully,

Louis Lutz

# Combatant Status: It Is Time for Intermediate Levels of Recognition for Partial Compliance

### ERIC TALBOT JENSEN[*]

———————————

I.  History of Combatant Status................................................ 214
II.  Combatant Status under Current International Law ................. 218
   A.  Analysis of Article 4 of the GPW ................................... 220
   B.  Protections for Noncombatants....................................... 224
   C.  GPI Arguments ........................................................... 226
III.  Evolve the Law to Allow Intermediate Levels of
   Recognition for Partial Compliance ......................................... 232
IV.  Specific Provisions ..................................................... 235
   A.  Immunity from Speech or Association Crimes
       Connected with Political Beliefs ................................... 236
   B.  No Execution of Punishment Until Conflict Resolved... 238
   C.  Offer of Parole, Including Immunity for Weapons
       Crimes not Resulting in Death or Injury......................... 240
   D.  Compliance with International Law as Mitigation at
       Sentencing ............................................................... 243
   E.  No Death Penalty........................................................ 244
   F.  If the Movement Results in International Armed
       Conflict and the Fighter Gets Subsequent Combatant
       Status, the Prior Lawful Warlike Actions Are Also
       Covered by Combatant Immunity ................................... 246
V.  Conclusion ................................................................. 248

* Lieutenant Colonel, Judge Advocate General's Corps, U.S. Army. B.A., Brigham Young University (1989); J.D., University of Notre Dame (1994); LL.M., The Judge Advocate General's Legal Center and School (2001). Operational Law Attorney, Task Force Eagle, Bosnia, 1996. Command Judge Advocate, Task Force Able Sentry, Macedonia, 1997. Chief, Military Law, Task Force Eagle, Bosnia, 1998. Professor, International and Operational Law Department, The Judge Advocate General's Legal Center and School, 2001–04. Deputy Staff Judge Advocate, 1st Cavalry Division, Baghdad, Iraq, 2004–05. Member of the Bars of Indiana and the United States Supreme Court. The views expressed in this article are those of the author and not The Judge Advocate General's Corps, the United States Army, or the Department of Defense.

> We are working at a disadvantage....The lack of uniforms, so
> that you can't define the enemy very well. And the intertwining
> of the enemy with combatants is very, very difficult. So you've
> got combatants and non-combatants mixed together
> intentionally....[I]f you think about just the way that, for
> instance, the Shi'ias could basically in this area right here,
> thousands of pilgrims on their way into this region right here,
> and the militia being able to just take off the black uniforms, and
> blend right in, into all those pilgrims.[1]

> At 4:45, while moving from (UNINTELLIGIBLE) to clear an
> armed enemy—a coalition force was ambushed by enemy
> elements of unknown size. Reports indicate at least 20 rocket
> grenades were observed during the course of the engagement.
> Forty to 50 armed individuals were observed, some wearing
> black pajamas, uniforms, others wearing civilian clothes.[2]

The quotes above come from military operations by coalition forces
in Iraq in April 2004. They highlight a problem that occurs not only in
Iraq, but also in the numerous armed conflicts currently occurring
throughout the world. Modern war is no longer characterized by
"uniformed armies on a large plain, with civilians tucked away safely
far behind the front-lines."[3] Rather, military operations are now
conducted in the contemporary operational environment,[4] which
assumes 360-degree operations against asymmetric opponents[5] who

---

1. Kelly McCann, *CNN Live Sunday: U.S. Helicopter Shot Down in Iraq, Both Pilots Killed; 7 Chinese Citizens Taken Hostage in Iraq* (CNN television broadcast, Apr. 11, 2004) (041104CN.V36), *transcript available at* LEXIS, News File.

2. Brigadier General Mark Kimmitt, *CNN Live Event: Coalition News Briefing* (CNN television broadcast, Apr. 11, 2004) (041101CN.V54), *available at* LEXIS, News File; *see also* Jason Callen, *Unlawful Combatants and the Geneva Conventions*, 44 VA. J. INT'L L. 1025, 1026 (2004) (citing the strategic use of civilian dress by unlawful combatants).

3. Rosa Ehrenreich Brooks, *War Everywhere: Rights, National Security Law, and the Law of Armed Conflict in the Age of Terror*, 153 U. PA. L. REV. 675, 730 (2004) (stating also that "[i]n fact, even the battles of the nineteenth century rarely fit this paradigm, and modern conflict fits this paradigm still less well").

4. *The Contemporary Operational Environment, in* OPERATION ENDURING FREEDOM TACTICS, TECHNIQUES AND PROCEDURES HANDBOOK NO. 02-8, *at http://www.strategypage.com/articles/operationenduringfreedom/chap1.asp* (last visited Sept. 21, 2005).

5. Charles J. Dunlap, Jr., *A Virtuous Warrior in a Savage World*, 8 USAFA J. LEG. STUD. 71, 72 (1997–98) ("In broad terms, 'asymmetrical' warfare describes strategies that seek to avoid an opponent's strengths; it is an approach that focuses whatever may be one side's comparative advantages against their enemy's relative weaknesses."); *see also* Michael N. Schmitt, *The Impact of High and Low-Tech Warfare on the Principle of Distinction*, Harvard Program on Humanitarian Policy and Conflict Research, International Humanitarian Law Research Initiative

strike at known weaknesses, including a nation's compliance with the law of war.[6]

When faced with such opponents, militaries intent on complying with the law of war struggle between the requirements of distinction[7] and their desire to protect non-combatants, and the practical reality of protecting their force from fighters[8] such as those mentioned in the initial quotes who act as combatants when engaging in combat but dissolve into the crowd of non-combatants when faced with opposing military forces.[9] These fighters, who may be members of insurgent

Briefing Paper 1, 2, 12–13 (Nov. 2003), *available at* http://www.ihlresearch.org/ihl/pdfs/briefing3296.pdf (last visited Sept. 21, 2005) (asserting that "military dominance in a conflict, whether State-on-State, as in the war with Iraq, or non-State actor-on-State, as in the case of the Palestinian uprising or transnational terrorism, paradoxically leads disadvantaged opponents to respond asymmetrically with low-tech, albeit highly effective, methods and means"); *cf.* Sylvain Charat, *Three Weapons to Fight Terror,* WASH. TIMES, Sept. 9, 2004, at A23, *available at* LEXIS, News File (alleging that terrorism is the prototypical type of asymmetric warfare).

6. *See* David B. Rivkin, Jr. & Lee A. Casey, *Leashing the Dogs of War,* NAT'L INTEREST, Fall 2003, at 9 (asserting that those who reject the controlling force of law of war create the largest contemporary security threat, and that those groups, in intentional disregard of such law, strategically endanger and attack civilians); *see also* R. George Wright, *Combating Civilian Casualties: Rules and Balancing in the Developing Law of War,* 38 WAKE FOREST L. REV. 129, 131 (2003) (stating that some combatants intentionally ignore the laws of war or manipulate such law to gain strategic advantage); *cf.* William Bradford, *Barbarians at the Gates: A Post-September 11th Proposal to Rationalize the Laws of War,* 73 MISS. L.J. 639, 673–74 (2004) (asserting that the asymmetric nature of respect for the law of war makes deterrence strategies useless against military forces that choose to ignore legal conventions); Col. Charles J. Dunlap, Jr., *Law and Military Interventions: Preserving Humanitarian Values in 21st Century Conflicts,* Carr Center for Human Rights Policy 4, 5 (2001), *available online at* http://www.ksg.harvard.edu/ochrp/Web%20Working%20Papers/Use%20of%20Force/Dunlap2001.pdf (last visited Sept. 21, 2005) (arguing that if the law of war remains as it is, it may be problematic because those who reject the confines of the law of war can manipulate the laws in order to endanger civilians).

7. *See* Mark D. Maxwell, *The Law of War and Civilians on the Battlefield: Are We Undermining Civilian Protections?,* MIL. REV., Sept.-Oct. 2004, at 17–18 (describing the principle of distinction and what steps must be taken in distinguishing between civilians, lawful combatants, and unlawful combatants as well as the implications of this process for targeting decisions); Kenneth Watkin, *Controlling the Use of Force: A Role for Human Rights Norms in Contemporary Armed Conflict,* 98 AM. J. INT'L L. 1, 15–17 (2004); Schmitt, *supra* note 5, at 1, 7; Michael E. Guillory, *Civilianizing the Force: Is the United States Crossing the Rubicon?,* 51 A.F. L. REV. 111, 113–14 (2001); Francisco Forrest Martin, *Using International Human Rights Law for Establishing a Unified Use of Force Rule in the Law of Armed Conflict,* 64 SASK. L. REV. 347, 352 (2001) (arguing that in seeking to minimize civilian casualties in pursuance with international war conventions, states have created the unintended effect of reduced casualty rates among opposing combatants).

8. Daniel P. Schoenekase, *Targeting Decisions Regarding Human Shields: Civilians on the Battlefield,* MIL. REV., Sept.-Oct. 2004, at 26–27; Ken Dilanian, *U.S. Troops Walk the Fine Line,* PHILA. INQUIRER, Feb. 13, 2005, *available at* LEXIS, News File.

9. *See* Edward Wong & Eric Schmitt, *Rebel Fighters Who Fled Attack May Now Be Active Elsewhere,* N.Y. TIMES, Nov. 10, 2004, at A1 (describing insurgents' use of their ability to blend

groups,[10] guerrillas,[11] disaffected citizens,[12] or terrorists,[13] do not receive the protections and benefits of combatant status based on the criteria set out in article 4 of the Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949 (GPW).[14] This combatant status is something they greatly desire because of the attendant combatant immunity for warlike acts.[15]

These battlefield fighters do not receive combatant status because under current international law, this status is an all-or-nothing

---

with civilians to evade U.S. forces in Iraq); *cf.* Laura Lopez, *Uncivil Wars: The Challenge of Applying International Humanitarian Law to Internal Armed Conflicts*, 69 N.Y.U. L. REV. 916, 928–29 (1994) (describing guerrillas' use of civilian clothing to conceal identity).

10. Though terms such as insurgent, guerrilla, and terrorist have specific meaning to specific people, those definitions are often inconsistent; a person who is labeled an insurgent by one may be identified as a guerrilla by another. *See, e.g.,* Matthew Brzezinski, *Surrealpolitik; How a Chechen Terror Suspect Wound up Living on Taxpayers' Dollars Near the National Zoo,* WASH. POST, Mar. 20, 2005 (Magazine), *available at* LEXIS, News File (detailing the quarrel between Russia and the United States over a Chechen leader who has been given asylum in the United States despite the fact that Russians consider him a terrorist); *see also Milan Judge to Sue in 'Guerrillas not Terrorists' Row,* Ansa Eng. Media Serv., Feb. 7, 2005, *available at* LEXIS, News File (describing an Italian judge who angered the Italian government by finding that indicted terror suspects were guerrillas and not terrorists); *cf.* Michael L. Gross, *Bioethics and Armed Conflict: Mapping the Moral Dimensions of Medicine and War,* Hastings Center Rep., Nov. 1, 2004, at 22, *available at* LEXIS, News File; *The U.N. and the Fight Against Terrorism: Hearing of the Int'l Terrorism and Nonproliferation Subcomm. Of the House Int'l Relations Comm.,* Fed. News Serv., Mar. 17, 2005, *available at* LEXIS, News File (highlighting the lack of a concrete international definition of terrorism).

11. *See, e.g., FARC Losing Battle to Government, Analyst Says,* Asia Afr. Intelligence Wire, Oct. 13, 2004, *available at* INFOTRAC, Gale Group File.

12. *See, e.g., Senior U.S. Military Officer Reviews Challenges in Latin America,* States News Serv., Mar. 16, 2005, *available at* LEXIS, News File (discussing the disaffected civilian populace in Bolivia and its effect on the government); *cf.* Bill Torpy, *War Shifts Gears as Allied Troops Tackle Reaching Out to Civilians,* Cox News Serv., Apr. 11, 2003, *available at* LEXIS, News File (citing the importance of military forces cultivating relationships with civilians in the occupied zones).

13. *See, e.g., S. Korea Assessing Iraq Troop Deployment After Death of 2 Civilians,* AFX-Asia, Dec. 1, 2003, *available at* LEXIS, News File (regarding the effect of deliberate targeting of civilians by terrorists in South Korea's decision on whether to send troops to Iraq).

14. Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, *reprinted in* DIETRICH SCHINDLER & JIRI TOMAN, THE LAWS OF ARMED CONFLICTS 434–35 (2d ed. 1981). Mercenaries are also specifically precluded from combatant status. *See* Protocol Additional to the Geneva Conventions of 12 Aug. 1949, and Relating to the Protection of Victims of International Armed Conflict, *adopted* June 10, 1977, 1125 U.N.T.S. 3; *see also* Montgomery Sapone, *Have Rifle With Scope, Will Travel: The Global Economy of Mercenary Violence,* 30 CAL. W. INT'L L.J. 1, 35–37 (1999).

15. Jordan J. Paust, *Current Pressures on International Humanitarian Law: War and Enemy Status after 9/11: Attacks on the Law of War,* 28 YALE J. INT'L L. 325, 330 (2003); *see also* William H. Ferrell, III, *No Shirt, No Shoes, No Status: Uniforms, Distinction, and Special Operations in International Armed Conflict,* 178 MIL. L. REV. 94, 97–98 (2003).

proposition. Either a fighting force qualifies under all the criteria of article 4 of the GPW and receives all the privileges and immunities of combatant status, or a force does not qualify, and is provided no protection above that of any other civilian in the area, and may even be disqualified from the protections afforded to civilians. Given the reality of today's battlefields where the conflict is seldom between the armed forces of two nations, these requirements are counterproductive in the world's attempts to protect noncombatants.[16] Providing fighters none of the benefits of combatant status unless they meet all the requirements of article 4 of the GPW provides a disincentive for fighters to distinguish themselves from the civilian population. Rather, the proscriptions on attacking non-combatants actually give those who would not otherwise get combatant immunity an incentive to move in and out of the civilian population at their convenience.

To remedy this counterproductive state of the law, the all-or-nothing nature of combatant status should evolve to allow for intermediate levels of recognition in response to partial compliance with the traditional combatant requirements. As those on the battlefield comply with portions of the combatant requirements, particularly that of distinguishing themselves from noncombatants, they should accrue privileges commensurate with their efforts. These intermediate privileges should include immunity from prosecution for speech or association crimes connected with political beliefs; abeyance of execution of punishment until conflict is resolved; offer of parole, including immunity for weapons crimes not resulting in death or injury; compliance with international law as a mitigating factor at sentencing; disallowance of the death penalty; and, if the movement which the fighter is a part of eventually achieves combatant status, the fighter's prior lawful warlike actions should also be covered by combatant immunity. Providing intermediate levels of recognition for partial compliance will provide incentives for otherwise unlawful combatants

---

16. *See* George H. Aldrich, *The Hague Peace Conferences: The Laws of War on Land*, 94 AM. J. INT'L. L. 42 (2000) (listing combatant status and protection of noncombatants as two of the top five areas of the law that need further development in the early 21st century); *see also* Lt. Col. Paul Kantwill & Maj. Sean Watts, *"Hostile Protected Persons" or "Extra-Conventional Persons": How Unlawful Combatants in the War on Terrorism Posed Extraordinary Challenges for Military Attorneys and Commanders*, 28 FORDHAM INT'L L.J. 681, 705–08 (2005) (detailing the U.S. Administration's lack of consideration of the Geneva Convention Relative to the Protection of Civilian Persons In Time of War when considering the status of fighters captured in Afghanistan during the global war on terror).

to comply with international law without eroding the maximum benefits offered to those who comply with all requirements of combatant status.

This Article will begin by briefly reviewing the history of combatant status under international law. It will then review the current international law of combatant status, including an analysis of article 4 of the GPW and the requirements and privileges associated with combatant status. The principle of distinction and protection for noncombatants will be reviewed, with particular attention to how the current rules for combatants do not support this principle. The Article will then examine how developing trends are also counterproductive to the protection of combatants, as illustrated by the controversial provisions on combatant status in the 1977 Protocol Additional to the Geneva Conventions of August12, 1949, and Relating to the Protection of Victims of International Armed Conflicts (GPI).[17] This discussion will be followed by an explanation of how changing the law to provide intermediate levels of recognition for partial compliance with the law of war will give fighters an incentive to distinguish themselves, thereby increasing protections to noncombatants.

## I.    HISTORY OF COMBATANT STATUS

Though almost every culture has had rules concerning the conduct of hostilities,[18] the modern law of armed conflict, including the idea of combatant status, is generally a western notion[19] and began developing (particularly in the area of defining who is a combatant) during the age of chivalry.[20] During these times of knighthood and its limited warrior class, including the *jus militare*, certain ideas of who should and should

---

17. *See* Protocol Additional to the Geneva Conventions of 12 Aug. 1949, *supra* note 14, 1125 U.N.T.S. at 23–25. The United States recognizes portions of GPI as customary international law. *See generally* Michael J. Matheson, *The United States Position on the Relation of Customary Law to the 1977 Protocols Additional to the 1949 Geneva Conventions*, 2 AM. U. J. INT'L L. & POL'Y 419 (1987) (discussing which articles of GPI the United States believes are customary international law and to which the United States objects).

18. *See, e.g.*, SUN TZU, THE ART OF WAR 76 (Samuel Griffith trans., Oxford Univ. Press 1963) (illustrating where Sun Tzu, in the 5th century B.C., wrote, "Treat the captives well, and care for them....Generally in war the best policy is to take a state intact; to ruin it is inferior to this."); *cf.* Bradford, *supra* note 6, at 641 n.12 ("Many ancient cultures, religions, and belief systems developed rules distinguishing between combatants and noncombatants and limiting methods and means of warfare.").

19. Brooks, *supra* note 3, at 706.

20. *See* Thomas C. Wingfield, *Chivalry in the Use of Force*, 32 U. TOL. L. REV. 111, 114 (2001). Wingfield gives an excellent overview of the laws of war during the Age of Chivalry (approximately 1100–1500 A.D.).

not participate in conflict began to solidify.[21] Much of this corresponded with the rise of the nation-state and its dominance as the major player in international relations.[22]

As the feudal system gave way to the rise of professional armies, these chivalric codes began to break down and local populations began to take a more active role in hostilities. Thus began a breakdown of the clear line between combatants and noncombatants. Nathan Canestaro writes:

> The erosion of the line between civilians and the professional military began with the fundamental changes in warfare seen in the Napoleonic era. The expanding scale of warfare, the advent of popular revolutions in some European countries, especially France, and repeated clashes between professional soldiers and armed peasantry during the Napoleonic wars, brought commoners into warfare in significant numbers for the first time.[23]

Perhaps in an attempt to counter this trend, codification of the law of war began to make meaningful advances in the mid-nineteenth century. This codification included the 1863 Instructions for the Government of Armies of the United States in the Field prepared by Francis Lieber (hereinafter Lieber Code),[24] the 1864 Convention for the Amelioration of the Condition of the Wounded in Armies in the Field[25] with its accompanying Additional Articles of 1868,[26] the 1868 Declaration of St. Petersburg,[27] the unratified Brussels Conference of 1874,[28] the Hague Conventions of 1899 and 1907,[29] the 1906 Convention for the

---

21. Nathan A. Canestaro, *"Small Wars" and the Law: Options for Prosecuting the Insurgents in Iraq*, 43 COLUM. J. TRANSNAT'L L. 73, 82 (2004).

22. *See id.* at 83 (arguing that "the principle that the right to wage war is limited to sovereign authority was asserted by the prominent Sixteenth Century legal scholar and father of international law, Hugo Grotius…"). Canestaro gives an interesting and concise summary of the historical beginnings of combatant status.

23. *Id.* at 84.

24. Instructions for the Government of Armies of the United States in the Field, U.S. War Department, Adjutant General's Office, General Orders No. 100, Apr. 24, 1863 [hereinafter Lieber Code], *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 3.

25. Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 24, 1864, 75 U.N.T.S. 31, *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 279.

26. *See* Additional Articles (1868), *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 285.

27. Declaration of St. Petersburg (1868), *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 101.

28. Brussels Conference (1874), *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 25.

29. Hague Conventions (1899 & 1907), *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at

Amelioration of the Condition of the Wounded and Sick in Armies in the Field,[30] and the 1929 Geneva Convention Relative to the Treatment of Prisoners of War.[31] This trend to codify the law of war included some references to combatants, including defining what constituted a lawful combatant.

While allowing for starvation of the general populace and the forced return of civilians back into besieged cities,[32] the Lieber Code also recognized the trend that "the inoffensive individual is as little disturbed in his private relations as the commander of the hostile troops can afford to grant in the overruling demands of a vigorous war."[33] It also allowed for summary treatment of persons who were taking part in hostilities but not as part of the armed forces of the enemy state.[34] While certainly not the standards nations ascribe to today, these provisions became the basis for further international law codifications.

Shortly after the Lieber Code, Czar Alexander II of Russia brought together delegates from fifteen European nations who produced the 1874 Brussels Declaration.[35] Though it was never ratified,[36] it contained a section on who should be recognized as combatants and

63–103.

30. Convention for the Amelioration of the Condition of the Wounded and Sick in Armies in the Field (July 6, 1906), *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 301.

31. 1929 Geneva Convention Relative to the Treatment of Prisoners of War, July 27, 1929, 118 L.N.T.S. 343 (1929).

32. Lieber Code, *supra* note 24, arts. 17–18, at 6.

33. *Id.* art. 23, at 7; *see also id.* arts. 20–25, 37, at 6–9.

34. Lieber Code, *supra* note 24, art. 82. Article 82 states:

    Men, or squads of men, who commit hostilities, whether by fighting, or inroads for destruction or plunder, or by raids of any kind, without commission, without being part and portion of the organized hostile army, and without sharing continuously in the war, but who do so with intermitting returns to their homes and avocations, or with the occasional assumption of the semblance of peaceful pursuits, divesting themselves of the character or appearance of soldiers—such men, or squads of men, are not public enemies, and, therefore, if captured, are not entitled to the privileges of prisoners of war, but shall be treated summarily as highway robbers or pirates.

*Id.*

35. Brussels Conference (1874), *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 28.

36. *See generally* Jack S. Weiss, *The Approval of Arms Control Agreements as Congressional-Executive Agreements*, 38 UCLA L. REV. 1533 (1991) (highlighting the Constitutional requirement for the President, after signing a treaty, to send it to the Senate for advice and consent before it may come into effect). Many nations have the same requirements and this is accounted for in international law. Vienna Convention on the Law of Treaties, May 23, 1969, arts. 11–15, 19, 1155 U.N.T.S. 331; *see also* Jim Lobe, *Bush 'Unsigns' War Crimes Treaty*, AlterNet, May 6, 2002, *at* http://www.alternet.org/story/13055/ (last visited Sept. 21, 2005) (noting that though the United States signed the 1998 Rome Statute to establish an International Criminal Court, it will not ratify it).

noncombatants. This included article 9, the first codification of the oft-quoted four criteria for combatants. Article 9 states:

> The laws, rights, and duties of war apply not only to armies, but also to militia and volunteer corps fulfilling the following conditions:
> 1. That they be commanded by a person responsible for his subordinates;
> 2. That they have a fixed distinctive emblem recognizable at a distance;
> 3. That they carry arms openly; and
> 4. That they conduct their operations in accordance with the laws and customs of war.
> In countries where militia constitute the army, or form part of it, they are included under the denomination "army."[37]

This language is repeated again in article 1 of the Annex to the 1907 Hague Regulations[38] and incorporated by direct reference in the 1929 Geneva Convention Relative to the Treatment of Prisoners of War.[39] The underlying assumption is that the regular armies of states have the obligation to abide by the laws of war simply because they are acting under the authority of the sovereign. Combatant immunity and other combatant privileges stem from this same fact.[40] Because other forces like the militia and volunteer corps may not be led by the sovereign's specific authority or may not be fighting under the sovereign's specific orders, they only benefit from the privileges of combatants when acting sufficiently like the sovereign's forces to be indistinguishable on the battlefield.

Along with establishing some baseline rules on what constituted a combatant and clarifying what standards had to be met to receive that status, these early codifications also had the effect of dividing the battlefield into two categories: combatants and noncombatants. This bifurcation continues as a part of international law today, and is the

---

37. Brussels Conference (1874), *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 28.

38. Hague Regulations Annex, art. 1 (1907), *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 75; *see also* Norman G. Printer, Jr., *The Use of Force Against Non-State Actors under International Law: An Analysis of the U.S. Predator Strike in Yemen*, 8 UCLA J. INT'L L. & FOREIGN AFF. 331, 363–65 (2003).

39. 1929 Geneva Convention Relative to the Treatment of Prisoners of War, *supra* note 31, at 343.

40. Canestaro, *supra* note 21, at 83.

218    VIRGINIA JOURNAL OF INTERNATIONAL LAW    [Vol. 46:1

foundation of the formulation of the current understanding of combatant status and its accompanying privileges.[41]

## II.    COMBATANT STATUS UNDER CURRENT INTERNATIONAL LAW

After World War II, the victorious nations convened at Geneva, Switzerland, in an attempt to remedy some of the problems that occurred during the war.[42] These meetings resulted in the four Geneva Conventions,[43] addressing various aspects of persons on the battlefield. The first three agreements built on prior Geneva Conventions,[44] the third of which is the GPW, which built on the 1929 Convention Relative to the Treatment of Prisoners of War[45] and reconfirmed the principles found in the earlier document. However, the fourth convention, Convention (IV) Relative to the Protection of Civilian Persons in Time of War (GCC),[46] which outlined the protections of civilians on the battlefield, was a clear recognition from the experiences of World War II for the increasing need to protect noncombatants on the battlefield.[47] These four conventions have become the definitive statement of customary international law[48] and are binding on all states.[49]

---

41. Maxwell, *supra* note 7, at 17–18.

42. *See* Mary Eileen E. McGrath, *Contemporary International Legal Issues—Nuclear Weapons: The Crisis of Conscience*, 107 MIL. L. REV. 191, 209–12 (1985).

43. *See* Convention (I) for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31, *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 373; Convention (II) for the Amelioration of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85, *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 401; Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 423 [hereinafter GPW]; Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S 287, *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 495 [hereinafter GCC].

44. Joshua S. Clover, *"Remember, We're the Good Guys": The Classification and Trial of the Guantanamo Bay Detainees*, 45 S. TEX. L. REV. 351, 358 (2004).

45. 1929 Geneva Convention Relative to the Treatment of Prisoners of War, *supra* note 31, at 343.

46. GCC, *supra* note 43, at 495.

47. *See* Kantwill & Watts, *supra* note 16, at 725; McGrath, *supra* note 42, at 209–10.

48. *See, e.g.,* Marsha V. Mills, *War Crimes in the 21st Century*, 3 HOFSTRA L. & POL'Y SYMP. 47, 50 (1999); *see also* GREEN H. HACKWORTH, U.S. DEP'T OF STATE, 1 DIGEST OF INTERNATIONAL LAW § 3, at 15–17 (1940) (outlining basic tenets of customary international law).

49. *See* HACKWORTH, *supra* note 48, § 1, at 2. The only country that has not ratified the 1949 Geneva Conventions is Nauru. INTERNATIONAL COMMITTEE OF THE RED CROSS, 2004 ANNUAL REPORT 183 (2005), *available at* http://www.icrc.org/Web/Eng/siteeng0.nsf/htmlall/section_annual_report_2004 (last visited Oct. 1, 2005).

One of the principles underlying the Conventions was the idea that all persons on the battlefield could be divided into one of two categories: combatant or noncombatant.[50] As Charlotte Liegl-Paul writes concerning the current state of the law:

> Whether on the battlefield voluntarily or involuntarily, each person must have a classification in order to determine his or her rights and responsibilities. Personnel on the battlefield are classified as either combatants or noncombatants....Combatants have the right to participate directly in hostilities; all others must refrain from participating in the hostilities. Civilians acting inconsistent with their noncombatant status risk losing the protections of this status.[51]

Within the Conventions, the GPW addresses combatants while noncombatants are discussed in the GCC. Though noncombatants are not defined,[52] article 4 of the GPW defines who will receive combatant status. It is this standard that has recently been the subject of widespread scrutiny.[53]

---

50. *See* Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, 1996 I.C.J. 3 ¶¶ 74–87 (July 8, 1996) *available at* http://www.icj-cij.org/icjwww/icases/iunan/ iunanframe.htm (last visited Sept. 21, 2005) ("The cardinal principles contained in the texts constituting the fabric of humanitarian law are the following. The first is aimed at the protection of the civilian population and civilian objects and establishes the distinction between combatants and noncombatants." ¶ 78); Orna Ben-Naftali & Sean S. Gleichgevitch, *Missing in Legal Action: Lebanese Hostages in Israel*, 41 HARV. INT'L L.J. 185, 243–44 (2000).

51. Charlotte M. Liegl-Paul, *Civilian Prisoners of War: A Proposed Citizen Code of Conduct*, 182 MIL. L. REV. 106, 113 (2004) (citations omitted).

52. The Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflict, Dec. 12, 1977, art. 50, 1125 U.N.T.S. 3, tries to solve this problem in article 50, which states:

> Article 50—Definition of civilians and civilian population

> 1. A civilian is any person who does not belong to one of the categories of persons referred to in Article 4 A (1), (2), (3) and (6) of the Third Convention and in Article 43 of this Protocol. In case of doubt whether a person is a civilian, that person shall be considered to be a civilian.

> 2. The civilian population comprises all persons who are civilians.

> 3. The presence within the civilian population of individuals who do not come within the definition of civilians does not deprive the population of its civilian character.

This does not do much to clarify the issues since it just falls back on the language of the prior Convention. It does, however, reiterate that there are only two legal statuses for persons on the battlefield.

53. *See, e.g.*, Jennifer Elsea, *Treatment of "Battlefield Detainees" in the War on Terrorism*, Cong. Res. Serv. Pol'y Paper, Dec. 8, 2003, *available at* LEXIS, News File.

## A.    Analysis of Article 4 of the GPW

The GPW starts off with an introductory paragraph, followed by articles 2[54] and 3,[55] which are common to all four Geneva Conventions and deal with applicability of the Conventions. The next article, article 4, discusses the issue of combatant status and addresses who is covered by its provisions. It states, in pertinent part:

A. Prisoners of War, in the sense of the present Convention, are persons belonging to one of the following categories, who have fallen into the power of the enemy:

(1) Members of the armed forces of a Party to the conflict as well as members of militias or volunteer corps forming part of such armed forces.

(2) Members of other militias and members of other volunteer corps, including those of organized resistance movements, belonging to a Party to the conflict and operating in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movements, fulfill the following conditions:

(a) that of being commanded by a person responsible for his subordinates;

---

54. Article 2 defines the applicability of the Geneva Conventions and is common to all four Conventions to ensure that they apply to the same situations. Article 2 specifically states that the Conventions apply to international armed conflict or conflict "between two or more of the High Contracting Parties [to the Geneva Conventions], even if the state of war is not recognized by one of them" and to states of "occupation." *See* GPW, *supra* note 43, *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 429–30. The full body of the law of war applies to common article 2 conflicts, including the provisions of the Geneva Conventions. International & Operational Law Department, The Judge Advocate General's Legal Center and School, U.S. Army, OPERATIONAL LAW HANDBOOK 12, 15 (Derek I. Grimes ed., 2005).

55. In contrast to article 2 conflicts, article 3 deals with "armed conflict not of an international character occurring in the territory of one of the High Contracting Parties." *See* Convention (I) for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, *supra* note 43, art. 2; Convention (II) for the Amelioration of the Condition of Wounded, Sick, and Shipwrecked Members of Armed Forces at Sea, *supra* note 43, art. 2; GPW, *supra* note 43, art. 2; and Convention (IV) Relative to the Protection of Civilian Persons in Time of War, *supra* note 43, art 2. A much smaller and less encompassing set of rights applies to individuals participating in common article 3 conflicts. For a discussion on the differences between common articles 2 and 3, see W. Michael Reisman and James Silk, *Which Law Applies to the Afghan Conflict?*, 82 AM. J. INT'L L. 459 (1988); Theodor Meron, *The Humanization of Humanitarian Law*, 94 AM. J. INT'L L. 239, 260 (2000). These rights do not include combatant immunity.

> (b) that of having a fixed distinctive sign recognizable at a
> distance;
>
> (c) that of carrying arms openly;
>
> (d) that of conducting their operations in accordance with
> the laws and customs of war.
>
> (3) Members of regular armed forces who profess allegiance
> to a government or an authority not recognized by the
> Detaining Power.
>
> ...
>
> (6) Inhabitants of a non-occupied territory, who on the
> approach of the enemy spontaneously take up arms to resist
> the invading forces, without having had time to form
> themselves into regular armed units, provided they carry arms
> openly and respect the laws of war. [56]

It is important to note that the 1949 Conventions were written largely
in response to the experiences of World War II. Given the partisan
operations during that conflict, deciding how to treat such forces was
certainly part of the negotiating process. The state representatives each
came with different ideas based on their experience from the war, some
of whom had supported large numbers of partisans and other irregular
forces.[57] Article 4 attempted to deal with the issues of partisans and
others who might participate on the battlefield and deserve protection.[58]

For example, the issue of extending combatant status to those
participating in civil wars was also debated at the Diplomatic
Conference of 1949. The delegates decided against it because they did
not want to grant combatant protections to groups fighting against their
own government.[59] Combatant status was too valuable a privilege to

---

56. GPW, *supra* note 43, art. 4.

57. *See* COMMENTARY ON THE GENEVA CONVENTION RELATIVE TO THE TREATMENT OF
PRISONERS OF WAR 52–53 (Jean S. Pictet ed., 1958); Aldrich, *supra* note 16, at 44.

58. *But see* Derek Jinks, *The Declining Significance of POW Status*, 45 HARV. INT'L L.J. 367,
374 (2004) ("It is well understood in humanitarian law circles that the 1949 Geneva Conventions
did little to resolve the long-standing dispute over whether and when irregular forces should
qualify for lawful combatant status.").

59. Nathaniel Berman, *Privileging Combat? Contemporary Conflict and the Legal
Construction of War*, 43 COLUM. J. TRANSNAT'L L. 1, 19–20 (2004). Article 3, dealing with
noninternational armed conflicts, specifically does not grant combatant immunity, regardless of
compliance with the four criteria of article 4. *See* Jinks, *supra* note 58, at 404–05 ("States
supported this language [of Article 3] so that members of an irregular armed group could be
subjected to domestic criminal prosecution for their very participation in the hostilities even if
conducted in accordance with the laws of war.").

distribute to all fighting forces. This special status was to be reserved for a select few who clearly distinguished themselves as lawful battlefield fighters.

Since the events of September 11, 2001, and the United States' resulting detention of "unlawful combatants"[60] in Guantanamo, there has been an ongoing debate concerning the definition of a combatant and who qualifies for combatant status. In its simplest form, the question is whether the four criteria in paragraph 4A(2) apply to the regular armed forces mentioned in 4A(1) and (3).[61] Though it is not resolved under international law,[62] the United States has taken a clear stand on this issue.[63] For the purposes of this Article, the resolution of this question is unimportant. It suffices to say that for those who are most contentious on the battlefield, meaning those who are not the regular forces of their nation state, compliance with the four criteria are required to receive the benefits of combatant status.

A further point of importance from article 4 is that these provisions provide an all-or-nothing test. As Professor Rosa Ehrenreich Brooks states, "one's status as a 'lawful combatant' under the Geneva Conventions hinges, as a threshold matter, not on one's substantive actions but on certain questions of form: whether one is under responsible command, whether one 'wears a fixed distinctive sign recognizable at a distance,' and whether one carries arms openly."[64] Further, these conditions are conjunctive, meaning that an individual must comply with all of them, or no status and no privileges are granted. As the United States argued in relation to the Taliban, their open noncompliance with the laws of war disqualified them from the privileges of combatant status despite their potential compliance with other criteria.[65]

---

60. *See* Printer, *supra* note 38, at 363–69 (defining combatants, noncombatants, and unlawful combatants).

61. *See* Berman, *supra* note 59, at 41–43 (2004) for an efficient encapsulation of the arguments on both sides.

62. *See* Leon Friedman, *U.S. is Violating Accord on POWs*, NEWSDAY, Jan. 26, 2004.

63. *See* John C. Yoo & James C. Ho, *The Status of Terrorists*, 44 VA. J. INT'L L. 207, 225 (2003).

64. Brooks, *supra* note 3, at 706.

65. Joseph P. Bialke, *Al-Qaeda & Taliban Unlawful Combatant Detainees, Unlawful Belligerency, and the International Laws of Armed Conflict*, 55 A.F. L. REV. 1, 30–34 (2004). *But see* Steven W. Becker, *"Mirror, Mirror on the Wall...": Assessing the Aftermath of September 11th*, 37 VAL. U.L. REV. 563, 571–75 (2003) (arguing that the Taliban deserved combatant status based on article 4 of the GPW).

The United States advocates against the Taliban and others who fail to comply with the article receiving combatant status because the status is associated with a number of privileges that are further outlined in the Convention. The most important benefit is combatant immunity; there are others of great value as well, such as repatriation after the war;[66] specific limitation on living conditions;[67] work requirements;[68] correspondence and relief packages;[69] and limitation on disciplinary and judicial proceedings.[70]

Professor Jinks has recently argued that these privileges attending combatant status are not significantly more extensive than those privileges offered to civilians in the GCC.[71] However, the one major exception to this is the lack of criminal sanction for normally illegal acts such as killing and destruction of property granted to combatants. Even Jinks agrees that "[i]n the end, the unique article significance of POW status is combatant immunity."[72] This blanket immunity for warlike acts that fit within the law of armed conflict turns a murderer into a soldier doing his duty to his sovereign. It is this immunity that the United States refuses to grant to al Qaeda and the Taliban,[73] despite

---

66. GPW, *supra* note 43, art. 118.

67. *Id.* arts. 22–25.

68. *Id.* arts. 49–57.

69. *Id.* arts. 71–77.

70. *Id.* arts. 82–108.

71. Jinks, *supra* note 58, at 380. Also see the Convention (IV) relative to the Protection of Civilian Persons in Time of War, *supra* note 43, where article 6 discusses the end of the application of the Convention at the end of hostilities or one year after in the case of occupation, articles 83–94 deal with internment camps, articles 95–96 deal with internee labor, articles 107–113 cover correspondence, articles 64–75 discuss disciplinary and judicial proceedings for the population as a whole, and articles 117–26 deal with disciplinary and judicial proceedings or internees. *See also* Gabor Rona, *War, International Law, and Sovereignty: Reevaluating the Rules of the Game in a New Century: Legal Frameworks to Combat Terrorists: An Abundant Inventory of Existing Tools*, 5 CHI. J. INT'L L. 499, 504 (2005) (noting that the United States' position would afford enemy combatants neither GPW privileges nor GCC privileges but would leave them in a "legal black hole."); Kantwill & Watts, *supra* note 16, at 687–708.

72. Jinks, *supra* note 58, at 436; *see also* Derek Jinks, *The Changing Laws of War: Do We Need a New Legal Regime After September 11?: Protective Parity and the Laws of War*, 79 NOTRE DAME L. REV. 1493, 1520 (2004); LOUISE DOSWALD-BECK, *Implementation of International Humanitarian Law in Future Wars, in* 71 THE LAW OF ARMED CONFLICT: INTO THE NEW MILLENNIUM 55 (Naval War College International Law Studies) (Michael N. Schmitt & Leslie C. Green eds., 1998).

73. The United States recently published Joint Publication 3-63, Joint Doctrine for Detainee Operations, where it states that enemy combatants "are not granted or entitled to the privileges of the Geneva Convention." THE JOINT CHIEFS OF STAFF, JOINT PUB 3-63, JOINT DOCTRINE FOR DETAINEE OPERATIONS 1-1 (Final Coordinating Draft, Mar. 23, 2005), *available at* http://cryptome.org/joint/joint-pubs.htm (last visited Sept. 21, 2005); *see also* Jim Mannion, *Rights Group Decries Proposed Military Doctrine that Formalizes "Enemy Combatants" Status,*

reasonable arguments to do so. The United States believes that it would not only cloak calculated murder in legitimacy, but also derogate the protections given noncombatants.[74]

## B.   Protections for Noncombatants

The primary reason for insisting on the criteria for combatant status is to allow for distinction on the battlefield.[75] As Lieutenant Colonel Joseph Bialke states:

> Armed conflict places large numbers of civilians on all sides of a conflict in grave situations where the risks of death, suffering, loss, and other depredations are extremely high. This is especially so when combatants disguise themselves as protected noncombatant civilians. [The law of armed conflict] has long been designed to mitigate the risks to civilians by clearly distinguishing lawful combatants from unlawful combatants.[76]

In the absence of this ability to distinguish combatants from noncombatants, soldiers on the battlefield are left in the unsatisfactory situation mentioned in the quotes beginning this Article. They must decide either not to shoot those who appear to be noncombatants and risk being killed, or attempt to distinguish between combatants and noncombatants, and in doing so, knowingly accept the risk of killing noncombatants for self-preservation.[77]

Distinguishing between combatants and noncombatants is generally done by requiring combatants[78] to wear uniforms.[79] The purpose of the

Agence France Presse, Apr. 8, 2005.

74. Bialke, *supra* note 65, at 84.

75. See Jinks, *supra* note 72, at 1497, which states:

> Noncombatants are granted immunity from attack so long as they do not participate directly in hostilities. In this sense, the protection of noncombatants from attack is predicated on a clear distinction between combatants and noncombatants. If attacking forces cannot distinguish between enemy soldiers and civilians, this type of rule cannot work well....It is the goal of protecting innocent civilians that requires a sharp line between combatants and noncombatants.

76. Bialke, *supra* note 76, at 7.

77. *See* Maxwell, *supra* note 7, at 23 ("Absent this ability to distinguish between lawful and unlawful combatants, an enemy might well be left with one of two unsatisfactory choices: do not engage any civilians, even though some are engaging its forces, or engage every enemy civilian on the battlefield. The latter choice will likely prevail.").

78. A significant issue in recent wars is the expansive use of civilian employees and contractors to support the force. The obvious challenge for nations like the United States which extensively use civilians in combat is to retain the legal protections for noncombatants in a way to allow these essential civilian contractors on the battlefield. *See* Liegl-Paul, *supra* note 51, at 108 ("The [U.S. Department of Defense] employs civilians in a variety of roles in [Iraq and

uniform requirement is to allow other combatants to know who to target and who not to target,[80] thereby protecting noncombatants.[81] The advantages to the fixed distinctive sign are obvious. A person's outward appearance provides no information about whether the person is likely to comply with the laws of war or is commanded by a reasonable entity. Furthermore, because of the general lack of safety in war-torn areas, many civilians carry weapons for protection.[82] Of the four article 4

Afghanistan]. Department of Defense civilians and contractors, at times, work side by side with uniformed personnel." (citations omitted)). Prior to Operation Enduring Freedom, both the Army and Air Force issued guidance that contractors should not wear military uniforms. Michael Guillory states:

> Initially, both the Army and the Air Force indicated that contractors should not wear military uniforms. "Contractors accompanying the force are not authorized to wear uniforms, except for specific items required for safety or security, such as: chemical defense equipment, cold weather equipment, or mission specific safety equipment." On February 8, 2001, the Acting Secretary of the Air Force issued a similar admonition but the prohibitions are not ironclad: "If required by the Theater commander, the deployment processing center will issue Organizational Clothing and Individual Equipment to contractor personnel. The wearing of such equipment by contractor personnel, however, is voluntary." "Exceptions may be made for compelling reasons....Should commanders issue any type of standard uniform item to contractors [sic] personnel, care must be taken to require that the contractor personnel be distinguishable from military personnel through the use of some distinctively colored patches, armbands, or headgear."

Guillory, *supra* note 7, at 128–29; *see also* Michael N. Schmitt, *War, International Law, and Sovereignty: Reevaluating the Rules of the Game in a New Century: Humanitarian Law and Direct Participation in Hostilities by Private Contractors or Civilian Employees*, 5 CHI. J. INT'L L. 511 (2005) (providing an excellent analysis of the status of civilian contractors and employees in armed conflict).

79. Bialke, *supra* note 65, at 13 ("LOAC [the law of armed conflict] seeks to protect civilian populations by proscribing conduct that endangers such populations unreasonably, such as taking part in combat without wearing a distinctive uniform or other form of identification that is clear and visible at a distance.").

80. Berman, *supra* note 59, at 43.

81. Guillory, *supra* note 7, at 133.

82. *See* Guillory, *supra* note 7, at 129–30 (*quoting* U.S. DEPARTMENT OF THE ARMY, FIELD MANUAL 100-21, CONTRACTORS ON THE BATTLEFIELD, 1–8 (2000)):

> The general policy of the Army is that contractor personnel will not be armed. However, under certain conditions...they may be allowed to do so. The decision to allow contractor personnel to carry and use weapons for personal protection rests with the CINC. Once the CINC has approved their issue and use, the contractor's company policy must permit the use of weapons by its employees; and, the employee must agree to carry a weapon. When all of these conditions have been met, contractor personnel may only be issued military specification sidearms, loaded with military specification ammunition, by the military. Additionally, contractor personnel must be specifically trained and familiarized with the weapon, and trained in the use of deadly force in order to protect themselves. Contractor personnel will not possess privately owned weapons.

*See also* Guillory, *supra* note 7, at 129–30 (*quoting* Lawrence J. Delaney, Interim Policy Memorandum—Contractors in the Theater (8 Feb. 2001)):

criteria, this leaves the fixed distinctive sign as clearly the best way to distinguish between combatants and noncombatants. Though other "distinctive sign[s] recognizable at a distance" have been used,[83] "the use of a uniform or distinctive sign is the most basic of the four indicia of lawful belligerency"[84] and remains the most effective means for distinguishing between combatants and noncombatants.

The goal of international law, given its desire to protect noncombatants during armed conflict, ought to be to ensure all battlefield fighters distinguish themselves by wearing a uniform. Unfortunately, the international community seems to be moving in the opposite direction.

## C. GPI Arguments

Despite the value of uniforms in preserving the principle of distinction, the international community decided to devalue the requirement for a fixed distinctive sign in Protocol I to the Geneva Conventions (GPI).[85] This Protocol was written in response to the experiences of the Vietnam War[86] and specifically relaxed the requirements for combatant status. Articles 43 and 44 state, in pertinent part:

> Article 43. Armed forces
> 1. The armed forces of a Party to a conflict consist of all organized armed forces, groups and units which are under a command responsible to that Party for the conduct or its subordinates, even if that Party is represented by a government or an authority not recognized by an adverse Party. Such armed forces shall be subject to an internal disciplinary system which,

Air Force commanders should not issue firearms to contractor personnel operating on their installations, nor should they allow contractor personnel to carry personally owned weapons. With the express permission of the geographic CINC and in consultation with host nation authorities, Air Force commanders may deviate from this prohibition of firearms only in the most unusual of circumstances (e.g., for protection from bandits or dangerous animals if no military personnel are present to provide protection).

83. Hays Parks, *Special Forces' Wear of Non-Standard Uniforms*, 4 CHI. J. INT'L L. 493, 523 (2003); *see also id.* (describing the Northern Alliance fighters in Afghanistan distinguishing themselves by the wear of a hat or tribal scarf.)

84. Bialke, *supra* note 65, at 24–25.

85. Protocol Additional to the Geneva Conventions of Aug. 12, 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I) [hereinafter GPI], *opened for signature* Dec. 12, 1977, 16 I.L.M. 1391.

86. *See* Theodor Meron, *The Time Has Come for the United States to Ratify Geneva Protocol I*, 88 AM. J. INT'L L. 678, 679 (1994).

inter alia, shall enforce compliance with the rules of international law applicable in armed conflict.

…

Article 44. Combatants and prisoners of war

…

3. In order to promote the protection of the civilian population from the effects of hostilities, combatants are obliged to distinguish themselves from the civilian population while they are engaged in an attack or in a military operation preparatory to an attack. Recognizing, however, that there are situations in armed conflicts where, owing to the nature of the hostilities an armed combatant cannot so distinguish himself, he shall retain his status as a combatant, provided that, in such situations, he carries his arms openly:
(a) during each military engagement, and
(b) during such time as he is visible to the adversary while he is engaged in a military deployment preceding the launching of an attack in which he is to participate.
Acts which comply with the requirements of this paragraph shall not be considered as perfidious within the meaning of Article 37, paragraph 1 (c).

…

5. Any combatant who falls into the power of an adverse Party while not engaged in an attack or in a military operation preparatory to an attack shall not forfeit his rights to be a combatant and a prisoner of war by virtue of his prior activities.

…

7. This Article is not intended to change the generally accepted practice of States with respect to the wearing of the uniform by combatants assigned to the regular, uniformed armed units of a Party to the conflict.[87]

---

87. GPI, *supra* note 85. The remainder of the provisions in these two articles are also important and have bearing on this problem:

    Article 43

    2. Members of the armed forces of a Party to a conflict (other than medical personnel and chaplains covered by Article 33 of the Third Convention) are combatants, that is to say, they have the right to participate directly in hostilities.

    3. Whenever a Party to a conflict incorporates a paramilitary or armed law enforcement agency into its armed forces it shall so notify the other Parties to the conflict.

228   Virginia Journal of International Law          [Vol. 46:1

These provisions are highly controversial.[88] The United States signed but did not ratify the GPI because, although it accepts much of the GPI as customary international law,[89] it specifically objects to articles 43 and 44.[90] In fact, President Reagan made those objections explicit in his letter of Transmittal to the Senate concerning their advice and consent.[91]

Article 44(3) changes the traditional requirements of article 4 of the GPW by not requiring the uniform when, "owing to the nature of the hostilities an armed combatant cannot so distinguish himself."[92] This derogation from the traditional standard "has been construed to overly broaden the category of lawful combatants to include un-uniformed guerrillas, insurgents and similar groups. This dramatically lowers the

> Article 44
>
> 1. Any combatant, as defined in Article 43, who falls into the power of an adverse Party shall be a prisoner of war.
>
> 2. While all combatants are obliged to comply with the rules of international law applicable in armed conflict, violations of these rules shall not deprive a combatant of his right to be a combatant or, if he falls into the power of an adverse Party, of his right to be a prisoner of war, except as provided in paragraphs 3 and 4.
>
> . . .
>
> 4. A combatant who falls into the power of an adverse Party while failing to meet the requirements set forth in the second sentence of paragraph 3 shall forfeit his right to be a prisoner of war, but he shall, nevertheless, be given protections equivalent in all respects to those accorded to prisoners of war by the Third Convention and by this Protocol. This protection includes protections equivalent to those accorded to prisoners of war by the Third Convention in the case where such a person is tried and punished for any offences he has committed.
>
> . . .
>
> 6. This Article is without prejudice to the right of any person to be a prisoner of war pursuant to Article 4 of the Third Convention.
>
> . . .
>
> 8. In addition to the categories of persons mentioned in Article 13 of the First and Second Conventions, all members of the armed forces of a Party to the conflict, as defined in Article 43 of this Protocol, shall be entitled to protection under those Conventions if they are wounded or sick or, in the case of the Second Convention, shipwrecked at sea or in other waters.
>
> *Id.*

88. *See* Aldrich, *supra* note 16, at 43–48. Mr. Aldrich was a part of the U.S. delegation to Protocol I and provides an interesting analysis of some of these provisions, while noting that they were controversial and caused much consternation and debate amongst the parties.

89. *See* Michael J. Matheson, *The United States Position on the Relation of Customary Law to the 1977 Protocols Additional to the 1949 Geneva Conventions*, 2 Am. U. J. Int'l L. & Pol'y 419 (1987) (discussing which articles of the GPI the United States believes are customary international law and to which the United States objects).

90. *See* Yoo & Ho, *supra* note 63, at 226–28; Matheson, *supra* note 89, at 425–26 (specifically detailing the United States' view on articles 43 and 44).

91. *See* Message of President Ronald Reagan to United States Senate, Jan. 29, 1987, *reprinted in* 81 Am. J. Int'l L. 910 (1987).

92. GPI, *supra* note 85, art. 44(3).

standard of a combatant's requirements of lawful belligerency and POW status, significantly diminishes combatant/noncombatant distinctions, and hence substantially endangers noncombatant civilians."[93] Part of the reason combatants are given special privileges is because they distinguish themselves from the civilian population,[94] and by so doing, hold themselves out as targets to lawful and unlawful combatants alike.[95] Article 44(7) creates a "bias against regular armed forces" because it leaves their responsibilities and requirements intact while article 44(3) excuses others from keeping them.[96]

As one of the sponsors of the Protocol, the ICRC compiled a commentary on the proceedings.[97] Concerning article 43, the Commentary states that "[i]t does not allow this combatant to have the status of a combatant while he is in action, and the status of a civilian at other times. It does not recognize combatant status strike as 'on demand.'"[98] It then adds that this language is designed to put "all combatants on an equal legal footing."[99] However, in the next paragraph, the commentary admits that "[a]n effective distinction between combatants and non-combatants may be more difficult as a result, but not to the point of becoming impossible."[100]

The approach of the GPI is counterproductive. Rather than attempt to give battlefield fighters an incentive to strive for complete compliance, GPI lowers the requirements for combatant status to bring more people within the ambit of the Convention's coverage. This approach does not support the overall idea of "promoting the protection of the civilian population from the effects of hostilities"[101] because it tries to solve the

---

93. Bialke, *supra* note 65, at 29.

94. *See* Jinks, *supra* note 72, at 1513 (arguing that the protections coming from Geneva Law are based on the assumption that all human beings deserved to be treated humanely and, therefore, unlawful combatants should be eligible for that same treatment. The difference in the case of privileges other than medical care, such as targeting issues and combatant immunity, is that by wearing uniforms, members of the military publicly make themselves targets, something unlawful combatants are not willing to do).

95. *Cf.* Ferrell, *supra* note 15, at 105 (arguing that some special operations missions in civilian clothes may result in the loss of combatant status or a charge of perfidy); W. Hays Parks, *supra* note 83, at 497 (arguing that it is permissible to dress in "non-standard" uniforms to "lower the visibility of U.S. forces").

96. Berman, *supra* note 59, at 47–49; Lee A. Casey & David B. Rivkin, Jr., *Double-Red-Crossed*, NAT'L INTEREST, Spring 2005, at 66–67.

97. COMMENTARY ON THE ADDITIONAL PROTOCOLS OF 8 JUNE 1977 TO THE GENEVA CONVENTIONS of 1949 (S. Pictet et al. eds., 1958).

98. *Id.* ¶ 1678.

99. *Id.*

100. *Id.* ¶ 1679.

101. GPI, *supra* note 85, art. 43(3).

problem of combatant status by relaxing the standards, giving insurgents a disincentive to distinguish themselves. Article 44(3)'s allowance for part-time combatants who "distinguish themselves from the civilian population while they are engaged in an attack or in a military operation preparatory to an attack"[102] may be an attempt to encourage those who otherwise would not distinguish themselves to do so. The exception allowed when "an armed combatant cannot so distinguish himself,"[103] however, not only destroys the utility of the article but is a fatal flaw to the document.[104]

GPI's derogation of the standards required to achieve combatant status, if accepted by the international community as a whole, would risk the safety of civilians. It is self-evident that "[n]oncombatants are most at risk when combatants hide amongst them, wearing civilian clothes and using civilians as human shields. There are good reasons to think that many fighters will continue to engage in this dangerous subterfuge."[105]

George Aldrich, head of the U.S. delegation to the Geneva Conference that signed the GPI,[106] wrote in 2000: "Whether or not these new rules offer enough incentive to induce resistance groups to comply can, of course, be determined only in practice."[107] The recent conflicts in Afghanistan and Iraq illustrate current practice and provide a clear example of why GPI's relaxation of the uniform standard is the wrong approach to encouraging the protection of civilians and why intermediate levels of recognition for those who wear fixed distinctive signs is so needed. The Taliban example illustrates this point. The Bush administration decided that the Taliban and al Qaeda would not receive combatant status.[108] Many have argued the United States was justified in its treatment of the Taliban and al Qaeda.[109] The President recognized

---

102. *Id.* art. 44(3).

103. *Id.*

104. *See* Aldrich, *supra* note 16, at 47 (explaining the intended interpretation of the language in article 44(3)).

105. Callen, *supra* note 2, at 1072; Berman, *supra* note 59, at 50.

106. *See* Aldrich, *supra* note 16, at 46.

107. *See id.* at 48.

108. *See* White House Fact Sheet: Status of Detainees at Guantanamo, *available at* http://www.whitehouse.gov/news/releases/2002/02/20020207-13.html (last visited Oct. 1, 2005); Brooks, *supra* note 3, at 732–33; *see also* David A. Martin, *Immigration Law and Human Rights: Legal Line Drawing Post-September 11: Symposium Article: Offshore Detainees and the Role of Courts after Rasul v. Bush: The Underappreciated Virtues of Deferential Review*, 25 B.C. THIRD WORLD L.J. 1 (2005) (discussing the Guantanamo detainee cases in the United States federal court system).

109. Bialke, *supra* note 65, at 2; Casey & Rivkin, Jr., *supra* note 96, at 63.

the Taliban as the regular forces of Afghanistan but made the decision not to grant them combatant status because of their lack of compliance with the law of war.[110] Given this decision, the Taliban have no continuing incentive to distinguish themselves from the civilian populace.[111]

Consider the consequences if the Taliban had anticipated that they would not be given combatant status, faded into the civilian populace, and fought from a position of anonymity as the terrorists have done in Iraq. There is no doubt this strategic maneuver would have resulted in more civilian and coalition force deaths. Yet what incentive did the Taliban have to do otherwise? Because of the current all-or-nothing approach to combatant status, the Taliban is faced with only disincentives to distinguish themselves.

Conversely, the laws of armed conflict, particularly those dealing with combatants, have been challenged by asymmetric opponents like al Qaeda and Fedayeen.[112] Though the Fedayeen have been distinguishable on certain occasions,[113] they and other groups such as Mahdi's Militia have fought in civilian clothes from within civilian formations.[114] It is unlikely that providing intermediate levels of recognition to al Qaeda will change its tactics,[115] but it may affect groups like the Fedayeen and Mahdi's Militia who otherwise would not get any of the privileges of combatant status. Granting them limited privileges in exchange for the ability to better distinguish noncombatants would be a significant step toward attaining the overall international law goal of providing greater protections to noncombatants.

---

110. Bialke, *supra* note 65, at 16.

111. *See Department of Defense News Briefing Part 1 of 2*, M2 Presswire, Feb. 11, 2002, *available at* LEXIS, News File. *But see The Osgood File: U.S. Troops Find Weapons in Afghan Caves and Believe Hundreds of Taliban Fighters Still Remaining* (CBS television broadcast Mar. 6, 2002), *transcript available at* LEXIS, News File.

112. Michael Sirak, *Legal Armed Conflict*, JANE'S DEFENCE WEEKLY, Jan. 14, 2004, at 25.

113. *See After Attack, S. Korean Engineers Quit Iraq*, WASH. POST, Dec. 8, 2003, *available at* LEXIS, News File; *U.S.-Iraq: A Sunday in Samarra Analysis*, IPS-Inter Press Serv., Dec. 6, 2003, *available at* LEXIS, News File. *But see Commanders Relate Lessons Learned in Iraq*, U.S. FED. NEWS, Oct. 29, 2004, *available at* LEXIS, News File.

114. *Insight: Interview with Thomas Friedman* (CNN INTERNATIONAL, Apr. 1, 2004), *transcript available at* LEXIS, News File.

115. Aldrich, *supra* note 16, at 44–45.

### III. EVOLVE THE LAW TO ALLOW INTERMEDIATE LEVELS OF RECOGNITION FOR PARTIAL COMPLIANCE

A sound approach is to evolve the law to allow for intermediate levels of recognition for partial compliance with the requirements clearly identified in article 4 of the GPW, particularly that of wearing a fixed distinctive emblem, or uniform. The benefit of this approach is that it would not lower the standard for full combatant status, thereby leaving incentives in place to completely comply, but it would provide intermediate incentives to encourage groups to do all they could to distinguish themselves from the populace, thereby preserving protections for noncombatants.

The combatant status determination system is outdated in today's world situation[116] and alternatives need to be found. Derek Jinks states that "[c]riminalization of belligerency creates perverse incentives for the unlawful combatants: because their very participation in the hostilities subjects them to criminal prosecution upon capture, they have no incentive to comply with the law of war."[117] The all-or-nothing nature of combatant status leaves those who cannot comply with little incentive to even try. Therefore, "[t]he denial of combatants' privilege to some combatants does not mean that they will not engage in combat. One may even speculate as to whether those fighting without the privilege may do so with a special ferocity, precisely because the stakes are so high."[118]

Once they have made the decision to fight outside of complete compliance, unlawful fighters know that they will receive no benefits and will be quickly tried as murderers in domestic courts or military tribunals. This motivation exists because the current system is organized with only negative incentives to comply with combatant status unless one can meet all four criteria of GPW.[119]

---

116. Brooks, *supra* note 3, at 734, 756–57:

> It should be noted that the rules for determining the lawfulness or unlawfulness of a combatant are themselves archaic and arguably biased in favor of wealthier armies. The notion that "lawfulness" might hinge, for instance, on the wearing of "fixed distinctive signs" is odd; again, the classic paradigm, with its images of bugles and banners, does not accord well with the realities of modern conflicts, in which the rag-tag soldiers of third-world states and militias may simply lack the resources to wear anything resembling a uniform. Here, the law of armed conflict offers a set of chivalric rules that favors those with more resources.

(citations omitted).

117. Jinks, *supra* note 58, at 438; Jinks, *supra* note 72, at 1523.

118. Berman, *supra* note 59, at 12.

119. Callen, *supra* note 2, at 1026–28, 1063–64.

Jinks has recently written two thought-provoking articles on this issue. Jinks agrees that "the question is how best to encourage fighters to distinguish themselves from the civilian population."[120] He argues that "protective status categories are an inefficient way to incentivize individual combatants because these categories necessarily trade on collective considerations—such as the organizational characteristics of the fighting force."[121] In other words, the four criteria for combatant status are too dependent upon a structural view of the person on the battlefield. There is no way for an individual actor to gain combatant status. He then proposes that "[t]he rule of distinction would be better served by an individual 'war crimes' approach that accorded all fighters substantial humanitarian protection and punished (in accord with basic requirements of due process) individual bad actors."[122]

There is no doubt that Jinks is correct in his analysis concerning the need to give positive incentives to fighters. However, this solution fails to view the problem from the perspective of a soldier on the ground trying to distinguish between persons dressed in civilian clothes, knowing that only some of whom are unlawful combatants. The fact that all who commit war crimes will be prosecuted, whether lawful or unlawful combatants, will only deter those unlawful combatants who are concerned about war crimes prosecutions. Jinks' solution also does not address the fact that this deterrence by prosecution approach may only, as mentioned above, increase the ferocity and frequency with which the fighter uses civilians in his fight.[123] Jinks offers only negative incentives, no carrots to counterbalance the sticks,[124] and argues that the Geneva Conventions are specifically organized in that way.[125]

The ultimate solution may include parts of Jinks' proposal, but there must also be some "carrot-type" incentives to encourage the unlawful combatant to distinguish himself and, therefore, make himself a target (thus protecting the noncombatant population).[126] Jason Callen agrees

---

120. Jinks, *supra* note 72, at 1495.

121. *Id.*

122. *Id.*

123. *See supra* note 111.

124. Jinks, *supra* note 58, at 441.

125. Jinks, *supra* note 72, at 1524-25.

126. The International Committee of the Red Cross does not believe that any change is necessary despite the clear noncompliance and its resulting risks to noncombatants. *See* Balthasar Staehelin and John Hutson Discuss the Idea of Possibly Changing the Geneva Conventions to Reflect a More Modern View of Warfare (NPR broadcast Nov. 28, 2004), *transcript available at* LEXIS, News File. (Mr. Staehelin, the Director for the International Committee of the Red Cross Operations for the Middle East and North Africa, states: "I think that the Geneva Conventions

and explains that "[t]he best way to protect civilians is to create the strongest incentives for combatants to distinguish themselves from the rest of the population."[127] Callen believes that the Conventions currently do this through rewarding only compliance; the incentive of combatant immunity should be sufficient. However, as the quotations at the beginning of the article and the continuing experience in Iraq[128] clearly portray, the incentives are currently not strong enough to provide for the desired safety of noncombatants.

Combatant immunity is a great carrot, or incentive, and ought to be used as such[129] in an attempt to bring battlefield fighters into complete compliance. Further, it is clear that partial compliance does not merit complete privilege. Unlawful battlefield combatants ought not to benefit completely from rules with which they do not comply.[130] But there are certainly intermediate protections and benefits that can be offered to those irregular armed forces to help encourage them to distinguish themselves from the general populace and give soldiers and other lawful battlefield participants a greater opportunity to apply the principle of distinction clearly.

These protections and benefits could include immunity from prosecution for speech or association crimes connected with political beliefs; abeyance of execution of punishment until conflict is resolved; offer of parole, including immunity for weapons crimes not resulting in death or injury; compliance with international law as a mitigating factor at sentencing; disallowance of the death penalty; and if the movement which the fighter is a part of eventually achieves combatant status, the fighter's prior lawful warlike actions may also be covered by combatant immunity.

---

provide very good answers to the problems we have today. If they were respected, I think we would have a totally different situation. So, in our view, the most important issue today is respect for these conventions and not for revisions."); *see also* Gabor Rona, *supra* note 71, at 499 ("While there will always be room for tinkering around the margins of any legal framework, the implication that a new one needs to be developed specifically to combat terrorism is doubtful.").

127. Callen, *supra* note 2, at 1072.

128. *See* Dilanian, *supra* note 8 ("The inability to separate the good guys from the bad is the central dilemma that has bedeviled American soldiers in Iraq for nearly two years as they have tried to root out an unknown number of insurgents who wreak havoc and then blend into the civilian population.").

129. Jinks, *supra* note 58, at 438.

130. *See* 2 FINAL RECORD OF THE DIPLOMATIC CONFERENCE OF GENEVA OF 1949, A, 621 (1949) *cited in* Callen, *supra* note 2, at 1051.

## IV.  SPECIFIC PROVISIONS

In enumerating specific proposed incentives to encourage all battlefield fighters to distinguish themselves from the local populace, it is important to ensure that these privileges are not already granted to the class of people targeted for change. Since the armed conflicts in Afghanistan and Iraq, there has been lively discussion on what privileges actually accrue to "unlawful combatants." As previously mentioned, some believe that unlawful combatants are already covered by the GCC and that those benefits closely approximate the privileges accorded prisoners of war in the GPW. This argument is cogently stated by Jinks who writes that "[t]he Geneva Conventions protect unlawful combatants, and this protection very closely approximates that accorded POWs."[131] He concludes his article:

> What difference does POW status make? Contrary to conventional wisdom (and the prevailing policy debates in the current "war on terrorism"), I maintain that POW status carries *no significant, unique protective consequences.* As a descriptive matter, the unique protective significance of POW status is minimal and in sharp decline. The text, structure, and history of the 1949 Geneva Conventions and the 1977 Additional Protocols thereto strongly support this conclusion.[132]

On the other hand, the traditional approach has been to argue that unlawful combatants receive neither the protections of the GPW or the GCC. Jason Callen endorses this position when he writes that the "text of the Civilian Convention, together with the Convention's legislative history, shows that battlefield unlawful combatants are not among the unlawful combatants covered by the Conventions."[133] As opposed to the ICRC commentary that Jinks uses to support his argument,[134] Callen

---

131.  Jinks, *supra* note 58, at 440.

132.  *Id.* at 442.

133.  Callen, *supra* note 2, at 1031.

134.  *See id.* Callen writes:

Scholars who argue that the Civilian convention protects all types of unlawful combatants rely on the International Committee of the Red Cross's Commentary to the Geneva Conventions. The Commentary provides background on the negotiations that occurred during the drafting of each Convention and offers the ICRC's interpretation of the meaning of the respective Convention's Articles. While the ICRC Commentary suggests that the Civilian Convention was intended to cover all unlawful combatants, the commentary does not persuasively show that this is what the Conventions' authors intended.

236    VIRGINIA JOURNAL OF INTERNATIONAL LAW    [Vol. 46:1

looks to prior conferences and the Final Record of the Geneva Conference[135] for his support.

The resolution of this argument is significant because if unlawful combatants are covered by the GCC as Jinks argues, some of the proposals below will represent less meaningful incentives. However, the fact that the discussion is ongoing and that Callen adopts the traditional approach make the suggestion of incentives important. Further, state practice, at least among coalition forces in Iraq and Afghanistan, has been not to apply GCC privileges to unlawful combatants as a matter of law, though U.S. forces have provided many privileges as a matter of policy.[136]

## A.    Immunity from Speech or Association Crimes Connected with Political Beliefs

The first incentive that should be offered to battlefield fighters who choose to distinguish themselves by wearing uniforms is immunity from prosecution for treasonous or inciting speech or associating with others who are involved in the armed conflict. These individuals could still be detained and held until they no longer represented a risk or the termination of the conflict,[137] but if prosecution was contemplated, the detainees would be immune from prosecution for their speech or associations. Such an incentive may have been useful, for example, in Baghdad in April 2004.

At that time, members of Mahdi's Militia were engaging in open hostilities against the occupying coalition forces.[138] Some wore uniforms and others did not.[139] These battlefield fighters did not qualify for

---

*Id.* (citations omitted).

135.  *Id.* at 1029.

136.  *See* Department of Defense Directive 5100.77, DoD Law of War Program (Dec. 9, 1998), *available at* http://www.dtic.mil/whs/directives/corres/pdf2/d510077p.pdf (last visited Oct. 1, 2005):

>  5.3. The Heads of the DoD Components shall:
>
>  5.3.1. Ensure that the members of their DoD Components comply with the law of war during all armed conflicts, however such conflicts are characterized, and with the principles and spirit of the law of war during all other operations.

*Id.*; Gregory P. Noone et al., *Prisoners of War in the 21st Century: Issues in Modern Warfare*, 50 NAVAL L. REV. 1, 17 (2004).

137.  Jordan J. Paust, *Current Pressures on International Humanitarian Law: War and Enemy Status after 9/11: Attacks on the Law of War*, 28 YALE J. INT'L L. 325, 328–29 (2003).

138.  Bill Powell et al., *An Eruption of Iraqi Insurgency Tests U.S. Resolve and Plays Havoc with Plans to Hand Over Control. How will the President Respond?*, TIME, Apr. 19, 2004, at 34.

139.  Kimmitt, *supra* note 2.

combatant status but certainly engaged in combat activities. They also engaged in many open meetings and gatherings to voice support for Muqtada Al-Sadr. Coalition forces could lawfully detain these individuals as security internees[140] and then either prosecute them under violations of domestic Iraqi law or Coalition Provisional Authority Orders.[141] However, if the proposed incentive was in place, and the security internees were dressed in Mahdi's Militia's distinctive black uniforms with green arm- or headbands, those persons could be held as security internees but not later prosecuted for the crimes associated with speech or association.[142]

This immunity represents an incentive for the unlawful battlefield fighter because if he is detained while in civilian clothes, he can immediately be prosecuted for violations of the law; yet if he distinguishes himself from the general populace, he receives immunity. Though he may be detained, he cannot be prosecuted for those crimes.

This offer of immunity in exchange for the wearing of a uniform represents a benefit to the occupier because it allows him to easily distinguish those who are actively supporting the counterinsurgency. As occupying forces move into a gathering of armed and unarmed people, some wearing fixed distinctive emblems and some not, it is easy to assess who the insurgents are.

---

140. GCC, *supra* note 43, art. 78.

141. *See* CPA Official Documents, *available at* http://www.iraqcoalition.org/regulations (last visited Sept. 21, 2005) (site scheduled to be taken down on June 30, 2006). For example, CPA Order 14, concerning media organizations, states:

Media organizations are prohibited from broadcasting or publishing original, re-broadcast, re-printed, or syndicated material that:

a) incites violence against any individual or group, including racial, ethnic or religious groups and women;

b) incites civil disorder, rioting or damage to property;

c) incites violence against Coalition Forces or CPA personnel;

d) advocates alterations to Iraq's borders by violent means....

Coalition Provisional Authority Order 14: Prohibited Media Activity, *available at* http://www.iraqcoalition.org/regulations/20030610_CPAORD_14_Prohibited_Media_Activity.pdf (last visited Oct. 10, 2005) (site scheduled to be taken down on June 30, 2006).

142. This proposal is somewhat analogous to the immunity given to civilians in GCC, article 70. *See* GCC, *supra* note 43, arts. 64–75. The occupier cannot prosecute or punish a protected person during occupation for the support he may have provided to the armies defending against the victorious occupier. OSCAR M. UHLER ET AL., COMMENTARY ON THE GENEVA CONVENTION RELATIVE TO THE PROTECTION OF CIVILIAN PERSONS IN TIME OF WAR 348–49 (Jean S. Pictet ed., Ronald Griffin & C.W. Dubleton trans., 1958). Particularly in the case of an insurgency as in Iraq, the attempt is to throw off the occupier and establish a new government or restore the old. If the insurgency is successful, the same principle of fighting for or against a prior government is not punishable by the succeeding government.

238    VIRGINIA JOURNAL OF INTERNATIONAL LAW    [Vol. 46:1

## B.    No Execution of Punishment Until Conflict Resolved

Another incentive that should be implemented for those irregular forces willing to distinguish themselves on the battlefield is to guarantee that no punishment for their lawful combatant-like criminal activities will be carried out until the end of hostilities. The use of the "end of hostilities" standard as a measure for granting privileges is somewhat analogous to provisions in both the GPW[143] and the GCC.[144] This becomes especially important when considered with some of the other proposals below, such as precluding the death penalty and the potential grant of combatant immunity if the unlawful combatants' organization later achieves combatant status.

Traditionally, unlawful combatants are subject to capture, detention, trial and punishment like prisoners of war,[145] and also trial and punishment by military tribunals for their unlawful acts on the battlefield.[146] However, in most cases, a POW may only receive disciplinary punishment,[147] not to exceed thirty days of confinement.[148] In the few instances where a POW is subject to judicial process,[149] he retains all the rights granted by the GPW,[150] including immunity for his lawful warlike acts.[151] Further, once hostilities are over, unless he has

---

143.  See GPW, *supra* note 43, arts. 118–19 (requiring POWs to be repatriated at the cessation of hostilities unless suspected of war crimes).

144.  Article 6 of the Convention (IV) Relative to the Protection of Civilian Persons in Time of War states:

The present Convention shall apply from the outset of any conflict or occupation mentioned in Article 2.

In the territory of Parties to the conflict, the application of the present Convention shall cease on the general close of military operations.

In the case of occupied territory, the application of the present Convention shall cease one year after the general close of military operations,....

Convention (IV) Relative to the Protection of Civilian Persons in Time of War, *supra* note 43, art. 6.

145.  See GPW, *supra* note 43, arts. 83–108.

146.  Berman, *supra* note 59, at 68.

147.  GPW, *supra* note 43, art. 83.

148.  *Id.* arts. 89–90.

149.  There is some debate over whether this would involve only war crimes committed prior to capture or also crimes committed during detention. *Compare* COMMENTARY ON THE GENEVA CONVENTION RELATIVE TO THE TREATMENT OF PRISONERS OF WAR, *supra* note 142, *with* Howard S. Levie, *War Crimes in the Persian Gulf,* 1996 ST. LOUIS-WARSAW TRANSATLANTIC L.J. 153, 155–56 (1996).

150.  GPW, *supra* note 43, art. 108, *reprinted in* SCHINDLER & TOMAN, *supra* note 14, at 466–67.

151.  Jordan J. Paust, *Current Pressures on International Humanitarian Law: War and Enemy Status after 9/11: Attacks on the Law of War,* 28 YALE J. INT'L L. 325, 330 (2003).

committed war crimes, he is repatriated to the civilian population with no further criminal consequences. His punishment for having been captured as a lawful combatant is really only detention until the end of the conflict.[152]

Protected persons under the GCC also enjoy certain protections.[153] They cannot be prosecuted for crimes committed or opinions expressed prior to the occupation,[154] and they have the right to most modern guarantees of a fair trial.[155] They also may be interred as security internees or put under house arrest.[156] This restraint can continue for extended periods, conceivably to the end of the occupation,[157] but must be reviewed periodically.[158] Protected persons also can be prosecuted for criminal activity.[159] While unlawful combatants may or may not deserve these benefits, they merit some additional protections if they are willing to wear uniforms.

A "no execution of punishment until after the conflict is resolved" standard is reasonable, follows from the facts of the situation, and represents a clear incentive for the unlawful fighter. Without this provision, he is likely to be summarily dealt with, potentially tried, and executed[160] depending on the nations involved in the conflict. However, his movement may be successful and his fellow partisans brought to power. In that case, if he had not had his punishment executed but was merely being held until the conflict was resolved, he would certainly be freed from any prison in which he was languishing. Further, it is only the punishment that must be held in abeyance so a trial could go forward and if acquitted, the unlawful belligerent goes free. If convicted, the unlawful belligerent may be held as a security internee until the conflict is resolved and he begins to serve his punishment, or until he is freed because he no longer represents a threat.[161]

---

152. GPW, *supra* note 43, art. 118.

153. GCC, *supra* note 43, art. 70.

154. *Id.* arts. 64–75.

155. *Id.* arts. 71–75.

156. *Id.* art. 78.

157. *Id.* art. 77.

158. *Id.*

159. *Id.* arts. 64–75.

160. Mark Mathews, *Kashmir Conflict an Old Grudge; But New Escalation by India, Pakistan has Higher Stakes,* BALT. SUN, Dec. 29, 2001, at 1A; *Hundreds of Chechens Said Missing,* AP Online, June 4, 2001, *available at* LEXIS, CURNWS File; *Ex-Dictator Starts University Lectures,* Press Ass'n, Sep. 29, 1997, *available at* LEXIS, CURNWS File; *Risky New Role for Mexico's Army,* UPI, Oct. 19, 1996, *available at* LEXIS, CURNWS File.

161. GCC, *supra* note 43, arts. 43, 78.

This also offers a clear benefit to the lawful battlefield forces. Again, the fact that the unlawful fighter has donned a uniform and chosen to distinguish himself not only will spare the civilian population, but will make him much easier to target and either kill or capture. The requirement to detain the captured belligerent will prove an inconvenience for the lawful forces, but is an exchange most forces will be willing to make for an increased ability to identify the enemy. The lawful forces could also decide to offer parole for detained unlawful combatants as discussed below to relieve them of the detention requirement.

## C.    Offer of Parole, Including Immunity for Weapons Crimes not Resulting in Death or Injury

Collecting large numbers of POWs and/or detainees is always problematic for an armed force, and especially so for an invading force. The required expenditure of resources can be quite burdensome to a force even as well supplied as the United States.[162] Offering parole to unlawful combatants may be a way not only to decrease the significant logistics requirements required for detainees, but also to provide incentives for those same detainees to distinguish themselves by wearing uniforms.

Parole, as commonly used in international law, is "releasing a prisoner of war...in return for a pledge not to bear arms."[163] The practice has been used since at least the age of the Roman Empire and continued into the twentieth century.[164] Parole was codified in the 1907 Hague Convention[165] and in the 1949 GPW[166] and remains a viable concept

---

162. See David Rose, Guantanamo Bay on Trial, VANITY FAIR, Jan. 2004, at 88 (discussing Halliburton's $135 million government contract to upgrade the detainee facilities at Guantanamo Bay).

163. Gary D. Brown, Prisoner of War Parole: Ancient Concept, Modern Utility, 156 MIL. L. REV. 200, 200 (1998).

164. For an excellent history on the use of parole, see id. at 201–09.

165. See Hague Convention (IV) Respecting the Laws and Customs of War on Land, Annex, Oct. 18, 1907, art. 10, reprinted in SCHINDLER & TOMAN, supra note 34, at 78. Article 10 of the Convention states:

> Prisoners of war may be set at liberty on parole if the laws of their country allow, and, in such cases, they are bound, on their personal honour, scrupulously to fulfil, both towards their own Government and the Government by whom they were made prisoners, the engagements they have contracted.

Id. art. 10.

166. See GPW, supra note 43, art. 21 ("Prisoners of war may be partially or wholly released on parole or promise, in so far as is allowed by the laws of the Power on which they depend.").

today, though it is seldom used and proscribed by the United States for use by its military members.[167] Joshua Clover has urged the reinstatement of the possibility for parole, for use with the Guantanamo detainees.[168] He advances three reasons why parole of that particular group of detainees would be advantageous:

> First, paroling these detainees would alleviate concerns over the fact that they may otherwise be held indefinitely. Second, although they may appear to be "freed," paroled prisoners of war are prohibited from being employed in active military service against their original captors. Third, if these parolees are later discovered to have "broken" their parole, the original detaining power, in this case the United States, "has extensive options in dealing with the miscreant." Though the laws of war conflict on some of the procedural specifics, the parole breaker could conceivably lose his prisoner of war status.[169]

These same advantages would apply to a much more general application of the principle of parole to unlawful combatants who distinguish themselves from noncombatants. Knowing that parole may be offered to those who distinguish themselves (so long as they have not otherwise committed murder or other serious violations of the law of war) is an incentive that will potentially affect some of the most devout insurgents.

A counterargument might be that if these unlawful fighters are already violating the law of war by not complying with the four criteria of combatancy, they have no reason to comply with a grant of parole that relies on personal honor to a large degree.[170] There is some risk involved, but treating parole-breaking as a grave breach[171] and exercising universal jurisdiction,[172] would, if nothing else, give overwhelming recourse and act as a deterrent. A similar system has been used in

---

167. *See* Exec. Order No. 10,631, 20 Fed. Reg. 6,057, art. III (Aug. 17, 1955), *amended by* Exec. Order No. 12,017, 42 Fed. Reg. 57,941 (Nov. 3, 1977), *further amended by* Exec. Order No. 12,633, 53 Fed. Reg. 10,355 (Mar. 30, 1988) (establishing the code of conduct for the U.S. armed forces that requires members of the military to deny parole from the enemy).

168. Clover, *supra* note 44, at 370.

169. *Id.* (citations omitted).

170. *See, e.g.,* Bradford, *supra* note 6, at 721 n.244; Brown, *supra* note 163, at 210–11.

171. *See generally* GCC, *supra* note 43, arts. 43, 147. Historically, parole violators were subject to death. Bradford, *supra* note 6, at 724 n.266.

172. *See* Theodor Meron, *The Humanization of Humanitarian Law*, 94 AM. J. INT'L L. 239, 253 (2000).

Iraq,[173] though there is no unclassified report on its success at this point. Further, it is important to note that parole would only be offered to those who had sufficient incentive to put on a uniform and make themselves a target, rather than take the easier and safer method of fighting from among the civilian crowds and immediately disappearing into safety. It may be that those willing to so identify themselves to gain the opportunity of parole will also have the integrity to honor their parole obligations.

Though the parolee would still not have the right to combatant immunity, and, therefore, could be prosecuted for any unlawful killing or injury he had caused in the course of his actions, this parole may also include a grant of immunity for weapons crimes that do not result in death or serious injury.[174] Further, the parole might include a grant of immunity from other unlawful combat activities such as sabotage or destruction of military property belonging to the opposing forces, providing it did not result in death or serious injury.[175]

The benefits to unlawful combatants of parole are great and should serve as a considerable incentive to wear a uniform. Insurgencies and guerrilla warfare are often full of sabotage and other non-deadly activities. For these activities, parole would exist as an option so long as the unlawful combatant was willing to mark himself as a target. Further, the offer of parole provides the unlawful combatant the opportunity to return to his home and care for his family and return to normal life, though now removed from continuing the conflict.

Distinction again provides the benefits to the lawful combatants. The ability to see the saboteur for who he is, before he completes his work is of incredible value, certainly worth returning him to society on the grounds that he will fit himself back into the compliant civilian population. The risks of parole violation bear heavy thought before granting parole, but are likely risks worth taking.

---

173. *See* Richard A. Oppel, Jr., *5 Iraqis Die in Gunfight After Bomb Hits U.S. Convoy*, N.Y. TIMES, Jan. 10, 2005, at A3 (detailing the release of Iraqi detainees into the supervision of community "guarantors").

174. *See generally* Coalition Provisional Authority, Order Number 3 (Revised) (Amended), (order entered into force Dec 31, 2003), *at* http://www.iraqcoalition.org/regulations/20031231_CPAORD3_REV__AMD_.pdf (last visited Oct. 1, 2005) (site scheduled to be taken down on June 30, 2006).

175. For descriptions and analyses of guerrilla warfare, see Johnie Gombo, *Understanding Guerrilla Warfare* (1990), *at* http://www.globalsecurity.org/military/library/report/1990/GJ.htm (last visited Sept. 21, 2005) (providing an overview of the nature of guerrilla warfare) and Lopez, *supra* note 9, at 928–29 (1994) (addressing the challenge of distinguishing combatant and civilian status during guerrilla warfare as defined under the Geneva Convention).

### D.  Compliance with International Law as Mitigation at Sentencing

In cases where parole is either not offered or inappropriate, such as cases of death or serious injury, allowing evidence of the unlawful combatant's compliance with the uniform requirement and other requirements of the combatancy criteria could be used as mitigation evidence at sentencing in any trial to which the unlawful belligerent was subject. Louise Doswald-Beck has urged such a course of action. In looking for an incentive approach to encouraging compliance, she has written "[t]he carrot could be, for example, allowing respect of international law rules to be used in mitigation of sentence when such persons are tried in national courts."[176]

Such a measure would have to be sufficiently publicized and would be less effective with trials that took place after the conflict, but may still have some effect on the mind of the unlawful combatants. The amount of mitigation provided would obviously be of significance as well. This, however, would be a matter of judicial decision and likely out of the power of the lawful combatants.

There is precedent for allowing compliance with the law of war as mitigating circumstances at trials. In the Nuremburg Trials after World War II, there are at least two examples of the Tribunal mitigating punishments based on attempts to comply with the law of war.[177] This would act as an incentive for the unlawful combatants by providing them at least the possibility of a mitigated sentence at trial. As mentioned above, because the current state of the law provides for no benefits at trial for those who do not achieve full combatant status, many unlawful combatants will be compelled to fight to the death rather than surrender without hope for a fair or mitigated sentence. Following this pattern established at Nuremburg may provide incentives to do otherwise.

On the other hand, allowing mitigation at sentencing is a small price to pay for the ability to identify the unlawful combatant. The difference between sending someone to jail for a short period as opposed to a longer period is generally of little significance to the invader or occupier. By the time the unlawful combatant is released from even his

---

176. DOSWALD-BECK, *supra* note 72, at 56.

177. *See* United States of America v. Flick, 9 L.R.T.W.C. 1, 29 (1949); United States of America v. List, 11 T.W.C. 757, 1300 (Nuremburg Military Trib. 1948). *See generally* William A. Schabas, *Sentencing by International Tribunals: A Human Rights Approach*, 7 DUKE J. COMP. & INT'L L. 461, 492–93 (1997) (describing numerous examples of sentences mitigated by the Nuremburg Tribunals).

mitigated sentence, it is likely that the insurgency will have been overcome and the government will firmly be in place or the invader will have been repelled and the old government reinstated.

### E.    No Death Penalty

If convicted at trial despite any potentially mitigating testimony concerning an unlawful belligerent's wearing of a uniform, he may face punishments as severe as death, depending on his actions. Both the GCC[178] and GPW[179] allow for the death penalty under certain circumstances. The language of article 68 of the GCC is particularly appropriate as it deals specifically with unlawful belligerents. It states in pertinent part:

> The penal provisions promulgated by the Occupying Power in accordance with Articles 64 and 65 may impose the death penalty on a protected person only in cases where the person is guilty of espionage, of serious acts of sabotage against the military installations of the Occupying Power or of intentional offences which have caused the death of one or more persons, provided that such offences were punishable by death under the law of the occupied territory in force before the occupation began.

> The death penalty may not be pronounced against a protected person unless the attention of the court has been particularly called to the fact that since the accused is not a national of the Occupying Power, he is not bound to it by any duty of allegiance.

> In any case, the death penalty may not be pronounced against a protected person who was under eighteen years of age at the time of the offence.[180]

---

178. *See* GCC, *supra* note 43, art. 68.

179. *See* GPW, *supra* note 43, art. 100:

> Prisoners of war and the Protecting Powers shall be informed, as soon as possible, of the offences which are punishable by the death sentence under the laws of the Detaining Power.

> Other offences shall not thereafter be made punishable by the death penalty without the concurrence of the Power upon which the prisoners of war depend. The death sentence cannot be pronounced on a prisoner of war unless the attention of the court has, in accordance with Article 87, second paragraph, been particularly called to the fact that since the accused is not a national of the Detaining Power, he is not bound to it by any duty of allegiance, and that he is in its power as the result of circumstances independent of his own will.

The first paragraph establishes two threshold questions before the death penalty can be considered for an unlawful combatant in an occupation: the type of crime and the law of the country occupied. Both are questions that would be resolved by the detaining power or tribunal before which the unlawful belligerent appears. The examples of crimes listed are precisely the type of acts unlawful combatants do and therefore represents little limitation on the use of the death penalty.[181]

Historically, summary execution was used as an option for violations of the law of war[182] and trial, conviction, and execution by a military tribunal is still lawful.[183] Customary international law also allows for the use of the death penalty,[184] though that is a trend that may be changing.[185] One hundred and thirteen countries still allow the death penalty, though it has not been used in some of those countries for more than ten years.[186] There are certainly circumstances where the death penalty is a sentencing option for convicted unlawful belligerents.

However, Thomas McDonnell has made the argument that the death penalty in the case of terrorism is counterproductive. He argues that using the death penalty against terrorists would lead to greater terrorism, less cooperation from our allies, and greater danger to our military and

*Id.*

180. GCC, *supra* note 43, art. 68.

181. *See* Deputy Secretary of Defense Paul Wolfowitz, Testimony as Delivered to the Senate Armed Services Committee on the Transition in Iraq (June 25, 2004), *in* U.S. Dep't of Defense Info., June 25, 2004, *available at* LEXIS, News File (addressing terrorist attacks and security issues in Iraq).

182. *See* Lieber Code, *supra* note 24, arts. 20–25, 37, at 6–8; Gregory P. Noone, *The History and Evolution of the Law of War Prior to World War II*, 47 NAVAL L. REV. 176, 192 n.94 (2000).

183. *See* Norman L. Greene et al., *Capital Punishment in the Age of Terrorism*, 41 CATH. LAW. 187, 205 (2001).

184. *See, e.g.,* Heather Anne Maddox, *After the Dust Settles: Military Tribunal Justice for Terrorists After September 11, 2001*, 28 N.C. J. INT'L L. & COM. REG. 421, 453 (2002) (quoting the 1940 U.S. War Department Rules of Land Warfare); Jose E. Alvarez, *Crimes of States/Crimes of Hate: Lessons from Rwanda*, 24 YALE J. INT'L L. 365, 408 n.215 (1999); Walter G. Sharp, Sr., *The Effective Deterrence of Environmental Damage During Armed Conflict: A Case Analysis of the Persian Gulf War*, 137 MIL. L. REV. 1, 35 (1992).

185. *See* Elizabeth A. Reimels, Comment, *Playing for Keeps: The United States Interpretation of International Prohibitions Against the Juvenile Death Penalty—The U.S. Wants to Play the International Human Rights Game, But Only If It Makes the Rules*, 15 EMORY INT'L L. REV. 303, 321 (2001) (arguing that the juvenile death penalty is a violation of customary international law and that the drafters of the International Covenant on Civil and Political Rights equated the right to life with the abolition of the death penalty).

186. *See* Amnesty International, *Facts and Figures on the Death Penalty, at* http://web.amnesty.org/pages/deathpenalty-facts-eng (last modified Sept. 27, 2005) (last visited Oct. 1, 2005).

civilians abroad.[187] These same arguments may also hold true with unlawful combatants. It is important to note that none of the three operating international criminal tribunals is authorized to administer the death penalty.[188]

Removing the death penalty as a possible punishment would create an incentive for at least a certain number of unlawful belligerents who might meet the two criteria of the GCC or otherwise be subject to the death penalty under customary international law or domestic law. Being protected from the death penalty may mean long prison sentences, but it may also mean eventual release through changing circumstances, such as success of the insurgency or international pressure.[189] As with other proposals, it would have to be publicized in advance for greatest effect, and strictly adhered to when circumstances were appropriate.

For the lawful belligerents, the major detractor from such an incentive is the issue of continued incarceration and its continuing logistical requirements. However, that can serve as a visible reminder of the veracity of the incentive and also of the penalties of fighting against the lawful forces, whereas killing the unlawful belligerent may make him a martyr to other like-minded noncombatants contemplating illegal activities.

## F.   If the Movement Results in International Armed Conflict and the Fighter Gets Subsequent Combatant Status, the Prior Lawful Warlike Actions Are Also Covered by Combatant Immunity

Finally, one of the greatest incentives that can be given to unlawful combatants to encourage them to wear uniforms is that if the movement they are fighting for at some point obtains combatant status, their prior actions would be covered by combatant immunity, so long as they would have been lawful if they had been combatants at the time. In other words, if an unlawful combatant conducts himself lawfully by abiding by the laws of war in how he engages in hostile activity, and does not qualify for combatant status only because of his non-

187. *See* Thomas M. McDonnell, *The Death Penalty—An Obstacle to the "War Against Terrorism"?*, 37 VAND. J. TRANSNAT'L L. 353, 400–417 (2004).

188. *See* Nora V. Demleitner, *The Law and Politics of the Death Penalty: Abolition, Moratorium, or Reform?: The Death Penalty in the United States: Following the European Lead?*, 81 OR. L. REV. 131, 143–44 (2002).

189. *See, e.g., Zimbabwe; President Arrives in New York for UN Assembly*, AFR. NEWS, Sep. 12, 2002, *available in* LEXIS, News File (discussing international pressures to release freedom fighters); Ken Adelman, *Open the Doors to Burma; Engage Its Military Leaders in Dialogue*, WASH. TIMES, May 21, 2002, at A21.

compliance with one of the other three criteria, he would be given combatant immunity if his organization does eventually receive combatant status.

A battlefield fighter's status is determined at the time he is captured.[190] Once that determination is made, it is generally not reconsidered unless there is some new evidence found that would change that status. Recognition as combatants for members of his organization could be such information that would cause a reconsideration of an unlawful combatant's status, and grant him combatant's status. For example, assume that an unlawful combatant is part of an irregular force that is fighting an invading force but doesn't meet the requirements of combatant status because the force is not complying with the laws of war, due to most of the fighters not fighting in uniforms. However, this particular battlefield fighter was fighting in a distinctive emblem that was subsequently adopted by the rest of his group and his group was then recognized as complying with the four combatant status criteria and given combatant status. Because the unlawful fighter was in uniform at the time of his capture, his status ought to be revisited and he ought to be given combatant status.

This incentive adds value to the prior proposals advocating holding in abeyance the execution of any punishment until the conflict is resolved and the disallowance of the death penalty. Because the determination may change over time, not executing the punishment, particularly the death penalty, is important because the unlawful fighter's status may change.

This provides obvious incentives for the unlawful belligerent. If he believes that he deserves combatant status but his fellow fighters simply have not got all the pieces of combatancy put together yet, he has a concrete incentive to wear a uniform. This argument is an especially important incentive to groups that are fighting in an internal armed conflict where combatant status does not apply[191] but where the group

---

190. Canestaro, *supra* note 21, at 112–13 (describing the U.S. Supreme Court's treatment of Nazi Saboteurs in *Ex parte Quirin*, 317 U.S. 1, 37 (1942)).

191. *See supra* note 55; *see also* Lopez, *supra* note 9, at 917:

> The growing number of fatalities and atrocities in recent civil wars highlights the inadequacy of the legal protections afforded to civilians, combatants, and peacekeepers under existing international humanitarian law. Although civil wars present the same horrors as international ones, they are governed by only a few, largely ineffective provisions in the Geneva Conventions of 1949 and their Additional Protocols of 1977. These provisions offer little protection to combatants and civilians in conventional civil wars, resulting in an unfortunate disparity between the protections afforded during international and internal conflicts.

believes that it will achieve sufficient recognition in the future to be given combatant status.

For the lawful forces, not only does it allow easier targeting since the fighter is now in uniform, but it also will act as an incentive for groups to comply with all the requirements of combatant status. The opportunity for eventual combatant status and combatant immunity will have a powerful influence on prospective battlefield fighters and will be a great encouragement to distinguish themselves on the battlefield.[192]

## V.    CONCLUSION

Today's battlefields are populated by noncombatants as well as combatants. Among those on the battlefield are many who do not meet all four requirements of article 4 of the GPW and therefore do not qualify for combatant status. Current international law requires a force to meet all four requirements before granting any privileges. Without this privilege of combatant status, these groups of "unlawful belligerents" have no incentive to comply with any of the four criteria of combatancy. This all-or-nothing approach is designed to encourage groups to attempt to achieve combatant status. Instead, it acts as a disincentive for groups who cannot meet all four criteria to attempt compliance with any of the four requirements, including wearing a fixed distinctive emblem to help distinguish them from the local populace.

The disincentive for unlawful belligerent groups to distinguish themselves is counterproductive to the modern attempts to protect noncombatants and to require combatants to refrain from military operations that would adversely affect non-combatants. If soldiers cannot distinguish who the enemy is, and if that enemy attacks from civilian crowds, it is impossible to expect soldiers to not respond in self-defense, thereby putting innocent noncombatants at risk. This can be remedied by offering incentives for the unlawful combatants to distinguish themselves by wearing uniforms. Providing incentives to motivate unlawful combatants to wear uniforms can be achieved by offering some benefits that they would not otherwise qualify for unless they distinguish themselves, thus, making themselves targets and

---

*Id.* (citations omitted); Gregory M. Travalio, *Terrorism, International Law, and the Use of Military Force,* 18 WIS. INT'L L.J. 145, 182 (2000); *cf.* Alex G. Peterson, *Order Out of Chaos: Domestic Enforcement of the Law of Internal Armed Conflict,* 171 MIL. L. REV. 1, 5–6 (2002) (discussing the portions of international law that have become applicable to internal armed conflicts).

192. Jinks, *supra* note 58, at 438.

allowing the lawful forces to better protect the civilian populace. These intermediate privileges include immunity from prosecution for speech or association crimes connected with political beliefs; abeyance on trial and execution of punishment until conflict is resolved; offering parole, including immunity for weapons crimes not resulting in death or injury; disallowance of the death penalty; and if the movement which the fighter is a part of eventually achieves combatant status, the fighter's prior lawful warlike actions will also be covered by combatant immunity. Granting these privileges will provide real incentives to unlawful combatants. Equally, the ability to distinguish the enemy that will flow from having unlawful combatants wear uniforms is certainly worth the exchange for privileges granted. Granting this intermediate recognition for partial compliance with the requirements of combatancy is a solution whose time has come.

* * *

HeinOnline -- 46 Va. J. Int'l L. 250 2005-2006

Civilians at war: reexamining the status of civilians accompanying the armed forces

**J. Ricou Heaton**

I. INTRODUCTION

II. TYPES OF REMOTELY CONDUCTED COMBAT OPERATIONS
 A. The Spectrum of Computer Network Attack and Exploitation Activities
 B. Unmanned Vehicles

III. THE TREATMENT OF CIVILIAN EMPLOYEES AND CONTRACTORS UNDER THE LAW OF WAR
 A. The Divisions Amongst Combatants, Noncombatants, and Civilians
  1. Combatants Defined
  2. Noncombatants Defined
  3. Civilians Defined
  4. Mercenaries Defined
 B. Determining What Constitutes Direct Participation in Hostilities
 C. Law of War Constraints on the Use of Force Affecting Civilians Accompanying the Armed Forces

IV. CIVILIAN INVOLVEMENT WITH THE ARMED FORCES IN COMBAT
 A. Armed Forces Utilization of Civilian Employees
 B. Armed Forces Utilization of Civilian Contractors
  1. Range of Services
  2. Reasons for Use

V. CIVILIAN PARTICIPATION IN REMOTELY CONDUCTED COMBAT OPERATIONS UNDER THE LAW OF WAR

VI. INADEQUACIES IN THE LAW OF WAR CONCERNING THE REGULATION OF ACCOMPANYING CIVILIANS PARTICIPATING IN COMBAT OPERATIONS
 A. The Law of War Fails to Adequately Separate Combatants From Civilians
 B. The Narrow Definition of What Constitutes Direct Participation in Hostilities Promotes the Civilianization of Military Forces
 C. The Law of War Does Not Distinguish Between Civilian Employee and Contractor Participation In Combat Operations

       D. The Prohibition Against Civilian Participation in Remotely

          Conducted Combat Operations is Subject to Circumvention

VII. MODIFYING THE LAW OF WAR

       A. Establishing Which Activities Constitute Direct Participation

          in Hostilities

          1. Clarifying the Meaning of Direct Participation in
             Hostilities

          2. Procedure for Specifying Which Activities Constitute
             Direct Participation in Hostilities

       B. Readdressing the Status of Accompanying Civilians

          1. Designating Civilian Employees as Remote Combatants

          2. Accompanying Civilians Providing Essential and Direct
             Support Should Be Lawful Targets for Attack

          3. Procedure for Authorizing Change in Civilian Status

VIII. CONCLUSION

## I. INTRODUCTION

Until the last century, the infliction of violence during war was an intimately personal experience. Warriors fighting with sword and spear could not be far removed from their opponents. The advent of gunpowder and later of aircraft stretched the physical dimensions of the battlefield, but still kept combatants in close proximity to the targets of their attack.

New technologies available to states have expanded the zone of conflict while at the same time allowing personnel engaged in hostilities to be far removed from the battlefield. This remotely conducted combat may take forms such as attacking an enemy's computer networks with worms and viruses or using remotely controlled unmanned aircraft to launch missiles onto the battlefield. Utilizing these methods, combatants sitting before computer screens can launch attacks against an enemy hundreds or even thousands of miles away.

A second development in the realm of armed conflict is the widespread practice of states shifting activities previously performed by military personnel to civilian employees and contractors. States increasingly are integrating civilians into their military forces, relying on them to operate and maintain sophisticated military equipment and to support combat operations. While this practice offers substantial benefits to states, which may be able to save money and gain access to superior technical expertise, it brings with it the risk of violating the law of war by inappropriately involving civilians in combat operations.

The law of war attempts to regulate state utilization of civilians in combat operations in the course of international armed conflicts by prohibiting civilians from directly participating in combat. The policy behind this prohibition is the desire to protect civilians from being targeted for attack. The effectiveness of this prohibition has been substantially undercut, however, by the failure of the law of war to provide a clear definition of what constitutes direct participation in combat. A prohibition that may have been easy to apply with simple weapons systems operating at short range does not provide clear guidance about the legality of civilians providing essential services in support of a state's warfighting efforts. States are aware of this ambiguity and have taken advantage of it to increase civilian participation in military activities.

The intersection of states making increased use of civilians and the development of remotely conducted combat operations forms a useful lens through which to analyze the inadequacies of the law of war in regulating civilian participation in combat in international conflicts. Currently, civilians are significantly involved in maintaining and operating the technologically complex systems used in remotely conducted combat operations. Definitional ambiguities and inadequacies in law of war prohibitions against civilians directly participating in combat are accentuated when applied to civilians situated far away from any battlefield, but who are nonetheless supporting or engaging in combat activities.

The issue of whether civilian employees and contractors may participate lawfully in combat activities and, in turn, be the subject of a lawful attack is relevant for four reasons. First, states are increasing the role civilians play in their armed forces to the point that civilians play an indispensable role in the ability of many states to use military force. Second, clear and logical guidelines concerning what combat related activities these civilians may engage in are necessary to prevent a blurring between civilians and combatants that may endanger the general civilian population. Third, civilians who do engage in combat activities in violation of the law of war may become unlawful combatants and face criminal liability for their actions. Fourth, a state using civilians in violation of the law of war will be in breach of its responsibilities under that law.

The law of war concerning civilians accompanying the armed forces needs to be changed to better protect these civilians and to maintain the general distinction between combatants and civilians unaffiliated with the military, while also acknowledging and legitimizing the fact that civilians are so integrated into many armed forces that they have become an indispensable and inseparable part of them. To accomplish these goals, the law of war should be modified in three ways: 1) direct participation in combat should be defined clearly and narrowly to enable states and individuals to determine

when civilians are engaging in combat; 2) states, after complying with appropriate notification requirements, should be able to designate civilian employees as combatants for the purpose of engaging in remotely conducted combat operations, and 3) civilian contractors and employees who provide direct and essential support to combat operations should be acknowledged as legitimate targets for attack.

The proposed changes in the law of war will be explored in six sections, beginning with Section II, which discusses the range of activities involved in two primary types of remotely conducted combat operations: computer network attack and exploitation; and the use of remote-controlled vehicles.

Section III then examines provisions in the law of war relevant to civilian employees and contractors. This examination includes a discussion of how civilians and combatants are defined under the law of war and the treatment accorded civilians accompanying the armed forces. This section discusses the meaning of the prohibition on civilians taking direct part in hostilities and how ambiguity over what civilian activity falls within this prohibition undercuts its effectiveness.

Section IV provides an overview of how states currently are integrating civilian employees and contractors into their militaries and using them in combat operations. Section V then examines the extent to which civilian employees and contractors may participate in remotely conducted combat operations under the law of war.

Section VI discusses problems with how the law of war regulates civilian participation in remotely conducted combat operations. The article will conclude in Section VII by recommending changes to the law of war to better regulate the combat-related activities of civilians accompanying the armed forces.

In the course of discussing these issues, a particular, although not exclusive, focus will be placed on how the United States uses civilian employees and contractors. This emphasis reflects the fact that the United States has significant capabilities to conduct combat remotely, has engaged in several international armed conflicts in recent years, and uses large numbers of civilian employees and contractors.

## II. TYPES OF REMOTELY CONDUCTED COMBAT OPERATIONS

### A. The Spectrum of Computer Network Attack and Exploitation Activities

Computers are indispensable components of a modern economy and military. The benefits computers provide, however, come at a cost. The same

computers that process financial transactions for a bank, monitor maintenance of military aircraft, or control the flow of natural gas through a pipeline are vulnerable to computer network attack and exploitation (CNAE) and this threat is growing. (1)

Computer network attack (CNA) involves operations that target an enemy's computer systems for the purpose of destroying, altering, or denying the systems or the information they contain. (2) Computer network exploitation (CNE) involves operations intended to obtain information from an enemy's computer systems. (3) Three characteristics of CNAE are: 1) they may be carried out from almost any location, 2) they may achieve many of the same results of conventional weapons, and 3) states have a widespread interest in developing the capacity to engage in CNAE. CNAE operations are well-suited to being conducted remotely because a targeted computer network can be attacked from any computer or other device with which it can communicate. (4) Some computer networks are connected to larger computer networks, such as the Internet, that are accessible to the public. (5) These publicly accessible networks are susceptible to being attacked from any computer linked to the network, no matter where in the world it is located. (6) Other computer networks reside on private networks where access to publicly accessible networks is either nonexistent or controlled. (7) Private computer networks are more difficult to penetrate in a CNAE operation, but they, too, are subject to attack. (8)

After a computer network has been penetrated, the basic concept of a CNAE operation involves inserting special types of software code into it. These types of code, often referred to as malicious code because of the purposes for which they are used, include viruses, (9) worms, (10) Trojan horses, (11) logic bombs, (12) spyware, (13) and back doors. (14) Successful insertion of these codes into a computer network may allow a CNAE operator to control the network, damage it, retrieve information from or place false information into it, or to shut it down. (15) The effects of an attack, and the choice of which CNAE tools to use, depend on the purpose served by the targeted computer network. (16)

There are two types of computer networks: information systems and infrastructure control systems. (17) Information systems process information but do not control anything tangible other than themselves. (18) These systems may contain documents, databases, and other types of information, and include the numerous local area networks operated by governments, businesses, and other organizations to help them transact their affairs. (19) Successful attacks against information systems do not cause direct physical damage, but may still cause significant harm. (20) Examples of the type of damage such attacks can cause are provided by viruses and worms that have spread through the Internet. In 2000, a single worm, known as the

"ILOVEYOU" worm, spread to more than 500,000 computer systems in one day and caused an estimated ten billion dollars in damage. (21) Multiple other incidents involving worms and viruses have each caused a billion dollars or more in damages. (22) Even unsuccessful attacks may have a significant impact because computer network users may be reluctant to rely on the network for fear it may have been corrupted. (23)

The second type of computer network, infrastructure control systems, interacts with and controls tangible equipment. (24) The most common type of this system is the supervisory control and acquisition (SCADA) system. (25) These systems are used to control transportation, water, power, and manufacturing facilities throughout the world. (26) SCADA systems monitor data and operations at the facility they control and send instructions to equipment. (27) SCADA systems represent an attractive military target because important industrial infrastructure supporting military operations may be damaged without the use of physical weapons. (28) At least one documented attack on a SCADA system, albeit by a private individual, has occurred. In this attack, the SCADA system of a sewage treatment plant in Australia was penetrated on multiple occasions for the purpose of releasing raw sewage into nearby parks and rivers. (29)

States' ability to engage in CNAE is not just theoretical. While the exact details are intentionally kept secret, the United States possesses both the capability and strategy for using CNAE. (30) The United States is believed to have used some form of CNA in Iraq (31) and to have considered its use in the Balkans. (32) China may have used CNA against Taiwan (33) and during the first Gulf War a group of Dutch hackers apparently offered to sell Iraq information that had been retrieved from Department of Defense computer systems. (34)

CNAE is establishing itself as an important tool in military arsenals throughout the world. As many as a hundred states are pursuing CNAE capabilities, attracted by the many advantages offered by this type of combat. (35) CNAE can be developed at a relatively low cost, can inflict significant damage, can be engaged in anonymously, and may reduce physical damage and casualties in a conflict. (36) As long as the economic health and security of modern states fully depend on computer networks, this interest in CNAE is unlikely to wane. (37)

B. Unmanned Vehicles

Unmanned vehicles currently in use or in the process of being developed will be in the air, on the ground, and in and under water, making future battlefields as much the domain of machines as men. A future conflict could start with military technicians in a facility within their state thousands of

miles away from the site of combat operating unmanned aerial vehicles (UAVs) as they fly over an enemy's territory. There they attack anti-aircraft systems with missiles and launch CNA attacks against wireless SCADA systems to shut down power plants and disrupt rail traffic. A naval task force then approaches the enemy's coast, using unmanned underwater vessels (UUVs) to destroy mines and find a safe passage for an amphibious landing. After a landing is made and a beachhead secured, armed unmanned ground vehicles (UGVs) carry supplies and ammunition toward a target of attack, an enemy city a hundred miles away, saving task force soldiers from facing the danger of traveling in a convoy for several days through hostile territory. Once the UGVs arrive at their destination, the soldiers will be ferried to this location by helicopter, where they will take ammunition and supplies from the UGVs and commence to attack their target.

The idea of unmanned vehicles on, or above, the battlefield, can be dated back to at least World War I, when the United States built a UAV that could be launched from a track to fly over enemy lines. (38) This first UAV, which never saw combat service, could not be controlled from the ground; rather, it contained a device engineered to stop the flow of gasoline to the engine after the propeller had made a predetermined number of revolutions, at which time the UAV would fall to the ground and explode. (39) By the Vietnam War, technology had progressed to the point where UAVs could be used for reconnaissance work, and UAVs flew more than 3500 sorties during the war, although technological limitations hampered their effectiveness. (40)

Developments such as the creation of the Global Positioning System and improvements in information transmission made UAVs more attractive in the 1990s. UAVs could now handle more complicated intelligence and reconnaissance missions and be controlled with greater precision over greater distances. (41) The United States has spent billions of dollars on UAVs and now has about 250 UAVs in its inventory, a number that may increase to 1400 by 2015. (42) These UAVs, including the Global Hawk and the Predator, have been used in reconnaissance and intelligence missions in conflicts ranging from the Balkans to Afghanistan and Iraq. (43) The Predator has been modified to carry missiles and has used them in Yemen, Afghanistan, and Iraq. (44)

While several UAVs are in current use, more than sixty separate UAV programs are under development. (45) These programs include two UAVs being designed by the Air Force and Navy for combat bombing missions. (46) The Army and the Marines are each developing unmanned helicopters for carrying supplies and combat missions. A UAV is even being developed to engage in computer network attack. (47)

Unmanned ground vehicles and naval vessels are also under development. The Department of Defense and Congress have established a goal of having one third of the Army's operational ground combat vehicles being unmanned by 2015 and are prepared to spend billions of dollars to achieve it. (48) Two Army programs involving unmanned ground combat vehicles include the Stryker combat vehicle and the Future Combat System (FCS). The Stryker combat vehicle, which may become the focal point for the Army to reorganize around, will be produced in manned and unmanned versions. (49) The unmanned version will contain an autonomous navigation system and be connected to a command center that can control the vehicle if it encounters problems. (50) The FCS is the Army's top procurement priority. (51) The FCS involves creating at least three UGVs that between them will carry supplies, perform surveillance and intelligence missions, and engage in combat. (52) The Marines are developing UGVs to perform similar missions. (53) While UGVs are primarily still in the development stage, they have received limited use from United States forces in Afghanistan and Iraq. (54)

Unmanned surface and subsurface vessels are planned as well. The Navy has developed and deployed for testing the Spartan, a fast armed boat with a range of up to a thousand miles that would be armed with missiles. (55) Underwater unmanned vehicles are more difficult to develop because of the technical challenges presented when operating underwater, but they do exist. (56) A UUV was used in Iraq to look for mines in the port at Um Qasar. (57) Other UUVs are being developed to engage in intelligence and demining operations and future Navy ships are being designed to carry them. (58)

This interest in unmanned vehicles is not limited to the United States. Countries such as Russia, (59) China, (60) France, (61) Israel, (62) Australia, (63) the United Kingdom, (64) and India (65) have established or are developing their own capabilities in unmanned vehicles. Almost half of all states possess at least one of the more than 500 UAV systems that have been developed to date, and at least forty-three of those states can manufacture a UAV. (66) These UAVs have been employed for decades, with two examples including Israel using UAVs to help destroy Syrian artillery in Lebanon in 1982 (67) and Pakistan sending Chinese-made UAVs into India to perform reconnaissance in 2002. (68)

Several factors drive this interest in unmanned vehicles. They can reduce casualties, be less expensive to build and operate than manned vehicles, and offer capabilities manned vehicles do not possess. Unmanned vehicles can reduce casualties by replacing manned systems performing hazardous combat related duties such as attacking anti-aircraft batteries, destroying mines, and resupplying troops in the field. When an unmanned vehicle is destroyed, the only damage is to equipment, a factor casualty-averse states find attractive. (69)

Unmanned vehicles are less expensive to build and operate than their manned counterparts because they do not need to provide space, protection, or life support for a crew. (70) In addition to the initial savings when making unmanned vehicles, training and maintenance costs may also be lowered. The X-45 UCAV bomber illustrates the potential for savings. Each X-45 will cost from 15 to 20 million dollars, one-third to one-half of what a new manned combat aircraft costs. (71) The X-45 can be stored for up to twenty years in its own climate controlled facility, reducing the need for maintenance. (72) The expense of training pilots, which includes pilots continuously needing to fly training missions to keep their skills intact, can also be avoided. (73) Manpower costs can be reduced even further because one operator can simultaneously control up to four X-45s. (74)

Finally, unmanned vehicles can offer superior performance because they are not subject to limitations imposed by the presence of a crew. Unmanned vehicles can engage in long missions without concern about fatigue and engage in maneuvers such as rapid acceleration that are beyond the tolerance of a human. (75)

## III. THE TREATMENT OF CIVILIAN EMPLOYEES AND CONTRACTORS UNDER THE LAW OF WAR

### A. The Divisions Amongst Combatants, Noncombatants, and Civilians

The modern battlefield presents a taxonomic challenge. Combatants, unlawful combatants, noncombatants, civilians accompanying the armed forces, and civilians from the general population may all be present and all are treated differently under the law of war. Understanding the meaning of these terms makes it possible to understand the status of civilian contractors and employees under the law of war.

### 1. Combatants Defined

Under the modern conception of the law of war, almost everyone involved in an international armed conflict is classified as having either of two primary statuses: combatant or civilian. (76) Combatants are entitled to participate directly in hostilities while civilians cannot. (77) Beyond this fundamental distinction, different protections and responsibilities belong to the members of each category. (78)

While war has been a constant presence in human history, the notion of separating out combatants from civilians is of surprisingly recent vintage. Soldiers and sailors existed before the nineteenth century, but not until then did scholars begin to write about combatants as the class of people entitled to take part in combat. (79)

The first international effort at forming a definition of combatant occurred in the Brussels Conference of 1874. (80) This definition was adapted with modifications during the Hague Peace Conferences of 1899 and 1907 and codified in the Hague Convention Respecting the Laws and Customs of War on Land (Hague Convention). (81)

The Hague Convention provides a two-part test for determining combatant status. (82) The first part requires a combatant to be part of the armed forces or of a militia or volunteer corps. Such a requirement reflects the fact that a state involved in an armed conflict acts through its armed forces however categorized. (83)

The second part of the test contains four criteria that must be met to achieve combatant status. Potential combatants must: 1) be commanded by a person responsible for his subordinates; 2) have a fixed distinctive emblem recognizable at a distance; 3) carry arms openly; and 4) conduct their operations in accordance with the laws and customs of war. (84) The Hague Convention also provides that a state's armed forces may consist of combatants and noncombatants. (85)

Over forty years passed before the coming into force of the next significant treaty dealing with combatants—the Geneva Convention Relative to the Treatment of Prisoners of War (Geneva Convention III). (86) This treaty, one of a series of four treaties concerning the law of war drafted under the auspices of the International Committee of the Red Cross, was signed in Geneva in 1949. (87) Geneva Convention III, as may be surmised from the title, deals with the protection to be afforded prisoners of war (POWs). Because POWs are, in most circumstances, simply combatants who fall into the hands of the enemy, the definition of who is entitled to POW status is all but synonymous with who is a combatant. (88) Geneva Convention III adopted the Hague Convention definition of combatant with very little change. (89)

By the 1970s, enough states felt the need to update the 1949 Geneva Conventions that they met in a conference, which resulted in the adoption of two protocols, the first of which was Protocol I Additional to the Geneva Convention of 1949 (Protocol I). (90) Protocol I supplements and updates the 1949 Geneva Conventions. (91) Protocol I has been ratified by over 160 states (92) and much of Protocol I is considered a codification of existing international law. (93)

Two aspects of the definition of "combatant" in Protocol I have provoked debate. First, members of national liberation movements can qualify for combatant status. Second, in some circumstances Protocol I appears to blur

the distinction between civilian and combatant status. Analyzing these issues begins with the definition of combatant in Protocol I:

    The armed forces of a Party to a conflict consist of all organized
    armed forces, groups and units which are under a command
    responsible to that Party for the conduct of its subordinates, even
    if that Party is represented by a government or an authority not
    recognized by an adverse Party. Such armed forces shall be subject
    to an internal disciplinary system which, inter alia, shall enforce
    compliance with the rules of international law applicable in armed
    conflict. (94)

The impetus for this expansion was the interest of many Third World countries in having the legitimacy of armed conflict with colonial powers recognized. (95) This definition does broadly extend eligibility for combatant status to nonstate parties, to include liberation movements, and has, accordingly, been controversial. (96) A particular concern has been that this article offers protection to terrorist groups. (97) The better argument, however, supports the conclusion that terrorists are not entitled to combatant status because the traditional criteria required for combatant status spelled out in Geneva Convention III still apply. (98) As one commentator has stated, "Protocol I does not really reduce the four conditions in the Geneva Conventions but rephrases them." (99) Protocol I, therefore, requires adherence to the law of war for combatant status, which means terrorists will not qualify as combatants. (100)

The second contested issue concerning combatant status involves Article 44 of Protocol I, which appears to allow combatants to switch back and forth between civilian and combatant status. Article 44 states:

    [C]ombatants are obliged to distinguish themselves from the
    civilian population while they are engaged in an attack or in a
    military operation preparatory to an attack. Recognizing, however,
    that there are situations in armed conflicts where, owing to the
    nature of the hostilities an armed combatant cannot so distinguish

```
    himself, he shall retain his status as a combatant, provided
that,
    in such situations, he carries his arms openly: (a) during each
    military engagement, and (b) during such time as he is visible
to
    the adversary while he is engaged in a military deployment
    preceding the launching of an attack in which he is to
participate.
    (101)
```

The language in this article suggests that combatants can carry concealed weapons while wearing civilian clothes, only brandishing their weapons as they carry out an attack. As a result, concern has been expressed that this article endangers civilians by breaking down the distinction between civilians and combatants. (102) The more logical interpretation of Article 44, however, is that it is meant to be narrowly construed. (103) The requirements from Article 43 of Protocol I must still be met and weapons must be carried openly well before any attack begins. (104)

Even after the advent of Protocol I, the definition of a combatant today is still almost completely derived from the definition of a combatant in the Hague Convention from 1907. The definition of a combatant has changed little in the last hundred years, despite the significant changes in the manner in which warfare is conducted.

Two aspects of combatant status are of particular importance. First, combatants are authorized to take direct part in hostilities. (105) Second, as has been alluded to, combatants are entitled to prisoner of war status if captured. (106) POWs receive a variety of protections, but one of particular relevance is that POWs may not be punished for taking part in hostilities as long as the requirements of the law of war have been met. (107) Unlawful combatants, who are people who do not have combatant status but take direct part in hostilities, receive no such protection and may be criminally prosecuted for their actions. (108)

There are at least three situations where civilians can be considered lawful combatants: the levee en masse, police agencies incorporated into the armed forces, and as commanders. The levee en masse consists of a spontaneous uprising against an enemy before a territory is occupied. (109) As long as the participants in the levee en masse obey the law of war and have not had time to organize themselves into a militia, they are entitled to combatant and, if captured, POW status. (110)

Civilian paramilitary and law enforcement agencies may be incorporated into the armed forces and receive combatant status upon notice to the other

parties to the conflict. (111) The mechanism for making this notification is by submitting written notice to the government of Switzerland. (112)

Finally, the Commentary to Geneva Convention III indicates civilians may lawfully lead partisan combat units. (113) Presumably, these leaders would then be entitled to the same combatant status as the partisans they lead.

## 2. Noncombatants Defined

"Noncombatant" and "civilian" are terms that may be used interchangeably in common parlance, but under the law of war they have distinct meanings. Noncombatants are members of the armed forces (114) who have primary status as combatants, not civilians, but do not take part in hostilities because their own state prohibits them from doing so. (115) Since noncombatant status derives only from the decision of their state, not the requirements of the law of war, noncombatants are, in fact, treated as combatants under the law of war. (116) They may be targeted as combatants and noncombatants may take part in hostilities without becoming unlawful combatants. (117) If captured, noncombatants are entitled to POW status. (118)

Medical and religious personnel may be referred to as noncombatants but that misconstrues their actual status because they do not have primary status as combatants. They have primary status as medical and religious personnel. (119) While noncombatants do not fight because of the domestic decision of their state, the law of war prohibits medical and religious personnel from engaging in combat. (120)

## 3. Civilians Defined

Protocol I defines civilians as those persons who are not part of the armed forces. (121) When there is ambiguity over whether someone is a combatant or civilian, they should be considered a civilian. (122) This definition of civilian includes civilians who accompany the armed forces. (123) Simply performing work for the armed forces is not sufficient to be considered a civilian accompanying the force. Only those civilians who have been authorized to accompany the armed forces and received an identification card can be considered civilians accompanying the armed forces. (124)

While civilians accompanying the force have civilian status, they do receive different treatment from other civilians because, unlike almost anyone else with civilian status, they are entitled to POW status when captured. (125) However, like other civilians, civilian employees and contractors who take part in hostilities will be considered unlawful combatants. (126) Civilian employees and contractors also face the risk of losing the protection from

attack civilians are owed under the law of war because of their proximity to military objectives. (127)

While the law of war does not draw a distinction between civilian employees and contractors, they have different relationships with the armed forces. Civilian employees are hired and supervised by the armed forces and have an employment relationship with them. (128) Contractors work independently or for a private company and have a contractual relationship with the armed forces.

4. Mercenaries Defined

States have a long tradition of employing mercenaries. (129) Mercenaries are generally considered to be professional soldiers who serve for money, not loyalty, typically in the service of a foreign country. (130) Prior to the 1970s, there was no prohibition in international law against their use and mercenaries could qualify for combatant status if they met the requisite combatant criteria. (131)

By the 1960s, many countries undergoing decolonization or experiencing national liberation movements, particularly in Africa, became concerned with the use of mercenaries. These countries successfully lobbied to have a ban on mercenaries placed into Protocol I, where Article 47 provides that:

A mercenary is any person who:

(a) is specially recruited locally or abroad in order to fight in an armed conflict;

(b) does, in fact, take a direct part in the hostilities;

(c) is motivated to take part in the hostilities essentially by the desire for private gain and, in fact, is promised, by or on behalf of a Party to the conflict, material compensation substantially in excess of that promised or paid to combatants of similar ranks and functions in the armed forces of that Party;

(d) is neither a national of a Party to the conflict nor a resident of territory controlled by a Party to the conflict;

(e) is not a member of the armed forces of a Party to the conflict; and

(f) has not been sent by a State which is not a Party to the conflict on official duty as a member of its armed forces. (132)

These requirements are sequential and cumulative: all must be met for someone to be considered a mercenary. (133)

This definition is so narrowly drawn that few people are likely to fall within its terms. (134) Proving someone fights for material gain as opposed to an ideological, moral, or religious motivation may be difficult. (135) In addition, the prohibition can be circumvented easily by a state incorporating potential mercenaries into its armed forces, as the United Kingdom has done with the Nepalese Gurkhas serving in its army. (136)

The main effect of being a mercenary under the Protocol I definition is becoming ineligible for lawful combatant or POW status. (137) As such, a mercenary engaging in combat is an unlawful combatant who can be held criminally liable for his actions. While not entitled to POW status, mercenaries are still entitled to the minimal due process standards guaranteed civilians in Geneva Convention IV and Article 75 of Protocol I. (138)

There have been several attempts subsequent to Protocol I to further regulate mercenaries, although these have not met with widespread success. (139) The end result of all these regulatory efforts is a limited ban on the small category of mercenaries who can fit within the parameters of the Protocol I definition. This lack of regulation does not mean, however, that mercenaries can engage in combat. (140) Unless they are incorporated into a state's armed forces they remain civilians who may not engage in combat. Signing a contract with a state is, by itself, insufficient to convert a civilian to a combatant. (141)

**B. Determining What Constitutes Direct Participation in Hostilities**

Consider a helicopter gunship attacking enemy soldiers during the course of the battle. An UAV circling above the battlefield operated by a civilian employee from a remote location provides targeting information to the helicopter. A crewman onboard the helicopter uses this information to direct the fire of a machine gun toward enemy soldiers on the ground. The helicopter receives minor damage from small arms fire and lands a short distance from the battlefield. Civilian contractors are brought to the helicopter to perform emergency repairs on it, allowing the helicopter to return to the battlefield. In this scenario the crewman firing the machine gun is clearly a combatant, but the status of the contractors and employees is more ambiguous as reasonable arguments could be made for and against the proposition they directly participated in hostilities and so lost their status as civilians.

Combatants are entitled to engage in combat, that is, to participate directly in hostilities. (142) This rule is codified in Article 43(2) of Protocol I. (143) The

logical corollary of this prohibition is that civilian employees and contractors can actively engage in noncombat activities, i.e., those activities falling short of direct participation in hostilities, without becoming unlawful combatants. (144) Before the full distinction between combatants and civilians can be discerned, therefore, the difference between combat and noncombat activities must be determined.

Military operations depend on a wide range of activities from firing a gun to providing intelligence about enemy targets to making bullets. Where the law of war requires the drawing of a line to distinguish between direct and indirect participation in hostilities is unclear. The Commentary to Protocol I suggests a narrow interpretation of direct participation in hostilities, limiting it to those activities where there is a, "direct causal relationship between the activity engaged in and the harm done to the enemy at the time and the place where the activity takes place." (145)

The Commentary to Article 77 of Protocol I provides a further gloss to what constitutes direct participation in hostilities. This article, which deals with the obligation of states to keep children from direct participation in hostilities, lists examples of activities which do not constitute direct participation as including, "gathering and transmission of military information, transportation of arms and munitions, [and] provision of supplies." (146) Protocol I, with its Commentary, suggests direct participation is limited to actions that directly cause damage to an enemy's personnel or equipment. This view would include only actions such as planting bombs to destroy an enemy's convoy of trucks or engaging in a firefight with enemy soldiers. (147)

This restrictive view of what constitutes direct participation in hostilities does not reflect state practice. (148) Between undoubted combat activities described in Protocol I and activities such as feeding and sheltering combatants that are acknowledged as not equating to direct participation in hostilities there is uncertainty. (149) Examples of the type of activity that may cause a civilian to be considered a combatant include intelligence gathering, performing mission-essential work at a military base, or providing logistical support. (150)

The lack of certainty over what activities constitute direct participation in hostilities may simply reflect the fact there is no consensus about where to draw the line between combat and noncombat activities. The British government described this difficulty in a policy paper:

    The distinction between combat and non-combat operations is often

    artificial. The people who fly soldiers and equipment to the

```
    battlefield are as much a part of the military operation as
those
    who do the shooting. At one remove the same applies to those
who
    help with maintenance, training, intelligence, planning and
    organisation-each of these can make a vital contribution to war
    fighting capability. Other tasks such as demining or guarding
    installations may be more or less distant from active military
    operations according to the broader strategic picture. (151)
```

This language captures an essential point of modern military conflicts, which is that the combatants shooting guns or dropping bombs are only capable of engaging in combat because of the support they have received. While it is easy to label the gun-toting soldier a combatant, it is harder to determine the status of those who transport him to the battlefield, gather intelligence about the location of enemy military positions, or repair and maintain the sophisticated weapons systems he uses to fight.

Two principles can be extracted from the various views on what constitutes direct participation in hostilities. The first principle is that the closer an activity occurs to the physical location of fighting, the more likely it will be considered combat. (152) This principle captures the idea that activity near the battlefield can usually be more closely linked to the infliction of harm on an enemy. An example of a civilian driving a truck loaded with ammunition illustrates this point. If the civilian is driving the truck in his home country from a munitions factory to a nearby port from where the munitions will be shipped to an area of conflict 4000 miles away, then his transporting the munitions would not normally be considered a combat activity. (153) Once the ship arrives at its destination, the ammunition is loaded onto a truck and a civilian driver drives the truck to resupply an artillery unit shelling enemy soldiers as part of an ongoing battle. At some point as the truck approaches the battlefield, driving the truck would appear to become a combat activity. (154)

This general rule does not, however, provide clear guidance on what locations should be considered so close to fighting as to elevate certain civilian support activities from noncombat to combat participation. Being physically present on the battlefield where fighting is occurring appears to qualify, but beyond that the exact geographic scope where participation in support activities may equate to combat activity has not been decisively determined. (155)

The second general rule looks at the nature of the combat-related activity itself and how closely the activity is related to the infliction of violence. This type of rule makes sense because the modern battlefield has been stretched to proportions far beyond what existed a century ago. Just as a sniper firing a

bullet at a target a mile away is by any definition a combatant, no one would contest that whoever presses the button to launch a missile that travels a thousand miles to hit its target is a combatant. Physical distance from the point of impact is irrelevant because the person launching the missile directly caused the damage caused by the missile.

The rule that participation in activities closely associated with the direct infliction of violence is more likely to be labeled combat explains why activities such as gathering intelligence for targeting purposes and servicing a weapons system may be considered direct participation in hostilities. (156) These activities are indispensable to and closely connected with the infliction of violence. By contrast, other activities, such as providing combatants with food and water, are considered sufficiently removed from the infliction of violence that civilians providing such services to combatants are unlikely to be considered to have taken a direct part in hostilities. (157)

The net effect of the unsettled nature of what constitutes combat activity is that while civilian employees and contractors accompanying the armed forces are entitled to status as civilians under the law of war, the range of activities they may lawfully engage in has not been clearly delineated. This ambiguity does not mean civilians are being kept from participating in military operations. Civilian participation and integration into military activities has grown rapidly in recent years. Examination of current civilian involvement in combat activities will indicate how states are interpreting where this line should be drawn in battlefields around the world.

C. Law of War Constraints on the Use of Force Affecting Civilians Accompanying the Armed Forces

States engaging in international armed conflicts are not entitled to use force indiscriminately. The three underlying principles of the law of war most directly affecting targeting decisions are military necessity, distinction, and proportionality. (158) Each of these principles works to protect civilians and limit the scope of violence during a conflict. (159)

The first restraint a commander must consider when selecting a target for attack is military necessity, which requires limiting attacks to targets of military significance using only those weapons or means needed to achieve military purposes. (160) The purpose of this principle is to ensure that every military action is driven by a military requirement and is intended to subjugate the enemy in the shortest amount of time and at the least possible expense of men and materiel. (160) Under this principle, acts which lack any direct military purpose, such as indiscriminate bombing of civilian dwellings or food supplies, are prohibited. (162)

This principle can be difficult to apply because it contains subjective elements, particularly when a commander must use his judgment to determine what actions will, in fact, further the purpose of subjugating the enemy in light of the goals of the conflict. While some civilian objects such as museums or churches will never, barring their misuse, be the lawful subject of an attack, the military necessity to attack many objects such as dams or factories may wax and wane during the course of a conflict. (163)

When selecting targets for attack, the principle of distinction prohibits direct attacks on civilians and civilian objects. (164) To achieve this aim, states are under an obligation to distinguish civilians and civilian objects from their military counterparts. This principle has been codified in Articles 48, 51(2), and 52(1) of Protocol I, which require states to avoid targeting civilians and instead, "direct their operations only against military objectives." (165) Military objectives, in turn, are defined in Article 52(2) of Protocol I:

> Attacks shall be limited strictly to military objectives. In so far
> as objects are concerned, military objectives are limited to those
> objects which by their nature, location, purpose or use make an
> effective contribution to military action and whose total or
> partial destruction, capture or neutralization, in the
> circumstances ruling at the time, offers a definite military
> advantage. (166)

The Commentary for this article indicates military objectives are also meant to encompass combatants. (167)

Many of the obligations placed on states by the law of war flow from this principle of distinction. Combatants are obliged to carry weapons openly and wear uniforms so they may be distinguished from civilians. (168) Military facilities are to be placed apart from civilians and civilian objects.

While there is general agreement that Protocol I accurately summarizes customary international law concerning the principle of distinction, there is disagreement over how this principle should be implemented on the field of battle. (169) There are at least two reasons for this problem: 1) the subjective nature of the test for determining what is a lawful military objective, and 2) the increasing intermingling of military and civilian objects. (170)

The subjective nature of applying the principle of distinction results from two aspects of the definition of a military objective: the determination of what makes an "effective contribution" to military action and what constitutes a

"definite military advantage." In the midst of the stresses and strains of a
conflict, different commanders are likely to reach different determinations
about these matters, particularly as there are significant disagreements over
issues as basic as whether economic facilities providing indirect but important
support to the military may even be targeted. (171)

The principle of distinction can be difficult to apply when civilian and military
objects, including personnel, are intermingled. (172) When objects such as
airports, buildings, or telecommunications systems have dual military and
civilian purposes, even the most precise weapons may cause harm to civilians.
The principle of distinction does not provide civilians with absolute immunity
from attack or clear guidance on how to deal with situations where the
distinction between civilian and military has become blurred. (173) The laws
of war have long acknowledged that injury to civilian objects incidental to
attack on lawful military objectives may be legitimate if not excessive, as
determined through use of the third principle--proportionality. (174)

The principle of proportionality must be used to determine how to proceed
when directing attacks against military objectives that will likely cause harm
to civilians and civilian objects. Proportionality calls for a balancing test to
weigh military advantage against civilian harm. States have an obligation to
use the means and methods of attack that will cause the least amount of
collateral damage while still achieving the military objective. (175) This
principle is codified by Protocol I in Article 51(5)(b), which prohibits, "an
attack which may be expected to cause incidental loss of civilian life, injury to
civilians, damage to civilian objects, or a combination thereof, which would be
excessive in relation to the concrete and direct military advantage
anticipated." (176)

When performing this balancing test, collateral damage to civilians is allowed
to the extent that it is not excessive in relation to the "concrete and direct
military advantage." (177) The determination of when civilian losses should
be considered excessive is subjective in nature and has not been resolved.
(178) Although the extent of protection offered civilians by this principle is
uncertain, two types of attacks do appear to be inherently disproportionate:
those that intentionally target civilians and attacks that have been so
negligently prepared or conducted that they amount to targeting civilians
directly. (179)

These principles of military necessity, distinction, and proportionality work to
protect civilians, but they are only principles. They provide general guidelines,
not detailed regulations, for states to follow when planning attacks and
selecting targets. These principles have not been clearly defined and proper
implementation of them involves making subjective calculations about

whether targets are military objectives, the value of attacking them, and the acceptable toll of civilian casualties from collateral damage.

## IV. CIVILIAN INVOLVEMENT WITH THE ARMED FORCES IN COMBAT

The two types of civilians accompanying the armed forces, employees and contractors, have different relationships with the armed forces. The distinction between these relationships, at least in the United States, is that the armed forces, as an employer, may control the detailed physical performance of civilian employees but not contractors. (180) Civilian employees fall under the command of a military commander and are subject to supervision, control, and discipline by the commander or his subordinate. (181) Contractors work for themselves or a private company. They are not subject to being controlled and supervised by a military commander to the same degree as civilian employees. (182)

### A. Armed Forces Utilization of Civilian Employees

Civilian employees are directly employed by armed forces throughout the world. In the United States, the Department of Defense employs almost 700,000 civilian employees. (183) These employees work in key areas such as weapons systems maintenance, logistics, and intelligence and form an integral part of the Department of Defense. (184) While the majority of these employees work within the United States, many are stationed overseas or have deployed abroad in support of military operations. (185)

Civilian employees are directly involved in supporting the operation of weapons systems throughout the U.S. military. The Department of Defense maintains an extensive network of industrial facilities to perform weapons systems maintenance, including Naval shipyards, Army depots and arsenals, and Air Force logistics centers. (186) These facilities employ tens of thousands of civilian employees who repair, maintain, manufacture, and upgrade weapons systems ranging from ships to missiles to aircraft. (187)

Civilian employees also play an important role in the logistics of shipping personnel and materiel in support of military operations. (188) Civilians operate ports, load airplanes, drive trucks and sail ships to assist in transporting the massive amount of supplies combat operations require. (189)

Civilian employees may deploy to areas where combat operations are occurring and they have deployed in the thousands to areas of conflict around the world. (190) The Department of Defense has determined that certain positions, designated as emergency essential (E-E), must be subject to deployment. An EE position is one that is, "required to ensure the success of

combat operations or to support combat-essential systems.... That position cannot be converted to a military position because it requires uninterrupted performance to provide immediate and continuing support for combat operations and/or support maintenance and repair of combat-essential systems." (191) Although this definition indicates civilian employees only deploy when there is a military necessity for their presence, the recent trend in deployments has been for civilian contractors to displace civilian employees. (192) Contractors have become favored for at least two reasons: the expertise they may provide and the difficulties commanders experience in managing civilian employees. (193)

There are several reasons to expect that civilian employees may become more deployable. Changes in the civilian personnel system may eliminate some of the personnel rules that made military commanders reluctant to deploy civilians. (194) The Department of Defense has indicated a desire to shift up to 300,000 positions currently occupied by military members to civilian employees. (195) Shifting military to civilian positions would result in a larger pool of employees offering additional skills and save the government billions of dollars as civilian employees are substantially less expensive to employ than military members. (196)

B. Armed Forces Utilization of Civilian Contractors

Civilian contractors working for private military companies (PMCs) are involved in almost every aspect of military activity. The United States makes significant use of contractors, but is not unique in doing so. Countries throughout the world make use of these contractors and the dollar value of their services runs into the tens of billions of dollars annually. (197)

1. Range of Services

Civilian contractors can be hired to perform almost any service a state requires. Contractors can train, feed, equip, and house an army. During a conflict, contractors can maintain weapons, gather intelligence, provide security at forward locations, and even fight. (198) Three categories of private military companies predominate: security provision firms, military consulting firms, and military support firms. (199) All three types of PMCs have the capability to provide services that may be considered direct participation in hostilities.

Provider firms offer contractors who can provide or direct the use of force, whether in the form of security, peacekeeping operations, controlling units engaged in combat, or engaging directly in combat. (200) Because of the nature of their work, they are often armed and may wear some type of uniform. (201)

States may hire provider firms directly or they may contract with companies that in turn subcontract to provider firms for security services. The situation in Iraq illustrates how this may happen. The United States has contracted directly with provider firms to provide protection to facilities and personnel. (202) The United States has also contracted with companies engaged in the reconstruction effort and these companies have, in turn, subcontracted protection services out to provider firms. (203)

Security contractors have become an integral part of the occupation and reconstruction of Iraq. An estimated 20,000 security contractors were in Iraq as of April 2004 and, while accurate numbers are difficult to compute, the number may have grown as high as 25,000 by August 2005. (204) Although these contractors work for many different companies, they do communicate with and assist one another and amount, in many ways, to the largest private army in the world. (205) They provide protection for military facilities and convoys, government ministries, oil facilities, and other contractors. (206) Security contractors have engaged in combat, killed, and been killed. (207)

While the scale of contractor involvement in Iraq is unparalleled, contractors have been providing security forces for protection throughout the world. (208) On occasion, security contractors have been hired for the explicit purpose of engaging in combat operations. (209) Countries where PMCs have engaged in combat directly include Sierra Leone, Angola, and Ethiopia. (210) PMCs in these, and other countries, have used helicopters, fighter and bomber aircraft, armored vehicles and other sophisticated weapons along with trained soldiers to carry out their contract with the hiring state. (211)

The second category of PMCs--consulting firms--offers advice and training. (212) They differ from security provision firms in that they do not, typically, participate in battlefield operations. (213) The nature of this advice and training covers the spectrum from explaining how to operate sophisticated equipment or conduct large and small scale combat operations to advising how a state's armed forces should be organized. (214) Consulting contractors may train one unit or an entire army and, in fact, contractors are providing training for the Iraqi and Afghani armies as well as the Saudi Arabian National Guard. (215) Training and advice is not limited to teaching soldiers how to fight, but also addresses how they should be used in active military operations. Consulting contractors are often hired to provide advice on how to conduct actual military operations. (216)

Contractors from consultant PMCs can become closely involved in combat operations in at least two ways: contractors may accompany the units they train or advise into combat, and contractors may become actively involved in planning combat operations. Even though the mission of consulting contractors is to train or advise, they may be expected to remain with their

units when the units take to the field. (217) This event happened during the first Gulf War when contractors from Vinnell Corporation, who were teaching the Saudi National Guard how to use heavy weapons systems, accompanied the Guard into battle against Iraqi forces in the battle of Khafji. (218) An example of consulting contractors planning military operations allegedly occurred in the Balkans, where contractors with MPRI reportedly helped prepare Croatia's plans for a successful offensive in 1995 against the Serbs in Krajina. (219)

The third category of PMCs--support firms--provides a vast array of services such as logistics, intelligence, and technical support and maintenance of military equipment and systems. (220) Many support firms are large companies capable of handling extremely challenging support needs during the midst of a large scale conflict. The United States Army has awarded a multi-billion dollar contract to a major PMC, Kellogg Brown & Root, to provide for the logistical and maintenance needs of the Army in Iraq for two years. (221) Altogether, twenty to thirty percent of the essential military support services in Iraq are provided by contractors. (222)

These support activities include building and operating military bases, as well as bringing in fuel, food, and other needed material. While perhaps more extensive than before, this type of activity is the same type contractors have traditionally provided the armed forces. (223) Providing logistical assistance to the armed forces is not without risk, however, as contractors may be placed in dangerously close proximity to combat. (224)

A major source of business for contractors is maintaining sophisticated military systems. Some of the equipment militaries use is so complicated that militaries rely on contractors to maintain it even during a conflict. (225) Examples of weapons in the United States inventory dependent on contractor maintenance include the F-117 Stealth fighter, the M1-A1 tank, the Patriot missile, the B-2 stealth bomber, the Apache helicopter, and many naval surface warfare ships. (226) For some systems, there may not even be military members capable of providing maintenance. (227) The result of this dependence on contractor support is that contractors will need to go where their services are needed, even if that brings them in close proximity to the battlefield. (228)

Contractors even operate some military systems. Contractors flew on targeting and surveillance aircraft and operated Global Hawk and Predator UAVs in Afghanistan and Iraq. (229) This type of participation does not appear anomalous as new systems, such as a Marine truck and an Army surveillance aircraft, are designed to be operated by contractors. (230)

Support contractors have also become active in providing services in information related fields including military intelligence and information warfare. (231) Intelligence may come in the form of interrogating prisoners and detainees, performing analysis, maintaining and supporting intelligence computer and electronic systems, or providing intelligence in the form of aerial reconnaissance and satellite imagery. (232) PMCs have become involved in information warfare, including the provision of defensive and offensive operations that would include CNAE. (233)

No matter what type of assistance accompanying contractors provide, they may run the risk of crossing the line into taking part in hostilities. Even contractors providing support services may find themselves in danger of becoming unlawful combatants, whether because their activities take them into close proximity of the battlefield or because their support is of such a nature as to become closely tied to use of a weapons system.

2. Reasons for Use

While the United States is the largest consumer of PMC services, PMC services are widely used around the world. (234) States engage the services of PMCs for a variety of reasons. Contractors may be hired because: 1) of their expertise, 2) they can provide a needed service more cheaply or efficiently than the military can accomplish with its internal resources, 3) their use is politically expedient, or 4) of military restructuring. (235)

Contractors can provide expertise not found within a state's armed forces. PMCs provide a mechanism through which skills developed at significant cost in sophisticated militaries such as those possessed by the United States, the United Kingdom or South Africa can be transferred relatively cheaply to states with inefficient or poorly trained militaries. (236) Contractors can also provide expertise in areas where militaries do not have the requisite competence. (237)

A second reason states use PMCs is to allow them more control over the number of uniformed military personnel. After the Cold War, many states made substantial cuts in the size of their militaries. (238) The United States military alone shrank by one third. (239) At the same time, however, the United States has faced an increasing number of deployment commitments. (240) Using contractors allows states to engage in extensive military activity with a smaller uniformed force. (241) States may benefit from using contractors because they can be substantially cheaper to use than military members. (242) In addition, some states simply believe that many military functions can be performed better if outsourced to the private sector. (243)

Finally, states can use PMC contractors to reduce the political costs of military operations and to avoid domestic or international constraints on the use of their own armed forces. The use of contractors can reduce political costs because the public tends to be more concerned with military members deploying and facing harm than contractors. (244) This lowered concern can be seen reflected in the reduced attention paid to contractor casualties versus those suffered by the military. (245)

States use contractors to avoid legal and policy constraints on the use of armed forces. Congress may impose limitations on the numbers of troops who may deploy to a location or the activities they may engage in. Congress imposed such limitations in Colombia and the Balkans and contractors were used in each case to circumvent them. (246) The United Kingdom allowed a PMC to ship arms to Sierra Leone in circumvention of a United Nations arms embargo. (247)

C. Legal Status of Current Civilian Employee and Contractor Activities

Civilian employees and contractors share the same status under the law of war as civilians accompanying the armed forces. (248) Because of their civilian status, they are not authorized to take direct part in hostilities. The treaties containing this prohibition were ambiguous about its scope. The practice of states indicates this prohibition against engaging in combat is being read very narrowly so as to widen the scope for civilian participation in military activities. Even with this narrow interpretation, the prohibition against civilians participating in combat rule has been violated numerous times. (249)

Faced with this ambiguously narrow rule, states are employing civilians in an assortment of activities that may not involve civilians directly using weapons for combat but strain the distinction between combat and noncombat activities. Armed civilians provide security, while other civilians maintain weapons systems in combat areas and operate intelligence-gathering systems. (250)

While engaging civilians to conduct offensive combat operations appears to be frowned upon, states openly employ civilians for all other military activities, even where the legal status of such participation is unclear. This uncertainty over when civilians become combatants has been widely acknowledged. (251) A publication of the U.S. Army discussing deployment of civilians notes:

> Civilians who take part in hostilities may be regarded as
> combatants and are subject to attack and/or injury incidental
> to an

attack on a military objective. Taking part in hostilities has not
been clearly defined in the law of war, but generally is not
regarded as limited to civilians who engage in actual fighting.
Since civilians augment the Army in areas in which technical
expertise is not available or is in short supply, they, in effect,
become substitutes for military personnel who would be combatants.
(252)

The U.S. military has even authorized the issuance of weapons to civilian contractors and employees because they may be regarded as combatants by an enemy. (253)

This review of state practice indicates that the ambiguity over what constitutes direct participation in hostilities has not been resolved. Civilians are being integrated more deeply into states' armed forces and many of them are engaging in activities that could well be considered combat.

## V. CIVILIAN PARTICIPATION IN REMOTELY CONDUCTED COMBAT OPERATIONS UNDER THE LAW OF WAR

Just as with traditional military operations, the legality of civilian involvement in remotely conducted combat operations depends on whether it constitutes direct participation in hostilities. (254) Accompanying civilians who directly participate in remotely conducted combat operations resulting in actual harm to enemy personnel or equipment may be unlawful combatants. (255)

Accompanying civilians participating in remotely conducted combat operations involving unmanned vehicles performing missions that may not be considered direct participation in hostilities, such as gathering intelligence or providing logistical support have an unsettled status under the law of war. The potential for accompanying civilians to participate in these activities will grow as increasing numbers of unmanned vehicles begin to arrive on the battlefield. (256) If the truck driver taking ammunition to a front line unit may be considered an unlawful combatant, the civilian operator of a remote controlled truck performing the same mission may be deemed a combatant as well. Whether the civilian's distance from the battlefield prevents him from being considered an unlawful combatant cannot be decisively determined.

The law of war provides limited guidance to help determine when computer network attack and exploitation actions are considered combat. (257) No treaties specifically regulate CNAE, but it is governed by the law of war. (258) Those aspects of CNAE which cause physical damage can be treated like

attacks with more conventional weapons, with the consequence that carrying out such attacks is limited to combatants. (259) Other types of CNAE, particularly those involving attacks on networks to steal, destroy, or alter information within them, do not necessarily constitute direct participation in hostilities and are arguably open to lawful civilian participation. (260)

## VI. INADEQUACIES IN THE LAW OF WAR CONCERNING THE REGULATION OF ACCOMPANYING CIVILIANS PARTICIPATING IN COMBAT OPERATIONS

The law of war inadequately regulates civilian participation in combat operations for four reasons: 1) direct participation in hostilities is defined too ambiguously to establish a clear demarcation between civilians and combatants; 2) lack of clarity over what activities are within the exclusive province of combatants undermines the principle of distinction by promoting the civilianization of military forces; 3) failure to differentiate between civilian employees and contractors promotes increased use of contractors; and 4) the complete ban on civilians directly participating in remotely conducted hostilities can be easily circumvented and may decrease adherence to the law of war.

### A. The Law of War Fails to Adequately Separate Combatants from Civilians

The determination as to what activities constitute direct participation in hostilities is challenging because the rules are often ambiguous and arguably defective. Consequently, many accompanying civilians run the risk of being considered unlawful combatants. (261) In addition, the risks to the general civilian population increase as the application of the principle of distinction becomes more difficult. Likewise, many accompanying civilians are unable to determining whether the activities in which they are engaged are jeopardizing their legal status, resulting in criminal liability and lawful direct attack.

The uncertainty over what constitutes direct participation in hostilities undermines the principle of distinction, which is built upon the premise of being able to distinguish and separate civilian and military personnel and objects from each other. (262) Civilians are performing many tasks now which may be considered direct participation in combat. (263) When civilians appear to be engaging in combat activity, particularly if they are not wearing any type of uniform or distinguishing emblem, then the protective power of the principle of distinction is weakened because they may be difficult to distinguish from the rest of the civilian population.

Accompanying civilians are inadequately protected by the current standard for determining unlawful combatant status because they cannot readily determine their criminal liability and status as lawful targets. By virtue of their status, accompanying civilians may not be directly targeted; however,

they may lose this immunity if they become unlawful combatants as a result of their actions, and they may lose their POW status if captured. (264) Even accompanying civilians engaged in remotely conducted combat operations who do not face a serious risk of being targeted or captured during a conflict may still be affected, as the prospect of criminal liability may continue for years after the conflict ends. Accompanying civilians may fear leaving their employing state lest they face the risk of criminal prosecution when abroad. (265)

Even more significant, states employing accompanying civilians as unlawful combatants are in breach of their obligations under international law. Such breaches of the law can have a number of ramifications, including alienation of public opinion, sanctions, and legal action before tribunals such as the International Court of Justice. (266) Individuals responsible for making civilians serve as combatants or targeting accompanying civilians may also face criminal liability before national courts or the International Criminal Court. (267)

The current definition of direct participation in hostilities contains an inherent flaw on two accounts: 1) it fails to encompass changes in warfare since the standard was formulated over one hundred years ago; and 2) it fails to come to a logical accommodation with the concept of military necessity. The current standard was constructed to define and limit direct participation in combat to the ultimate acts causing death or destruction, such as a soldier firing a rifle or a pilot launching a missile from his aircraft. The standard ignores the penultimate and other anterior acts of indispensable support provided to the soldier or pilot. The solider or pilot occupies the top of a pyramid, supported by the broad-based efforts of support personnel. These support personnel are often accompanying civilians acting as intelligence analysts, logisticians, and weapons systems maintainers. Their efforts are essential in allowing combatants to inflict damage to the enemy.

The law of war prevents intentional targeting of accompanying civilians as long as they retain their status, no matter how militarily important their work. The result is considerable tension between the targeting standards employed for making direct and indirect attacks against civilians. The standard for making direct attacks against civilians is that they must be participating directly in hostilities, at which point they become unlawful combatants and may be targeted directly. (268) This is a narrowly drawn standard, particularly when compared with the second standard, which provides that attacks against military objectives causing collateral injury to civilians are allowed if the civilian casualties will be proportionate to the concrete and direct military advantage anticipated. (269)

Accompanying civilians will almost always be covered by the latter standard because, while the general civilian population must be segregated from military objectives, accompanying civilians work in them. (270) Accompanying civilians working at a maintenance depot repairing aircraft illustrate this point. They are unlikely to be considered unlawful combatants because of their work on the aircraft, so they cannot be directly targeted because of their civilian status. (271) Yet their status as civilians offers them scant protection because the depot is unquestionably a legitimate military objective that may be attacked. (272) Any protection provided to them by the law of war depends on the enemy's subjective conception of the advantage to be derived from attacking the depot and what constitutes a proportional amount of collateral damage. The presence of large numbers of workers does not necessarily shift the balance toward reducing the scope of an attack either, because more workers may only mean the depot has greater military significance--and more civilian casualties will be acceptable in an attack. (273)

**B. The Narrow Definition of What Constitutes Direct Participation in Hostilities Promotes the Civilianization of Military Forces**

A fundamental concern of the law of war is protecting civilians. (274) Consistent with this aim, civilians cannot be targeted for attack unless they forfeit their civilian status by participating directly in hostilities. The presumption exists that even a person whose conduct makes his claim to civilian status ambiguous should still be considered a civilian. (275) A narrow, albeit ambiguous, definition of what constitutes direct participation in hostilities sufficient to turn a civilian into a combatant appears consistent with this aim. By construing who is a combatant narrowly, civilians supporting the war effort by working in armaments factories, chemical plants, or other installations vital to a state's capability to wage a conflict successfully retain their status as civilians and may not be targeted, though they may suffer injury when their workplace is attacked.

The current definition of direct participation in hostilities, however, has the opposite of its intended effect because it allows the civilianization of a state's military force. Because civilians are only prohibited from direct participation in combat, the allowable scope of civilian participation in military operations is inversely proportional to how narrowly combat is defined. If direct participation in hostilities is defined broadly, then all the activities within its scope become forbidden to accompanying civilians. Conversely, if direct participation is defined narrowly, then the range of positions that may be filled by civilians increases.

States have a strong interest in defining direct participation in hostilities narrowly so as to increase their flexibility in determining the exact mix of

military personnel, civilian employees, and contractors they want in their forces. (276) State practice reinforces this notion because accompanying civilians are increasingly performing duties once reserved for military personnel and becoming increasingly intertwined with, and essential for, combat operations. (277)

The law of war further encourages civilianization by prohibiting civilians from being targeted for direct attack, as opposed to combatants who are legitimate targets in and of themselves. While this protection has limits because civilians working in proximity to military objectives may suffer from collateral damage, the presence of accompanying civilians at a military objective may serve to shield a site by preventing or reducing the scope of an attack.

This increasing civilianization of military forces poses a threat to the general civilian population by weakening the principle of distinction between combatant and civilian. When accompanying civilians become deeply involved in military operations, an enemy may feel no choice but to target them specifically, which places other civilians at risk as they may be mistaken for accompanying civilians. (278) This situation may have developed in Iraq, where all contractors find themselves in danger as the distinction between accompanying contractors and combatants has all but disappeared. The demise of distinction in Iraq was aptly captured by a Coalition Provisional Authority official who stated that in Iraq's reconstruction, "the military role and the civilian-contractor role are exactly the same." (279)

C. The Law of War Does Not Distinguish Between Civilian Employee and Contractor Participation in Combat Operations

The law of war treats civilian employees and contractors identically. States may choose to favor contractors over employees when staffing positions without legal impediment. (280) Treating these two groups the same, however, undermines the obligation belligerents have to ensure their forces obey the law of war during the course of hostilities. This undermining occurs because civilian contractors are under substantially less control than civilian employees, meaning their opportunities to engage in misconduct are correspondingly greater.

Because employees and contractors are engaging in activities that reasonably could be construed as constituting direct participation in combat, the disciplinary requirements established for lawful combatant status in Geneva Convention III and Protocol I should be met. (281) Lawful combatants must be subject to an internal disciplinary system sufficient to ensure compliance with the law of war. (282) To meet these criteria, states must be able to punish grave breaches of international law through criminal sanctions,

although lesser infractions may be handled through non-penal disciplinary measures. (283)

States can more readily supervise, control, and discipline civilian employees than contractors. Within the U.S. military, civilian employees are considered to be under the control of a military commander, while civilian contractors are not. (284) Civilian employees are also subject to a comprehensive supervisory and disciplinary scheme that allows a commander many options to prevent and punish misconduct. (285)

These options are not available with respect to civilian contractors because they do not have an employment relationship with the armed forces but with a private company. Because this relationship is contractual, control over contractor behavior is greatly attenuated. (286) The armed forces may not even be aware of how many contractors are present within an area of operations or what jobs they are doing, as has been the recent U.S. experience. (287) If contractors misbehave, the armed forces may have limited options for dealing with the misconduct. (288) By ignoring the limited supervisory control armed forces exert over the contractors they hire, the probability of conduct inconsistent with the law of war increases. (289)

D. The Prohibition Against Civilian Participation in Remotely Conducted Combat Operations is Subject to Circumvention

The nature of remotely conducted combat actions makes circumvention of the prohibition against civilians engaging in combat easy to achieve. Combatants engaging in remotely conducted combat do so with their identities concealed from the opponent. This secrecy does not excuse intentional violations of the law of war, but it does give states more of an opportunity to interpret the ban on direct participation narrowly to increase the scope of civilian participation. States also know their decisions on this matter are unlikely to ever be reviewed.

Under such a narrow interpretation, accompanying civilian participation in remotely conducted combat activities can be almost unlimited. Accompanying civilians can participate directly in all activities not resulting in the infliction of damage, meaning they could engage in activities including operating UAVs or conducting CNAE operations that target information residing in an enemy's computer network.

With respect to operations that inflict actual harm, remotely conducted combat activities could be structured in such a way as to comply with the technical requirements of the law of war while maintaining extensive civilian participation. A fleet of armed UAVs could be flown to a battlefield under the control of civilian operators who would notify a military member whenever a

target for attack was spotted. The military member would then press the button to launch a missile. A CNAE operation could be structured in a similar fashion. For example, a military CNAE operator could seize control of the SCADA computer system controlling a power plant for the purpose of inducing a major malfunction in the power-generating turbines. The military member would be supported by a team of civilians including a contractor linguist and civil and computer engineers. The computer engineer would explain how to access the SCADA system, the contract linguist would translate the computerized control menus, and the civil engineer would instruct on how to induce a malfunction in the turbines. In both of the above situations, minimal military participation legitimizes the accompanying civilian support of these combat operations.

In sum, a narrow but ambiguous definition of what constitutes combat means states have extensive leeway to structure their remotely conducted combat activities in such a way that civilians can be used for almost every remotely conducted combat operation. Even clear-cut combat operations can be performed with extensive civilian participation as long as a military member takes the action that directly causes harm to the enemy.

## VII. MODIFYING THE LAW OF WAR

The law of war restraints placed on accompanying civilian participation in combat related activity must take into account the fact states will not abandon or substantially reduce their reliance on accompanying civilians. States rely on these civilians to save money, reduce the political costs of military operations, increase the competence of their armed forces, and ensure vital weapons systems function. (290) An overly broad ban on the activities in which accompanying civilians may participate would adversely impact states' vital interests and would likely meet with resistance. Recent history indicates that if a state engaged in conflict is forced to choose between rigid adherence to the law of war or mission accomplishment, it will not allow the law of war to constrain its actions. (291)

The problems with how the law of war regulates accompanying civilians can be resolved by making three separate changes: 1) clarifying which activities constitute direct participation in hostilities, 2) allowing civilian employees to be designated as remote combatants, and 3) legitimizing targeting of accompanying civilians when they provide direct essential support. These changes should be made through two separate mechanisms. First, major military states should jointly issue a non-binding statement of principles containing their views on which specific activities constitute direct participation in hostilities. Second, a convention concerning the status of accompanying civilians should be negotiated under the auspices of the

International Committee of the Red Cross to codify the new rules on remote combatant status and on the targeting of accompanying civilians.

A. Establishing Which Activities Constitute Direct Participation in Hostilities

1. Clarifying the Meaning of Direct Participation in Hostilities

Direct participation in hostilities should be defined as consisting of direct participation in the following four activities: 1) direct infliction of damage to enemy personnel or equipment; 2) operation of a weapons system; 3) gathering intelligence for the immediate purpose of selecting targets for attack or assisting in the planning of imminent or ongoing military combat operations; and 4) directing or advising on the conduct of imminent or ongoing combat operations. Under the current standard of what constitutes direct participation in hostilities, only the first category of activities, the direct infliction of damage, unambiguously qualifies as a combat activity. (292) All four of these activities belong together, however, because they capture the indispensable and immediate precursors to the delivery of violence.

The concept of what constitutes damage to enemy personnel and equipment needs to be broadened to explicitly cover damage to information residing within computer networks. Attacks on information processing computer systems that destroy, damage, or alter information can result in significant damage to an economy or military. (293) Acknowledging that attacks on information systems do cause damage recognizes the central role played by computer networks and ensures attacks on them during the course of an international armed conflict are restricted to combatants and regulated by the law of war.

The second type of activity that should be considered direct participation in hostilities is participation in the operation of a weapons system. The rule would establish that when a weapons system requires more than one person to operate it, all personnel share combatant status. While this rule is an implication of the prohibition against the direct infliction of violence, making it explicit prevents a bifurcation in status amongst the members of a weapons crew. For instance, if an accompanying civilian operates an armed UAV, but a military member presses the button to fire a missile from it, then the civilian operator cannot disclaim combatant status by arguing he did not fire the missile.

Third, anyone gathering intelligence for the direct and immediate purpose of finding targets to attack or to direct combat operations against should also be considered a combatant. The classic example of such activity is an artillery spotter serving as the eyes for artillery that can shoot their rounds beyond the line of sight. With modern technology, these spotters may be able to find

targets and direct fire from the vantage point of a UAV circling over a battlefield. Because this information may be directly relied upon to direct attacks, the UAV operators should be held responsible for adhering to the standards of the law of war.

The last type of activity that should be considered direct participation in hostilities is providing advice to or directing a state's armed forces concerning the conducting of an imminent or ongoing military operation. This type of activity may not involve firing weapons, but it is closely connected to decisions about choosing targets and methods of attack. While a single soldier may do considerable damage by himself, the person planning an attack involving a hundred or a thousand soldiers may cause much more significant violations in the law of war because of the greater scale of forces responsive to his advice or orders.

Specifying that these activities be reserved for combatants is consistent with and encourages compliance with the law of war. Combatants receive the privilege of being entitled to use force lawfully, while they also shoulder the responsibility of complying with the law of war. Individuals participating in all four types of activities may face situations where they will have to make judgments impacting the use of force. The law of war can best serve its purpose of protecting the general civilian population if the people making decisions about when and how to attack an enemy receive combatant status with its attendant heightened obligation to respect and be trained in the principles of military necessity, distinction, and proportionality. (294)

2. Procedure jot Specifying Which Activities Constitute Direct Participation in Hostilities

Major military states should issue a non-binding statement of principles wherein they state which activities constitute direct participation in hostilities. Using these principles as guidance, states can modify their military doctrines consistent with these principles. Domestic laws and regulations could also be changed where appropriate to ensure enemy civilians captured in a conflict are only labeled unlawful combatants if they engaged in direct participation in hostilities as defined within the statement of principles. In addition, states could also issue internal guidance to their forces to ensure combatant roles are not filled by civilians. Actions such as these will begin to establish a pattern of state practice that could, in time, ripen into customary international law. (295)

This method for addressing what constitutes direct participation in hostilities possesses several advantages. First, this process can be handled much more quickly than going through a treaty process. (296) Second, this method retains flexibility over defining participation in hostilities. A disadvantage of a

treaty is that once the definition has been codified it can be difficult to change. This can be seen in the current standard for direct participation which has been essentially unchanged for more than one hundred years despite the numerous changes in the methods of warfare and civilian participation in them. In contrast, a non-binding statement can be supplemented or altered whenever changes in the conduct of warfare so warrant.

Finally, this method can be used without conflicting with states' obligations under Geneva Convention III or Protocol I. Neither of these treaties define direct participation in hostilities and the Protocol I Commentary contains only a brief discussion of the issue. (297) The activities proposed for inclusion on the statement of principles are consistent with the terms of the treaties because they focus on activities closely associated with the infliction of violence. In addition, by better defining what constitutes direct participation in hostilities states will be complying with and promoting the purposes of these two treaties, particularly as they will make the line between combatants and civilians clearer, and so strengthen the principle of distinction.

### B. Readdressing the Status of Accompanying Civilians

The legal status of accompanying civilians must be altered to better fit the roles they have assumed within states' armed forces. States should be able to designate civilian employees as remote combatants. Remote combatants would be authorized to participate in combat away from the battlefield once they met the applicable criteria for combatant status and provided notification to the opposing state. Accompanying civilians who provide direct and essential support for combat operations should be recognized as legitimate targets for attack. These changes should be accomplished through the mechanism of a convention on the status of civilians accompanying the armed forces.

### 1. Designating Civilian Employees as Remote Combatants

States should be authorized, after providing appropriate notice to an opponent state, to designate civilian employees who are nationals as remote combatants who may operate unmanned vehicles or engage in CNAE from within a state's territory or onboard a military aircraft or ship. Allowing civilian employees to be designated as remote combatants confers three advantages: 1) it protects employees from becoming unlawful combatants; 2) it recognizes the principle that civilian employees should be able to play a greater role in combat activities than contractors; and 3) it addresses the legitimate state need for civilian expertise in the conduct of remotely conducted combat operations.

Accompanying civilian employees designated as remote combatants do not have to worry about the possibility of being considered unlawful combatants. As a result, they will not be subject to criminal liability for their actions that otherwise comply with the law of war. (298) Neither will designation as remote combatants place them at a significantly greater risk of being attacked because, working at military objectives as they do, accompanying civilian employees already face much greater danger of attack than the general civilian population. (299)

The ability to designate civilian employees as remote combatants may increase the attractiveness of civilian employees relative to contractors when states determine the composition of their armed forces. It may also establish the principle that civilian employees should be allowed greater participation in combat activities than contractors. Because civilian employees are subject to more direct control and supervision from the military than contractors receive, any shift in the composition of accompanying civilians that raises the proportion of civilian employees compared to contractors will increase compliance with the law of war. (300)

Disciplinary concerns are also addressed by restricting designation of remote combatants to employee nationals who are only authorized to directly participate in hostilities within a state's territory. These limitations will ensure states have a sound basis for asserting jurisdiction over an employee who may engage in behavior in violation of the law of war. (301) States may also, during times of conflict, make civilian employees submit to military jurisdiction. (302)

Allowing civilian employees to serve as remote combatants recognizes states' interest in accessing civilian expertise. Because states rely on accompanying civilians to help support and operate remotely conducted combat operations, refusing to permit employees to be designated remote combatants may give states an incentive simply to hide what their civilians are doing. If remotely conducted combat operations are driven further into concealment, the chances of them being conducted in violation of the law of war will increase because of the difficulty in monitoring state actions and assigning responsibility for any breaches of the law. (303)

The main argument against designating civilian employees as remote combatants is that it undercuts the principle of distinction. This argument does not withstand scrutiny. Even though the principle of distinction has been eroded between accompanying civilians and combatants, designating civilian employees as remote combatants will not cause this principle any further deterioration. Civilian employees engaging in remote combat do so away from the battlefield while operating from military sites that states are required to keep segregated from the general civilian population. (304)

This separation from the scene of conflict and the general civilian population makes the actions of remote combatants different than the actions of civilians who fight with combatants at close quarters. When this proximity exists, the actions of some civilians can place others in danger if combatants repelling an attack from civilians cannot, when returning fire, distinguish between civilians who are and are not participating in hostilities.

Designating civilian employees as remote combatants will not reduce adherence to the laws of war by sowing confusion over when civilians may be targeted. The desire to keep the law of war targeting rules simple to promote adherence to them is legitimate. Allowing civilian employees to be designated remote combatants does not add complexity to the system. Additionally, the prohibition against targeting civilian objectives will not be violated because they will be operating from military objectives segregated from the general civilian population. (305)

Permitting the designation of civilians as remote combatants will not allow terrorists to garner combatant status. (306) Terrorists are not members or employees of the armed forces and do not comply with the law of war. (307) While civilian employees are not members of the armed forces, they do work directly for the state and serve under the supervision and control of military commanders for whose actions states are responsible. (308)

2. Accompanying Civilians Providing Essential and Direct Support Should Be Lawful Targets for Attack

The vital role accompanying civilians play in the military capacity of states' armed forces should be acknowledged by authorizing the targeting of accompanying civilians who provide direct and essential support to military combat operations. This change will protect the principle of distinction, remove an incentive for civilianizing militaries, and promote adherence to the law of war.

The principle of distinction is under distress because accompanying civilians are grouped together with the general civilian population. (309) When accompanying civilians provide direct and essential support to military operations, they become logical targets for attack, even if the attack is against their workplace. (310) The law of war has not resolved the tension between the protection owed civilians and the military necessity for attacking accompanying civilians providing direct and essential support. (311) Authorizing the targeting of this subclass of accompanying civilians resolves this tension with a logical rule that accepts that this particular group of civilians needs to be treated differently than the general civilian population.

This change in targeting status will have two additional effects. It removes the incentive for states to favor staffing positions with civilians rather than military members and it promotes adherence to the law of war by making the prohibition against attacking the general civilian population stronger. (312)

### 3. Procedure for Authorizing Change in Civilian Status

The procedure for changing the status of accompanying civilians should be through a treaty negotiated under the auspices of the International Committee of the Red Cross, which has expertise in this matter and a long history of participation in the development of the law of war and, in particular, the Geneva Conventions and Protocol I. (313) The proposed changes in accompanying civilian status should not, at a procedural level, be difficult to codify, including the process by which states notify one another if they will use accompanying civilian employees as remote combatants. This procedure can mirror the one already established for switching civilian members of police agencies to combatant status. (314)

A treaty is the preferred method of action because these changes alter the terms of Protocol I, to which the vast majority of states belong. An elemental part of international law is that treaties are binding on parties to them and they must carry out their terms in good faith. (315) However, states interested in establishing these new rules concerning civilians can, amongst themselves, use a new treaty to change that rule (316)

A treaty is also the preferred course of action because unilateral national action cannot make effective changes to the status of accompanying civilians. An international armed conflict will by definition involve at least two states, neither of which will be bound by any domestically initiated alterations concerning the treatment of accompanying civilians in the absence of a binding agreement between them. If one state designates accompanying civilians as remote combatants or targets them for attack when they provide direct and essential support, the opposing state may treat the accompanying civilians as unlawful combatants and the combatants who targeted accompanying civilians directly as war criminals. (317)

States do share a broad interest in addressing the status of accompanying civilians. States throughout the world and at all levels of military power have become increasingly dependent on their use and would benefit from a reexamination of their status under the law of war.

### VIII. CONCLUSION

The waging of modern war has changed significantly in recent decades both in terms of who participates and how they fight. The battlefield is becoming less

the domain of the soldier as accompanying civilians and remotely operated vehicles take his place. New frontiers for conflict are being opened as states develop the means to attack each other through cyberspace.

The law of war has not yet accommodated these changes in the way states wage war. No suitable standards exist for determining what civilians accompanying the armed forces may do and when they may be targeted for attack. These failures to properly regulate the status of an increasingly important component of states' armed forces diminishes the protection the law of war provides the general civilian population.

States need to establish the status of accompanying civilians in a way that maintains the principle of distinction but also takes into account that accompanying civilians are an essential element of military power. Allowing civilian employees to be designated as remote combatants and legitimizing the targeting of those accompanying civilians who provide direct and essential support of combat operations are critical first steps in the process.

(1) THE WHITE HOUSE, THE NATIONAL STRATEGY TO SECURE CYBERSPACE (2003), available at http://www.whitehouse.gov/pcipb/[hereinafter NATIONAL STRATEGY].

(2) JOINT CHIEFS OF STAFF, JOINT PUBLICATION 3-13, JOINT DOCTRINE FOR INFORMATION OPERATIONS GL-5 (1998).

(3) See JOINT CHIEFS OF STAFF, JOINT INST. 6510.01D, INFORMATION ASSURANCE AND COMPUTER NETWORK DEFENSE A-2 (15 JUNE 2004) (defining CNE and its relevance to information operations).

(4) Tim Gibson, What You Should Know About Attacking Computer Networks', UNITED STATES NAVAL INSTITUTE: PROCEEDINGS, Jan. 2003, available at 2003 WL 12258933. See also Maria O'Daniel, Differences in Computer Networks', NEW STRAITS TIMES-COMPUTIMES, Oct. 21, 1999, at 41 (defining computer networks as a set of computers linked together by some means of communication such as cables or satellite links that can communicate with one another).

(5) Gibson, supra note 4.

(6) See generally Cyber Terrorism. The New Asymmetric Threat: Hearing Before the Subcomm. on Terrorism, Unconventional Threats' and Capabilities of the House Comm. on the Armed Services, 108th Cong. (2003) (statement of Richard Dacey, Director, Information Security Issues, Gen. Accounting Office), reprinted in U.S. GEN. ACCOUNTING OFFICE, GAO-03-1037T, INFORMATION SECURITY: FURTHER EFFORTS NEEDED TO FULLY IMPLEMENT STATUTORY

REQUIREMENTS IN DOD (2003), available at
http://www.gpoaccess.gov/aoreports/index.html (discussing how British
computer administrator scanned tens of thousands of U.S. military computers
from his home, eventually breaking in to almost 100 U.S. networks)
[hereinafter Dacey Cyber Terrorism Statement]; see also Andrea Stone,
Cyberspace is the Next Battlefield. U.S., Foreign Forces" Prepare for Conflict
Unlike Any Before, USA TODAY, June 19, 2001, at 1A (discussing how U.S.
military computer networks have been penetrated on numerous occasions,
including by hackers from Russia and others who at first appeared to come
from the United Arab Emirates but were later traced to California).

(7) Gibson, supra note 4.

(8) See id.

(9) Viruses are pieces of software code that can be inserted into software
programs. When an infected program is executed, the virus replicates itself
and spreads. Cyber Terrorism: The New Asymmetric Threat: Hearing Before
the Subcomm. on Terrorism, Unconventional Threats and Capabilities of the
House Comm. on the Armed Services, 108th Cong. (2003) (statement of
Eugene H. Spafford, Professor and Director, Center for Education and
Research and Information Assurance and Security, Perdue University),
available at http ://www.house. gov/hasc/schedules/2003.html#Jul03 (last
visited Jan. 10, 2006) [hereinafter Spafford Cyber Terrorism Statement].

(10) Worms are software programs that contain some similarities to viruses.
Worms can run independently and can travel throughout a network. Worms
may change other programs or contain other software code, such as a virus,
that does. Id.

(11) Trojan horses are software programs that conceal their true function
behind the guise of a benign one. A trojan horse program may appear as a
game available for download. While the user plays the game, the trojan horse
sets about performing its true purpose, destroying or altering information on
the user's computer system. Id.

(12) Logic bombs are software code contained in programs that activate when
predetermined triggering conditions are met. The bombs are typically created
when the software is being developed. When triggered, the logic bomb may
cause the system to stop or may damage or destroy data within it. Spafford
Cyber Terrorism Statement, supra note 9.

(13) Spyware software can monitor activity on a computer and then send that
information to a desired location. Id.

(14) Back doors are shortcuts written into software programs allowing entry into the program without following normal authentication requirements. Id.

(15) See id., Gibson, supra note 4.

(16) See Gibson, supra note 4.

(17) Id.

(18) Gibson, supra note 4.

(19) Id.

(20) Dacey Cyber Terrorism Statement, supra note 6 (discussing how one worm, the SQL Slammer worm, infected ninety percent of all vulnerable computers in the world in ten minutes and caused network outages, resulting in canceled airline flights and ATM outages). See also Gibson, supra note 4 (indicating how such attacks could include transferring money out of domestic banks to accounts abroad).

(21) Spafford Cyber Terrorism Statement, supra note 9.

(22) Id. (discussing the Code Red and Nimda worms, which caused several billion dollars in damage in 2001, and the Sapphire/Slammer worms, which caused over a billion dollars in damage in 2003).

(23) David A. Fulghum & Douglas Barrie, Cracks in the Net, AVIATION WK & SPACE TECH., June 30, 2003, at 52 (discussing growing concern that small, precise attacks on military computer networks, even if unsuccessful, may make military leaders unsure whether the data within them is false or corrupted, meaning they would be unable to rely on the information during potentially crucial moments of a military operation).

(24) Gibson, supra note 4.

(25) Id.

(26) Id.

(27) Gibson, supra note 4.

(28) Id. See also Dacey Cyber Terrorism Statement, supra note 6 (noting the types of potentially vulnerable infrastructure systems that may be the subject of CNA attack, including power grids, gas and oil distribution pipelines, water

treatment and distribution systems, hydroelectric and flood control dams, oil and chemical refineries).

(29) Gibson, supra note 4. The attacker in this case was a technician who had helped install the wireless system controlling valves at the sewage plant. He subsequently used a two-way radio, a laptop computer, and some telemetry equipment to access this wireless SCADA system and, on more than forty occasions, cause the release of raw sewage by opening and closing valves. See id.; see also Tony Wilson, Cybercrimes the New Foe, GOLD COAST BULLETIN (Australia), Oct. 25, 2002, at 14.

(30) See Bradley Graham, Bush Orders Guidelines for Cyber-Warfare; Rules for Attacking Enemy Computers Prepared as U.S. Weighs Iraq Options, WASH. POST, Feb. 7, 2003, at A1. The United States is maintaining even more secrecy over its arsenal of CNA and other cyberweapons than with its nuclear capabilities. Id. See also David A. Fulghum, Network-Centric Warfare, AVIATION WK & SPACE TECH., Oct. 25, 2004, at 90; David A. Fulghum et al., Black Surprises, AVIATION WK & SPACE TECH., Feb. 14, 2005, at 68 (discussing several CNAE programs and planned uses for them).

(31) Dawn S. Olney, U.S. Aims to Make War on Iraq's Networks', GOV'T COMPUTER NEWS, Feb. 24, 2003, available at 2003 WL 10986759 (quoting U.S. intelligence official stating information operations against Iraq had commenced). See also Cyber War Bombardment Begins, AUSTRALIAN, Mar. 20, 2003, at 25 (indicating likelihood U.S. forces have been planting viruses and corrupting databases in Iraqi computer networks).

(32) Stone, supra note 6, at 1A (discussing how the United States considered taking money from Serbian leader Slobodan Milosevic's bank accounts).

(33) UPI Hears ..., UPI, Nov. 4, 2003, LEXIS, Nexis Library, UPI File (discussing how China may have used twenty or more Trojan Horse programs to attack computer networks in Taiwan).

(34) Josh Martin, Virtually Helpless, VILLAGE VOICE, Sep. 17, 2002, at 46.

(35) Protecting America's Critical Infrastructures. How Secure Are Government Computer Systems? Hearing Before the Subcomm. on Oversight and Investigations of the House Comm. on Energy and Commerce, 107th Cong. (2001) (statement of Ms. Sallie McDonald, Assistant Commissioner, Office of Information Assurance and Critical Infrastructure: U.S. General Services Administration), available at http://energycommerce.house.gov/107/Hearings/ 04052001 hearing 153/McDonald229.htm.

(36) See Stone, supra note 6, at 1A.

(37) See generally NATIONAL STRATEGY, supra note 1. This publication indicates the utter reliance the United States places on computer networks.

```
    By 2003, our economy and national security became fully
dependent
    upon information technology and the information infrastructure.
A
    network of networks directly supports the operation of all
sectors
    of our economy--energy (electric power, oil and gas),
    transportation (rail, air, merchant marine), finance and
banking,
    information and telecommunications, public health, emergency
    services, water, chemical, defense industrial base, food,
    agriculture, and postal and shipping. The reach of these
computer
    networks exceeds the bounds of cyberspace. They also control
    physical objects such as electrical transformers, trains,
pipeline
    pumps, chemical vats, and radars.
```

Id. at 6.

(38) John DeGaspari, Look, Ma, No Pilot, MECHANICAL ENGINEERING, Nov. 2003, available at http://www.memagazine.org/backissues/nov03/features/lookma/lookma.html.

(39) Id.

(40) Matthew Brzezinski, The Unmanned Army, N.Y. TIMES, Apr. 20, 2003, at 38. See also DeGaspari, supra note 38. The UAVs used in Vietnam suffered from at least two serious technological problems: they were difficult to navigate from the ground and they did not provide real-time information because they typically carried cameras which could only be examined upon completion of a mission. Id.

(41) Michael Kilian, Unmanned Planes Show Mixed Results; Craft Can Be Balky, Easy to Shoot Down, CHI. TRIB., Mar. 2, 2003, at C4. The Predator UAV has a range of 500 miles and can be controlled through a satellite link. Id. The Global Hawk has a range of over 5000 miles. See Testimony Before the Subcomm. on Tactical Air and Land Forces of the House Comm. on the Armed Services, 108th Cong. (2003) (statement of Dyke Weatherington, UAV

Planning Task Force, Defense Systems, Air Warfare, Office of the Secretary of Defense), available at
http://armedservices.house.gov/schedules/2003.html#mar03.

(42) David A. Fulghum, Unmanned Unknowns, AVIATION WK & SPACE TECH., Aug. 15, 2005, at 18.

(43) Kilian, supra note 41. See also Bale Out Flyer, Your Days are Numbered, MERCURY (Australia), Dec. 4, 2003. The United States alone used ten separate UAV systems during the 2003 war in Iraq. See Testimony Before the Subcomm. on Tactical Air and Land Forces of the House Comm. on the Armed Services, 108th Cong. (2004) (statement of Dr. Glen Lamartin, Director, Defense Systems, Office of the Secretary of Defense), available at http://armedservices.house.gov/openingstatementsandpressreleases/108thcongress/04-03-17lamartin.html (providing general overview of the state of U.S. UAV programs).

(44) See Brzezinski, supra note 40 (discussing Predators firing missiles at a convoy in Afghanistan and anti-aircraft batteries in Iraq); see also Kilian, supra note 41 (discussing Predator being used to kill six Al-Qaeda terrorists in Yemen).

(45) Justin Ewers, 2003: The Next Frontier, U.S. NEWS & WORLD REPORT, July 21, 2003, at 45. For a general overview of current and planned UAV activities by the Department of Defense, see OFFICE OF THE SECRETARY OF DEFENSE, UNMANNED AIRCRAFT SYSTEMS ROADMAP 2005-2030 (2005), available at http://www.acq.osd.mil/uas/(last visited Jan. 15, 2006).

(46) Brzezinski, supra note 40.

(47) War From 60,000 Feet, AVIATION WK & SPACE TECH., Sep. 8, 2003, available at 2003 WL 63473518. UAVs could be used when line-of-sight access is needed to penetrate computer networks through a microwave antenna or air defense radar. Id.

(48) See Lane Harvey Brown, Tireless Workers for Dangerous Jobs; Robotics Making Strides On and Off the Battlefield, RECORD, Feb. 10, 2004, at Z13 (discussing the Department of Defense's goal and how DoD has already spent 27.6 billion dollars for researching, developing, and demonstrating unmanned technologies); see also Mike Toner, Robots Far From Leading the Fight; Machines with Smarts Needed on Front Lines, ATLANTA J.-CONST., Mar. 14, 2004, at 3B (discussing the goal set by Congress and how the Army is planning on spending almost fourteen billion dollars over the next five years on robotic and related systems).

(49) See Frank Oliveri, At Enormous Cost, the New Look Army will be Bullet-proof and Remote Controlled, GOLD COAST BULL. (Australia), Mar. 13, 2004. See also Andrea Shalal-Esar & Justin Pope, Military Technology; War Without Death, ADVERTISER (Australia), Feb. 8, 2003, at 29.

(50) Brown, supra note 48.

(51) Darrell Hassler & Tony Capaccio, GAO Hoists Red Flag Over Costly Boeing Army Project, SEATTLE TIMES, Apr. 2, 2004, at E1. Production of the FCS will cost an estimated ninety-two billion dollars by 2020, making it the second largest ongoing military procurement. Id.

(52) Roxana Tiron, Lack of Autonomy Hampering Progress of Battlefield Robots, NAT'L DEE., May 1, 2003, at 33. These three unmanned vehicles are: the Multifunctional Utility Logistics Equipment, a 2.5 ton reconnaissance and transport/supply vehicle; the Armed Reconnaissance Vehicle, a six-ton vehicle armed with missiles and a gun; and the Soldier Unmanned Ground Vehicle for reconnaissance and surveillance. Id. For information about the FCS, see the Defense Advanced Research Projects Agency website at http://ww.darpa.mil/tto/PROGRAMS/fcs.html.

(53) Toner, supra note 48. The Marines are developing a small thirteen pound robot called the Dragon Runner to perform surveillance missions and a larger vehicle named the Gladiator that could be armed and used for scouting and identifying targets. See id.; Byron Spice, Marines Seeking a Few Good Robots, SCRIPPS-HOWARD NEWS SERVICE, May 29, 2003, available at LEXIS, News Library, SCHWRD File.

(54) One of Their Own Robots Blown Up-They're Thrilled, CANBERRA TIMES, Apr. 19, 2004, at A13. Fifty to one hundred PackBots are being used in Iraq and Afghanistan for tasks such as battlefield reconnaissance and handling explosives. See also Unmanned Vehicle Soon Will Deploy to War Zone, ARMY TIMES, Sept. 19, 2005, at 40 (discussing car-sized amphibious UGV being sent to Iraq to perform perimeter security and surveillance missions).

(55) See Fiscal 2005 Budget: Terrorism Defense Plans: Hearing Before the Subcomm. on Terrorism, Unconventional Threats and Capabilities of the House Comm. on the Armed Services, 108th Cong. (2004) (testimony of Rear Admiral Jay M. Cohen, U.S. Navy, Chief of Naval Research) (noting that a Spartan USV is currently deployed to the Middle East), available at http://armedservices.house.gov/openingstatementsandpressreleases/108thcongress/04-0325cohen.html (last visited Jan. 20, 2006); Roxana Tiron, High-speed Unmanned Craft Eyed for Surveillance Role, Under Development for Navy, NAT'L DEF., May 1, 2002, at 27 (discussing range, payload, and potential missions of Spartan).

(56) Fiscal Year 2005 Budget Request for Navy Research and Development, Transformation and Future Navy Capabilities. Hearing Before the Subcomm. on Projection Forces of the House Comm. on the Armed Services" 108th Cong. (2004) (testimony of Rear Admiral Jay Cohen, Chief, Naval Research), available at http://armedservices.house.gov/openingstatementsand pressreleases/108thcongress/04-03-11young.html (last visited Jan. 20, 2006).

(57) Id.

(58) Robert Little, Expanding Missions for Military's Drones, BALTIMORE SUN, Feb. 2., 2003, at ID. See J.R. Wilson, Virginia-class Submarines Usher in a New Era in Undersea Electronics, MIL. & AEROSPACE ELECTRONICS, Jan. 1, 2004 (noting new Virginia-class submarines have a communications system designed to communicate with UUVs); see also E. R. Hooten, Security to 100 Atmospheres, ARMADA INT'L, Aug. 1,2005, at 80 (discussing UUV and USV programs in the U.S. Navy and worldwide).

(59) Nikolai Khorunzhii, The Skat Took Off and Hovered Over the Enemy, IZVESTIA (Moscow), Apr. 7, 2004, at 6 (providing overview of extensive Soviet and Russian use of UAVs).

(60) Linda de France, China Believed Progressing Toward UCAV Development, AEROSPACE DALLY, Dec. 12, 2000, at 397.

(61) Christina Mackenzie, French UAV Shares Airspace with Airbus, FLIGHT INT'L, Dec. 16, 2003, at 22 (indicating France has completed development of its second-generation UAV).

(62) Hilary Leila Krieger, The Creation Story, JERUSALEM POST, Jul. 11, 2003, at 12. Israel has developed its own UAVs and sold them, in turn, to at least twenty-six countries. Id.

(63) See Ben Woodhead, Underwater Vehicles on a Virtual Battlefield, AUSTRALIAN FIN. REV., Feb. 6, 2004, at 16 (discussing development of UUVs by Australian Defence Force). See also John Kerin, Pilotless Spy Planes Prove Their Worth, AUSTRALIAN, June 20, 2003, at 26 (indicating expectation Australia will buy a range of UAVs).

(64) John Fricker, MOD Shortlists NG, Thales for Watchkeeper UAV Program, AEROSPACE DAILY, Feb. 10, 2003, at 3 (discussing 1.3 billion dollar UAV program). See also Rich Yuttle, 'Robust' Approach to Watchkeeper Backed by Parliament Committee, AEROSPACE DAILY, Mar. 18, 2004, at 4. During the 2003 Iraq conflict, the British deployed eighty-nine Phoenix UAVs, twenty-three of which were destroyed during the course of flying 138 missions. Id.

(65) Bulbul Singh, India to Produce Israeli UAVs, AEROSPACE DALLY, Jan. 15, 2004, at 4. India has deployed 150 UAVs and wants to acquire in excess of 250 more. Id.

(66) J.R. Wilson, UAV Worldwide Roundup--2005, AEROSPACE AMERICA, Sept. 2005, at 26. See also Nonproliferation. Assessing Missile Technology Export Controls: Hearing Before the Subcomm. on Nat'l Security, Emerging Threats, and Int'l Relations of the House Gov't Reform Comm., 108th Cong. (2004) (testimony of Lieutenant General Tome Walters, Jr., Def. Security Cooperation Agency) (noting widespread use of UAVs throughout the world).

(67) U.S. GEN. ACCOUNTING OFFICE, GAO-04-342, IMPROVED STRATEGIC PLANNING CAN ENHANCE DOD'S UNMANNED AERIAL VEHICLES EFFORTS 4 (2004), available at http://www.gpoaccess.gov/gaoreports/index.html (last visited Jan. 23, 2006).

(68) Govt Clears Induction of LL TRs to Screen Air Intrusions, PRESS TRUST OF INDIA, Dec. 8, 2002, LEXIS, Nexis Library, PTI File.

(69) See Shalal-Esar & Pope, supra note 49; Brown, supra note 48; Brzezinski, supra note 40.

(70) Brzezinski, supra note 40. See also David A. Fulghum & Robert Wall, Small, Fast, Cheap, AVIATION WK. & SPACE TECH., Feb. 16, 2004, at 24 (discussing cost benefits driving Israeli and Indian forces to greater use of UAVs).

(71) Brzezinski, supra note 40.

(72) Id.

(73) Id. This savings may not be universal, however; in a few countries, such as Russia, pilot training may be relatively inexpensive. See Khorunzhii, supra note 59.

(74) Brzezinski, supra note 40.

(75) Id. See also Kilian, supra note 41.

(76) Knut Ipsen, Combatants and Non-Combatants, in THE HANDBOOK OF HUMANITARIAN LAW IN ARMED CONFLICTS 65, 65 (Dieter Fleck ed., 1995). There is a third primary status for medical and religious personnel. Id. at 69.

(77) See 1977 Geneva Protocol I Additional to the Geneva Conventions of Aug. 12, 1949, and Relating to the Protection of Victims of International

Armed Conflicts, Dec. 12, 1977, arts. 43 and 51, 1125 U.N.T.S. 3 (entered into force Dec. 7, 1978) [hereinafter Protocol I]. See also A.P.V. ROGERS, LAW ON THE BATTLEFIELD 8 (1996).

(78) See generally Ipsen, supra note 76.

(79) LESLIE C. GREEN, THE CONTEMPORARY LAW OF ARMED CONFLICT 104-5 (2nd ed. 2000).

(80) Id. See also D. SCHINDLER & J. TOMAN, THE LAWS OF ARMED CONFLICT 22-34 (1988) (reprinting the provisions adopted by the Brussels Conference). The Brussels Conference articles are also available at http://www.icrc.org/ihl.nsf/WebFULL?OpenView.

(81) Id. See also The 1907 Hague Convention No. IV Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277, 205 Consol. T.S. 277 [hereinafter Hague Convention IV].

(82) Annex to Hague Convention IV, Regulations Respecting the Laws and Customs of War on Land, art. 1, Oct. 18, 1907, 36 Stat. 2277 [hereinafter Annex to Hague Convention IV].

(83) Ipsen, supra note 76, at 71.

(84) Annex to Hague Convention IV, supra note 82, art. 1.

(85) Id. art. 3.

(86) Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 [hereinafter Geneva Convention III].

(87) W. Hays Park, Air War and the Law of War, 32 A.F.L. REV. 1, 55-57 (1990).

(88) Ipsen, supra note 76, at 81.

(89) See Geneva Convention III, supra note 86, art. 4(A)(2).

(90) See GREEN, supra note 79, at 50.

(91) See generally Christopher Greenwood, A Critique of the Additional Protocols to the Geneva Conventions of 1949, in THE CHANGING FACE OF CONFLICT AND THE EFFICACY OF INTERNATIONAL LAW 3-20 (Helen Durham & Timothy L.H. McCormack eds., 1999).

(92) The International Committee of the Red Cross maintains a list of countries that have ratified Protocol I. One hundred and sixty-two countries had ratified Protocol I as of May 7, 2004. An additional five states, including the United States, have signed but not ratified it. This list is available at http://www.icrc.org/ihl.nsf/WebNORM?OpenView (last visited Jan. 26, 2006).

(93) See GREEN, supra note 79, at 51 (discussing how the Institute of International Law prepared a resolution that embodied what the Institute considered to be customary international law and significantly influenced the terms of Protocol I); INGRID DETTER, THE LAW OF WAR 143 (2nd ed. 2000) (arguing that states that have not ratified Protocol 1 may be bound by the many parts of it that reflect existing law).

(94) Protocol I, supra note 77, art. 43(1).

(95) Greenwood, supra note 91, at 6.

(96) See Abraham D. Sofaer, AGORA: The U.S. Decision Not to Ratify Protocol I to the Geneva Conventions on the Protection of War Victims (Cont'd), 82 AM. J. INT'L L. 784, 785-86 (1988) (discussing U.S. concerns over granting irregulars the status of combatants). See also Greenwood, supra note 91, at 16-18.

(97) See Sofaer, supra note 96, at 785-86; Douglas J. Feith, Law in the Service of Terror, 1 NAT'L INTEREST 36 (1985).

(98) Hans-Peter Gasser, The U.S. Decision not to Ratify Protocol I to the Geneva Conventions on the Protection of War Victims: An Appeal for Ratification by the United States, 81 AM. J. INT'L L. 912, 918-23 (1987). Gasser argues terrorists are not protected because they must belong to the armed forces, which, in turn, must comply with the laws of war or lose their status under Article 43 of Protocol I. Id.

(99) DETTER, supra note 93, at 142.

(100) See Gasser, supra note 98, at 918-23.

(101) Protocol I, supra note 77, art. 44(3).

(102) See Sofaer, supra note 96.

(103) See Greenwood, supra note 91, at 17-18. The official commentary to Article 44 makes clear that the criteria for POW (and hence combatant) status are still retained. See INT'L COMM. OF THE RED CROSS, COMMENTARY ON THE

ADDITIONAL PROTOCOLS OF JUNE 8, 1977 TO THE GENEVA CONVENTIONS OF AUGUST 12, 1949, at 522 (Y. Sandoz et. al eds., 1957) [hereinafter PROTOCOL I COMMENTARY].

(104) Gasser, supra note 98, at 920 (indicating the generally accepted rule appears to be that weapons should be carried openly once a combatant makes any movement toward a place from where an attack is to be launched).

(105) Protocol I, supra note 77, art. 43(2). See also Ipsen, supra note 76, at 67.

(106) See Geneva Convention III, supra note 86, art. 4(A).

(107) Ipsen, supra note 76, at 68 (discussing how POWs cannot be punished for the 'mere fact of fighting' although they are still liable for criminal acts they commit outside the scope of their protected combat activities).

(108) Id.

(109) See Geneva Convention III, supra note 86, art. 4(A)(6).

(110) Ipsen, supra note 76, at 79.

(111) Protocol I, supra note 77, art. 43(3).

(112) See PROTOCOL I COMMENTARY, supra note 103, at 517, 1113 (discussing how notice can be made through the depositary, the Swiss government).

(113) INT'L COMM. OF THE RED CROSS, COMMENTARY: III GENEVA CONVENTION RELATIVE TO THE TREATMENT OF PRISONERS ON WAR 59 (Jean de Preux ed., 1960) [hereinafter GENEVA CONVENTION III COMMENTARY].

(114) Annex to the Hague Convention IV, supra note 82, art. 3.

(115) Ipsen, supra note 76, at 84. Ipsen offers, as historical examples of such noncombatants, quartermasters and members of legal services. Id. at 82.

(116) Id. at 84.

(117) Id. at 85, 90-91. See also PROTOCOL I COMMENTARY, supra note 103, at 515.

(118) Ipsen, supra note 76, at 84. A good example of how the distinction between noncombatants and civilians can become blurred is the civilian air

reserve technician program used by the U.S. Air Force. An air reserve technician (ART) is a civilian employee who is a member of the Air Force Reserves or Air National Guard. ARTS typically maintain and operate military aircraft. The ART must, in many circumstances, wear his military uniform even when reporting to work in civilian status. Any observer seeing uniformed ART personnel working on military aircraft would logically assume they are combatants, although they are actually civilians under the law of war who may not engage in combat until converted to active duty status. See U.S DEP'T OF AIR FORCE, INSTR. 36-108, AIR RESERVE TECHNICIAN PROGRAM (July 1994) (providing details of ART program); U.S DEP'T OF AIR FORCE, INSTR, 36-2903, DRESS AND PERSONAL APPEARANCE OF AIR FORCE PERSONNEL 124 (Sept. 2002) (concerning wear of uniform by ART personnel when in civilian status).

(119) Ipsen, supra note 76, at 89 (discussing the special primary status medical and religious personnel have under the Geneva Conventions).

(120) Id. at 90-92 (noting medical personnel may be armed and can use force to protect themselves and their patients, while religious personnel should not be armed but can defend themselves when attacked).

(121) Protocol I, supra note 77, art. 50.

(122) Id.

(123) Id. Protocol I provides in art. 50 that a "civilian is any person who does not belong to one of the categories of persons referred to in Article 4(A)(1), (2), (3), and (6) of the Third Convention and in Article 43 of this Protocol." Id. Civilians accompanying the armed forces are referred to in Geneva Convention art. 4(A)(4), which states:

> Persons who accompany the armed forces without actually being members thereof, such as civilian members of military aircraft crews, war correspondents, supply contractors, members of labour
> units or of services responsible for the welfare of the armed forces, provided that they have received authorization, from the
> armed forces which they accompany, who shall provide them for that
> purpose with an identity card similar to the annexed model.

(124) See U.S. DEP'T OF DEFENSE, INSTR. 1000.1, IDENTITY CARDS REQUIRED BY THE GENEVA CONVENTIONS para. 5.2 (Jan. 1974) for an example of the procedures used for issuing identification cards to civilians

accompanying the armed forces. Cards are issued to emergency essential DoD employees and contractors who may accompany U.S. military forces to areas of conflict. Id.

(125) Geneva Convention III, supra note 86, art. 4(4). See also Ipsen, supra note 76, at 95.

(126) See Ipsen, supra note 76, at 95.

(127) See id. at 65; GREEN, supra note 79, at 229.

(128) See U.S. DEP'T OF DEFENSE, DIR. 1400.32, DOD CIVILIAN WORK FORCE CONTINGENCY AND EMERGENCY PLANNING AND EXECUTION para. 3.1 (Apr. 1995).

(129) See P.W. SINGER, THE RISE OF THE PRIVATIZED MILITARY INDUSTRY 20-39 (2003). For a brief history of the use of mercenaries, see Todd S. Millard, Overcoming Post-Colonial Myopia: A Call to Recognize and Regulate Private Military Companies, 176 MIL. L. REV. 1 (2003).

(130) A mercenary is defined as "one that serves merely for wages, especially a soldier hired into foreign service." WEBSTER'S NINTH COLLEGIATE DICTIONARY 742 (1991). See also Millard, supra note 129, at 6.

(131) Richard R. Baxter, The Duties off Combatants and the Conduct of Hostilities, in INTERNATIONAL DIMENSIONS OF HUMANITARIAN LAW (Jiri Toman ed., 1988) (noting neither the Hague Regulations of 1907 or the Geneva Conventions of 1949 contained any prohibitions against the use of mercenaries).

(132) Protocol I, supra note 77, art. 47.

(133) Baxter, supra note 131, at 114.

(134) Greenwood, supra note 91, at 6. The unlikelihood of being deemed a mercenary under this definition has been captured by one commentator as follows: "any person who cannot avoid being characterized as a mercenary under this definition deserves to be shot and his defence lawyer with him." GEOFFREY BEST, HUMANITY IN WARFARE 374-5 (1980).

(135) HILAIRE MCCOUBREY, INTERNATIONAL HUMANITARIAN LAW: MODERN DEVELOPMENTS IN THE LIMITATION OF WARFARE 145-48 (2nd ed. 1998). Examples of soldiers fighting for such moral or ideological reasons would include U.S. citizens fighting for Allied forces in the First and Second World Wars before the United States entered the war. Id.

(136) Id. See also UNITED KINGDOM FOREIGN AND COMMONWEALTH OFFICE, PRIVATE MILITARY COMPANIES: OPTIONS FOR REGULATION 2002, 7 (2002) [hereinafter UK GREEN PAPER], available at www.fco.gov.uk/Files/kfile/mercenaries,0.pdf (discussing example of Papua New Guinea arranging for mercenaries to become special constables).

(137) "A mercenary shall not have the right to be a combatant or a prisoner of war." Protocol I, supra note 77, art. 47.

(138) GREEN, supra note 79, at 115.

(139) See P.W. Singer, War, Profits, and the Vacuum of Law: Privatized Military Firms and International Law, 42 COLUM. J. TRANSNAT'L L. 521, 528-32 (2004) (discussing two conventions and their limitations: the Convention for the Elimination of Mercenarism in Africa established by the Organization of African Unity in 1977 and the International Convention Against the Recruitment, Use, Financing and Training of Mercenaries).

(140) Ipsen, supra note 76, at 69.

(141) Id.

(142) See Hans-Peter Gasser, Protection of the Civilian Population, in THE HANDBOOK OF HUMANITARIAN Law IN ARMED CONFLICTS 209, 210 (Dieter Fleck ed., 1995).

(143) Protocol I, supra note 77, art. 43(2).

(144) Id. art. 51. See also Gasser, supra note 142, at 232.

(145) PROTOCOL I COMMENTARY, supra note 103, at 516.

(146) Id. at 901.

(147) See Frits Kalshoven & Liesbeth Zegveld, Constraints on the Waging of War: An Introduction to International Humanitarian Law 99 (2001), available at http://www.icrc.org/Web/eng/siteeng0.nsf/iwpList526/ 8DDA382303475B2DC1256C550047B1AA.

(148) See Jean-Marie Henckaerts, The Conduct of Hostilities: Target Selection, Proportionality and Precautionary Measures Under International Humanitarian Law, in PROTECTING CIVILIANS IN 21ST-CENTURY WARFARE 13-14 (Mireille Hector & Martine Jellema eds., 2001); Park, supra note 87, at 130-135.

(149) See Henckaerts, supra note 148, at 13-14. See also DETTER, supra note 93, at 146 ("There is no doubt that there is still confusion as to who is a combatant and who is a civilian as a result of the lack of stringent criteria for qualifications as a combatant."); Michael N. Schmitt, The Principle of Discrimination in 21st Century Warfare, 2 YALE HUM. RTS. & DEV. L.J. 143, 160 (1999) (discussing the blurring between civilians who work for the armed forces and combatants); Michael N. Schmitt, War, International Law, and Sovereignty: Reevaluating the Rules of the Game in a New Century, 5 U. CHI. J. INT'L L. 511, 531-534 (2005) [hereinafter Schmitt, War] (noting ambiguity about what constitutes direct participation in hostilities and the need for a case by case determination of whether it has occurred).

(150) See Gasser, supra note 142, at 232. Gasser states:

    A civilian who ... gathers information in the area of
operations
    may be made the object of attack. The same applies to civilians
who
    operate a weapons system, supervise such operation, or service
such
    equipment. The transmission of information concerning targets
    directly intended for the use of a weapon is also considered as
    taking part in hostilities. Furthermore, the logistics of
military
    operations are among the activities prohibited to civilians.

See also Park, supra note 87, at 118, 134; Park, supra note 400 (indicating logistical support, intelligence gathering, and being a mission-essential civilian on a military installation make civilians lawful subjects of attack). On the other hand, DoD has recently taken the position that many of these functions are permissible as "indirect participation in military operations." See U.S. DEP'T OF DEFENSE, INSTR. 3020.41, CONTRACTOR PERSONNEL AUTHORIZED TO ACCOMPANY THE U.S. ARMED FORCES para. 6.1.1. (Oct. 2005) [hereinafter DODI 3020.41] (stating that "contractor personnel may support contingency operations through the indirect participation in military operations, such as by providing communications support, transporting munitions and other supplies, performing maintenance functions for military equipment, providing security services according to subparagraph 6.3.5. and providing logistic services such as billeting, messing, etc.").

(151) See UK GREEN PAPER, supra note 136, at 8.

(152) See Gasser, supra note 142, at 232. The activities Gasser identified as prohibited to civilians all share a nexus of proximity to the area of military operations.

(153) See ROGERS, supra note 77, at 8-9 (discussing a similar hypothetical regarding a civilian truck driver). See also PROTOCOL I COMMENTARY, supra note 103, at 516 (discussing how simply supporting the war effort is insufficient to lose civilian status).

(154) ROGERS, supra note 77, at 9. See also Schmitt, War, supra note 149, at 544-45 (indicating that performing immediate battlefield logistics and local repair of minor battle damage would constitute direct participation in combat because of the proximity to the battle zone).

(155) Henckaerts, supra note 148, at 13 (noting much of the state practice in this area consists of assessing combatant status on a case by case basis or relying on a general proscription against direct participation in hostilities without further defining it).

(156) See Gasser, supra note 142, at 232.

(157) See PROTOCOL I COMMENTARY, supra note 103, at 619.

(158) ROGERS, supra note 77, at 3. Several additional principles include those of humanity and chivalry. See id. at 3, 6.

(159) See generally id. at 3-25.

(160) See Burrus M. Carnahan, Lincoln, Lieber and the Laws of War: The Origins and Limits of the Principle of Military Necessity, 92 AM. J. INT'L L. 213 (1998) (defining military necessity and discussing its historical evolution). DEXTER, supra note 93, at 392-98 (discussing how military necessity has been used in the past to justify violating the law of war, but this particular use of military necessity appears to have fallen out of favor).

(161) ROGERS, supra note 77, at 5-6. The definition used by the Air Force is almost identical. See THE JUDGE ADVOCATE GENERAL SCHOOL, U.S. AIR FORCE, THE MILITARY COMMANDER AND THE LAW 549 (2004). This definition states that military necessity:

```
    Permits the application of only that degree of regulated force,
not
    otherwise prohibited by the law of war, required for the
partial or
    complete submission of the enemy with the least expenditure of
    life, time, and physical resources. Attacks must be limited to
    military objectives, i.e., any objects which by their nature,
    location, purpose, or use make an effective contribution to
```

military action and whose total or partial destruction, capture, or
neutralization, under the circumstances ruling at the time, offers a definite military advantage. Examples include troops, bases, supplies, lines of communications, and headquarters.

Id.

(162) ROGERS, supra note 77, at 7.

(163) See Carnahan, supra note 160, at 229 (discussing how military necessity for attacking irrigation dams during Korean War grew towards the end of conflict and how targets in Vietnam were bombed after peace negotiations broke down in 1972).

(164) Schmitt, supra note 149, at 148.

(165) Protocol I, supra note 77, art. 48. Article 51(2) states, "The civilian population as such, as well as individual civilians, shall not be the object of attack." Article 52(1) provides that, "Civilian objects shall not be the object of attack or of reprisals." Id.

(166) Protocol I, supra note 77, art. 52(2).

(167) PROTOCOL I COMMENTARY, supra note 103, at 635.

(168) See supra note 184.

(169) Several examples of this requirement are located within Protocol I. Article 58 requires states to remove civilians from the vicinity of military objects and to avoid placing military objects in densely populated areas. Protocol I, supra note 77, art. 58. Article 53 prohibits using cultural objects or places of worship for military purposes. Protocol I, supra note 77, art. 53.

(170) See Schmitt, supra note 149, at 148-49. See also Henckaerts, supra note 148, at 14 (discussing how this definition of military objective has been adopted in at least five other treaties).

(171) See Schmitt, supra note 149, at 149.

(172) See Tom Boyle, Proportionality in Decision Making and Combat Actions, in PROTECTING CIVILIANS IN 21st-CENTURY WARFARE 33 (Mireille Hector & Martine Jellema eds., 2001). Boyle, a military officer and bomber pilot who handled targeting issues for the U.K. armed forces, provides details about the

practical and procedural aspects of ensuring targeting decisions comply with the law of war. He notes how making the distinction between military and civil objects is becoming increasingly difficult, particularly when targeting communications infrastructure. Id.

(173) See Schmitt, supra note 149, at 159-60 (discussing problems in the concept of what constitutes a military objective when civilian activities become militarized and military activities become civilianized); DETTER, supra note 93, at 146 (discussing current state of confusion over who should be considered a combatant).

(174) See Judith Gail Gardam, Proportionality and Force in International Law, 87 AM. J. INT'L L. 391, 397-98 (1993) (summarizing history and current status of principle of proportionality).

(175) Schmitt, supra note 149, at 152.

(176) Protocol I, supra note 77, art. 51(5)(b). Articles 35 and 57 of Protocol I also contain language relating to proportionality. Article 35(2) states, "It is prohibited to employ weapons, projectiles and material and methods of warfare of a nature to cause superfluous injury or unnecessary suffering." Article 57(2)(b) states, "an attack shall be canceled or suspended if it becomes apparent that the objective is not a military one or is subject to special protection or that the attack may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects, or a combination thereof, which would be excessive in relation to the concrete and direct military advantage anticipated." On the issue of whether this article codifies customary international law, see Henckaerts, supra note 148 (noting how state practice establishes the rule in this article is customary international law).

(177) Disagreement exists over the meaning of "concrete and direct military advantage." See Gardam, supra note 174, at 406 (noting the language in Protocol I appears to require a determination whether individual parts of an attacks are proportional). See also Henckaerts, supra note 148, at 17 (indicating many states disagree with this interpretation and calculate proportionality based on the military advantage to be derived from the whole attack).

(178) Gardam, supra note 174, at 400.

(179) Id. at 410.

(180) See Logue v. United States, 412 U.S. 521, 527-528 (1973).

(181) See Lisa L. Turner & Lynn G. Norton, Civilians at the Tip of the Spear, 51 A.F.L. REV. 1, 35-36 (2001).

(182) See id. at 36-38.

(183) U.S. GEN. ACCOUNTING OFFICE, GAO-03-475, DOD PERSONNEL: DOD ACTIONS NEEDED TO STRENGTHEN CIVILIAN HUMAN CAPITAL STRATEGIC PLANNING AND INTEGRATION WITH MILITARY PERSONNEL AND SOURCING DECISIONS I (2003), available at http://www.gpoaccess.gov/gaoreports/index.html.

(184) See id. (listing functions performed by civilian employees). See also Diane K. Morales, DOD Maintenance Depots Prove Their Worth: The Global War on Terrorism has Allowed the Department of Defense's In-House Maintainers to Demonstrate Their Vital Role in Supporting Combat in Afghanistan and Iraq, ARMY LOGISTICIAN, Mar. 1, 2004, at 3 (discussing the work performed by 60,000 workers at military depots).

(185) See The Defense Transformation Act for the 21st Century Act. Hearing Before the Subcomm. on Civil Service and Agency Organization of the House Comm. on Gov't Reform, 108th Cong. (2003) (statement of David S. C. Chu, Under Secretary of Defense for Personnel and Readiness), available at http://reform.house.gov/CSA/Hearings/EventSingle.aspx?EventID=365 [hereinafter Chu Statement] (indicating 1500 civilian employees have deployed to the Iraqi theater of operations). See also U.S. GEN. ACCOUNTING OFFICE, GAO/NSIAD-97-127BR, DEFENSE BUDGET: OBSERVATIONS ON INFRASTRUCTURE ACTIVITIES 29 (1997), available at http://www.gpoaccess.gov/gaoreports/index.html [hereinafter 1997 GAO REPORT] (discussing civilian deployments during First Gulf War); Deployment of Civilians Increasing, FDCH FED. DEP'T AND AGENCY DOCUMENTS, Oct. 28, 1999, available at LEXIS, News Library, FEDDOC File (noting 43000 Army civilians deployed to overseas locations, including some who have provided direct support to military operations in areas such as Haiti, Bosnia, and Kosovo).

(186) See George Cahlink, Erasing Bases; The Hit List Taking Shape Today may be the Biggest Ever, GOV'T EXECUTIVE, Oct. 2003, at 29 (discussing size of DoD industrial facilities and noting they perform twenty billion dollars of work annually).

(187) See id.; Morales, supra note 184.

(188) See John R. Moran, Letter to Editor, Honoring Civilians, WASH. POST, Jan. 8, 1992 (noting efforts of civilians employees during Operation Desert Storm operating thirty-three ports, loading 560 ships with almost one million

pieces of equipment, and sending 37,000 containers to Persian Gulf); Jack
Dorsey, Transporting People, Goods to War a Big Job, General Says,
VIRGINIAN PILOT, Mar. 8, 2003 (noting efforts of civilians assisting in
shipment of men and materiel to Afghanistan and Iraq).

(189) See USS COLE-Implications and Implementation of Lessons Learned.
Hearing Before the Senate Armed Services Comm., 107th Cong. (2001)
(statement of General Charles T. Robertson, Jr., USAF Commander in Chief of
U.S. Transportation Command), available at
http://armedservices.senate.gov/hearings/2001/f010503.htm (discussing
broad range of transport activities); Katherine McIntire Peters, Line in the
Sand; Launching a Bold Military Sweep Through Iraq Required a Supply Line
Stretching from Depots in the United States to Fast-moving Forces in the
Desert, GOV'T EXECUTIVE, May 2003, at 69; Dorsey, supra note 188.

(190) See Chu Statement, supra note 185; 1997 GAO REPORT, supra note
185, at 29.

(191) U.S. DEP'T OF DEFENSE, DIR. 1400.10, EMERGENCY-ESSENTIAL (E-E)
DOD U.S. CITIZEN CIVILIAN EMPLOYEES para. E2.1.5 (Apr. 1992) (indicating
that only U.S. citizens may hold E-E positions). For Air Force and Army
guidance on when and how to deploy civilian employees, see U.S. DEP'T OF
AIR FORCE, INSTR. 10-231, FEDERAL CIVILIAN DEPLOYMENT GUIDE (Apr.
1999) and U.S. DEP'T OF ARMY, PAM. 690-47, DA CIVILIAN EMPLOYEE GUIDE
(Nov. 1995).

(192) Transforming the Department of Defense Personnel System: Finding the
Right Approach: Hearing Before the Senate Comm. on Governmental Reform,
108th Cong. (2003) (testimony of Donald H. Rumsfeld, Secretary of Defense)
(indicating that because of perceived difficulties in managing employees,
eighty-three percent of civilians deployed to Central Command for Operation
Iraqi Freedom were contractors while only seventeen percent were civilian
employees).

(193) See Id.

(194) Id.

(195) Id. See also Stephen Barr, Pentagon Plan Would Shift 10,000 Military
Jobs to Civilians, WASH. POST., Oct. 7, 2003, at B2 (discussing that the
Defense Department is ready to convert 10,000 jobs performed by military
members to civilian positions in fiscal year 2004 alone).

(196) See 1997 GAO REPORT, supra note 185, at 21 (stating manning a position with a civilian costs on average $15,000 less than manning with a military member).

(197) Chalmers Johnson, The War Business: Squeezing a Profit from the Wreckage in Iraq, HARPER'S MAG., Nov. 1, 2003, at 53.

(198) See SINGER, supra note 129, at 9-17.

(199) See id. at 92-97. See also Comment & Analysis, FIN. TIMES, Aug. 12, 2003, at 15; UK GREEN PAPER, supra note 136, at 8-9.

(200) See SINGER, supra note 129, at 92-94.

(201) See U.S. DEP'T OF ARMY, PAM. 715-16, CONTRACTOR DEPLOYMENT GUIDE App. B-1, para. 5-1, (1998) (authorizing issuance of uniforms to deploying contractors). See also Christian Bourge, Can Private Firms Bring Peace?, UPI, Aug. 26, 2003, available at LEXIS, News Library, UPI File (stating contractor bodyguards for head of the U.S. civilian authority in Baghdad wear uniforms resembling those worn in Army).

(202) See Daniel Bergner, The Other Army, N.Y. TIMES MAG., Aug. 14, 2005, at 29. See also Seth Borenstein & Scott Dodd, Private Security Companies in Iraq See Big Paychecks, Big Risks, KNIGHT RIDDER/TRIB. NEWS SERVICE, Apr. 2, 2004, available at LEXIS, News Library, KRTNWS File (discussing contracts Coalition Provisional Authority in Iraq has made with private security companies).

(203) See Borenstein & Dodd, supra note 202. See also T. Christian Miller, Soaring Security Costs Burden Iraq Reconstruction Efforts; For Contractors in a High-Risk Zone, Cash and Manpower are Being Diverted from Projects, L.A. TIMES, Apr. 9, 2004, at A10 (noting as much as four billion dollars may be spent on security as some companies involved in reconstruction efforts are spending twenty percent of the contract price for protection).

(204) See Dana Priest & Mary Pat Flaherty, Under Fire, Security Firms Form an Alliance, WASH. POST, Apr. 8, 2004, at A1; Bergner, supra note 202. See also GEN. ACCOUNTING OFFICE, GAO-05-737, REBUILDING IRAQ: ACTIONS NEEDED TO IMPROVE USE OF PRIVATE SECURITY PROVIDERS 8 (2005) [hereinafter 2005 GAO REPORT ON PRIVATE SECURITY PROVIDERS], available at http://www.gpoaccess.gov/gaoreports/index.html (last visited Jan. 23, 2006).

(205) Id.

(206) See Bourge, supra note 201 (contractors providing security to CPA);
Borzou Daragahi, Contractors Lighten Load on Troops; For Profit, Private
Firms Train Iraqi Soldiers, Provide Security and Much More, PITTSBURGH
POST-GAZETTE, Sep. 28, 2003, at A6 (discussing role of contractors in
guarding the Baghdad airport and oil fields); Oliver Poole, On Patrol with
Baghdad's Hired Guns, DAILY TELEGRAPH (London), May 4, 2004, at 12
(discussing contractors providing protection for convoys of military
equipment); 2005 GAO REPORT ON PRIVATE SECURITY PROVIDERS, supra
note 204, at 9.

(207) Bergner, supra note 202 (indicating 160 to 200 security contractors are
estimated to have been killed as of August 2005 and describing a number of
instances of contractors engaging in combat in Iraq). See also Poole, supra
note 206 (providing examples of casualties inflicted by security contractors).

(208) SINGER, supra note 129, at 9-15, 93 (providing overview of private
security contractor operations in Africa, Europe, Asia and the Americas). See
also 'Who Takes Responsibility if One of These Guys Shoots the Wrong
People?' The Hiring of Contractors for Military Tasks Extends to Their Use in
Peacekeeping Operations, FIN. TIMES, Aug. 12, 2003, at 15 (discussing
contractors guarding U.S. Embassy in Liberia fighting rebels besieging
embassy).

(209) SINGER, supra note 129, at 92-94.

(210) Id. at 107-110 (discussing Angola), at 110-115 (discussing Sierra
Leone), and 158 (discussing Ethiopia). See also International Consortium of
Investigative Journalists, Marketing the New Dogs of War, Oct. 30, 2002,
available at http://www.publicintegrity.org/bow/(last visited Jan. 23, 2006)
(discussing details of private military firm operations in Africa).

(211) SINGER, supra note 129, at 4, 113 (discussing Sierra Leone and how
PMC contractors killed several hundred people in one operation).

(212) Id. at 95. See also UK GREEN PAPER, supra note 136, at 8.

(213) SINGER, supra note 129, at 95.

(214) See id. at 95-97; UK GREEN PAPER, supra note 136, at 8. See also GEN.
ACCOUNTING OFFICE, GAO-03-695, MILITARY OPERATIONS: CONTRACTORS
PROVIDE VITAL SERVICES TO DEPLOYED FORCES BUT ARE NOT ADEQUATELY
ADDRESSED IN DOD PLANS 7, 10 (2003) [hereinafter 2003 GAO REPORT ON
MILITARY OPERATIONS], available at
http://www.gpoaccess.gov/gaoreports/index.html (noting role of

contractors in training soldiers how to use equipment that is either specialized or utilizes newer technologies).

(215) See Johnson, supra note 197. Contractors training the Saudi National Guard were one of the main targets when Al Qaeda terrorists attacked a housing compound in Riyadh in May 2002, killing thirty-four people, including eight Americans. Id.

(216) See SINGER, supra note 129, at 95-97.

(217) See Id. at 95 (quoting a contractor who stated, "If we do operate in civil wars, we are there as 'advisers' or 'trainers.' But, of course we are on the frontline, and the excuse is so that we can see if our training is working.").

(218) Esther Schrader, Companies Capitalize on War on Terror, L.A. TIMES, Apr. 14, 2002, at Al.

(219) See SINGER, supra note 129, at 125-127 (discussing how MPRI's CEO, a former Army four star general, met with the Croat general planning the offensive at least ten times in the five days before the offensive began). See also Eric Pape et al., Dogs of Peace, NEWSWEEK, Aug. 25, 2003, at 22. Both Singer and Pape note MPRI has denied the allegations. Id.

(220) SINGER, supra note 129, at 97.

(221) See Johnson, supra note 197 (noting the potential value of the contract is seven billion dollars and that Kellogg Brown & Root has provided similar services in Kuwait, Turkey, Uzbekistan, and the Balkans).

(222) Anthony Bianco et al., Outsourcing War, Bus. WK., Sep. 15, 2003, at 68.

(223) See Geneva Convention III, supra note 86, art. 4 (referring to supply contractors). See Military Contractors. an Old Story, U.S. NEWS & WORLD REP., Nov. 4, 2002, at 41, for figures on the number of civilians who have accompanied U.S. forces in past conflicts, including 200,000 in the Civil War and 734,000 in World War II.

(224) See What is KBR?, DALLAS MORNING NEWS, May 10, 2004, at 2A (stating thirty-four KBR employees have died in Iraq and seventy-four have been wounded); Eric Pape et al., supra note 219 (relating how contractors flying transport helicopters in Liberia and Sierra Leone in support of Nigerian peacekeepers were fired upon and returned fire).

(225) Bianco et al., supra note 222.

(226) See id.; Singer, supra note 139, at 522. See also 2003 GAO REPORT ON MILITARY OPERATIONS, supra note 214, at 8-9 (discussing Apache helicopters and Predator UAVs).

(227) See 2003 GAO REPORT ON MILITARY OPERATIONS, supra note 214, at 8-9, 16 (discussing reliance on contractors to provide maintenance for various systems is unavoidable because the armed forces simply lack any internal capacity to maintain the equipment).

(228) See Thomas Adams, The New Mercenaries and the Privatization of Conflict, PARAMETERS, Summer 1999, at 103, 115, available at http://www.carlisle.army.mil/usawc/parameters/99summer/adams.htm (last visited Jan. 23, 2006) ("Even the U.S. Army has concluded that in the future it will require contract personnel, even in the close fight area, to keep its most modern systems functioning.").

(229) See Peter W. Singer, Warriors for Hire in Iraq, SALON.COM, Apr. 15, 2004, available at http://www.brookings.edu/views/articles/fellows/singer20040415.htm.; Victoria Burnett et al., From Building Camps to Gathering Intelligence, Dozens of Tasks Once in the Hands of Soldiers Are Now Carried Out by Contractors, FIN. TIMES, Aug. 11, 2003, at 13 (discussing contractors operating UAVs used in Iraq and Afghanistan).

(230) See Victoria Burnett et al., supra note 229, at 13.

(231) See 2003 GAO REPORT ON MILITARY OPERATIONS, supra note 214, at 2-10, 17 (discussing contractor-provided intelligence services); Linda Robinson & Douglas Pasternak, A Swarm of Private Contractors Bedevils the U.S. Military, U.S. NEWS & WORLD REP., Nov. 4, 2002, at 38 (noting prevalence of contractors, and lack of control over them, in U.S. military intelligence in Balkans); UK GREEN PAPER, supra note 136, at 29-38 (charting various operations around the world where contractors have provided intelligence services); Adams, supra note 228, at 115 (discussing information warfare). For an indication of how related intelligence and information warfare can be to one another, see Anthony Lisuzzo, Data Sharing on the Battlefield, GOV'T COMPUTER NEWS, Jun. 16, 2003, available at LEXIS, News Library, GOVCMP File (discussing how the Army has fused intelligence and information warfare together into the Intelligence and Information Warfare Directorate).

(232) See SINGER, supra note 129, at 99.

(233) Id. at 62-63, 100. See also Dawn S. Onley, Air Force Picks Information Warfare Contractors, GOV'T COMPUTER NEWS, Aug. 28, 2003, available at

LEXIS, News Library, GOVCMP File (discussing pending $252 million Air Force contract for information warfare techniques).

(234) See Blanco et al., supra note 222.

(235) See id.; SINGER, supra note 129, at 49-70; and UK GREEN PAPER, supra note 136, at 12-14.

(236) See SINGER, supra note 129, at 96 ("The primary advantage of using outside consultants is access to and delegation of a greater amount of experience and expertise than almost any standing public military force in the world can match."); Robinson & Pasternak, supra note 231, at 38 (discussing former Soviet bloc countries using consultants to make their militaries reach NATO standard). Even a modern military such as the U.K.'s is heavily reliant on training from contractors. See UK GREEN PAPER, supra note 136, at 13.

(237) See supra notes 226-27 and accompanying text.

(238) SINGER, supra note 129, at 53.

(239) Id.

(240) Id.

(241) See Dangerous Work; Private Security Firms in Iraq, ECONOMIST, Apr. 10, 2004, available at LEXIS, News Library, ECON File.

(242) See 'Who Takes Responsibility if One of These Guys Shoots the Wrong People?' The Hiring of Contractors for Military Tasks Extends to Their Use in Peacekeeping Operations, FIN. TIMES, Aug. 12, 2003, at 15 (discussing PMC position that it could perform a military operation at one-fifteenth of what it would cost the U.S. military); Bianco et al., supra note 222, at 68 (discussing cost savings accruing to PMCs because they do not bear the cost of training and deploying soldiers and may be able to subcontract with local labor for significant cost savings).

(243) See SINGER, supra note 129, at 66-70.

(244) Id. at 58. See also Ed Timms, In Iraq, Advances and Setbacks: Private Firms Pick up the Slack in Conflict, but at What Price?, DALLAS MORNING NEWS, Apr. 13, 2004, at 1A.

(245) Even though estimates of contractor casualties in Iraq since the beginning of the war in 2003 range from several dozen to as high as one hundred, many companies do not release casualty figures, nor has the U.S.

government. See Miller, supra note 203, at A10. See also SINGER, supra note 129, at 208 (noting lack of outcry over contractor deaths in Colombia).

(246) See 2003 GAO REPORT ON MILITARY OPERATIONS, supra note 214, at 8 (discussing the Balkans); SINGER, supra note 129, at 206-7 (discussing Colombia).

(247) Bourge, supra note 201.

(248) See Geneva Convention III, supra note 86, art. 4(A)(4).

(249) See supra notes 209-11 and accompanying text.

(250) See supra notes 200-31 and accompanying text.

(251) See supra notes 149-51 and accompanying text. See also INT'L COMM. OF THE RED CROSS, INTERNATIONAL HUMANITARIAN LAW AND THE CHALLENGES OF CONTEMPORARY ARMED CONFLICTS 36 (2003), available at http://www.icrc.org/Web/eng/siteeng0.nsf/iwpList74/ 73BA3908D5B7E2F7C1256E6D0034B5CE (noting need for clarification about what constitutes direct participation in hostilities). See also David Barstow et al., Security Companies: Shadow Soldiers In Iraq, N.Y. TIMES, Apr. 19, 2004, at A1 (discussing how Iraqi insurgents are targeting contractors and how contractor duties are blurring with those of soldiers).

(252) U.S. DEP'T OF ARMY, PAM. 690-47, DA CIVILIAN EMPLOYEE GUIDE, para. 1-22 (Nov. 1995).

(253) See JOINT CHIEFS OF STAFF, JOINT PUBLICATION 1-0, DOCTRINE FOR PERSONNEL SUPPORT FOR JOINT OPERATIONS 0-2, (1998). See also Turner & Norton, supra note 181, at 20. Under new DoD guidance, the geographic Combatant Commander may authorize contingency contractor to be armed for individual self-defense. DODI 3020.41, supra note 150, para. 6.3.4.1.

(254) Protocol 1, supra note 77, arts. 43(1) and 51(3). See also supra notes 142-44 and accompanying text.

(255) See supra notes 146-47 and accompanying text.

(256) See supra notes 45-66 and accompanying text.

(257) See Michael N. Schmitt, Wired Warfare, Computer Network Attack and Jus in Bello, 84 INT'L REV. OF THE RED CROSS 365, 368 (2002) (noting the absence of any humanitarian law instruments discussing CNA). See also

DETTER, supra note 93, at 273 (noting lack of any systematic approach to regulating information warfare).

(258) See Id. at 369-71 (arguing CNA is regulated by international humanitarian law).

(259) See Schmitt, supra note 257, at 374-75 (arguing for a consequence-based approach under which CNA causing injury, death, damage, or destruction Is covered by international humanitarian law).

(260) See id at 374.

(261) See DETTER, supra note 93, at 146. See also supra note 149 and accompanying text.

(262) See supra notes 164-72 and accompanying text.

(263) See supra notes 204-11 and accompanying text.

(264) Geneva Convention III, supra note 86, art. 4(4); Protocol I, supra note 77, arts. 50(1), 51(2). See also supra note 125 and 165 and accompanying text. It is important to note that accompanying civilians are always subject to Indirect attack if they are in close proximity to an otherwise lawful target.

(265) DEP'T OF DEF. OFF. LEGAL COUNSEL, AN ASSESSMENT OF INTERNATIONAL LEGAL ISSUES IN INFORMATION OPERATIONS 46-47 (1999), available at downloads.securityfocus.com/library/Infowar/reports/dodio.pdf.

(266) See DETTER, supra note 93, at 415-19.

(267) Id. at 423-27.

(268) See supra notes 142 and 164-66 and accompanying text.

(269) See Protocol I, supra note 77, art. 51(5)(b).

(270) See id. art. 58 and supra notes 184-191 and 203-232 and accompanying text.

(271) Even if they could be directly targeted, the most logical place to attack them would be at the depot, where they would be concentrated together.

(272) See GREEN, supra note 79, at 49 n. 186. Green indicates the paucity of protection accorded civilians at a military objective in this example: "There

can be little doubt that a munitions factory as well as the barracks within its compound in which the workers reside is a military objective. It is questionable, however, whether their houses outside the factory would also qualify, even in the absence of any barracks."

(273) See supra notes 174-79 and accompanying text.

(274) See supra note 159 and accompanying text.

(275) Protocol I, supra note 77, art. 50(1).

(276) See supra note 249 and accompanying text.

(277) See supra notes 195-196 and 198-99 and accompanying text.

(278) See DETTER, supra note 93, at 144-46.

(279) Ariana Eunjung Cha & Renae Merle, Line Increasingly Blurred Between Soldiery and Civilian Contractors, WASH. POST, May 13, 2004, at A1.

(280) See supra note 248 and accompanying text.

(281) See Geneva Convention III, supra note 86, art. 4(a), (b); Protocol I, supra note 77, art. 43(1).

(282) Protocol I, supra note 77, art. 43(1).

(283) See Rudiger Wolfrum, Enforcement of International Humanitarian Law, in THE HANDBOOK OF HUMANITARIAN LAW IN ARMED CONFLICTS 530-42 (Dieter Fleck ed., 1995) (outlining some of the requirements of the disciplinary system).

(284) See Turner & Norton, supra note 181, at 35.

(285) Id. at 35-36.

(286) Id. at 36-37. See also DODI 3020.41, supra note 150, at para. 6.3.3.

(287) See 2003 GAO REPORT ON MILITARY OPERATIONS, supra note 214, at 33.

(288) Turner & Norton, supra note 181, at 35-41. See also Dangerous Work; Private Security Firms in Iraq, ECONOMIST, Apr. 10, 2004, available at LEXIS, News Library, ECON File (noting contractors in Iraq working outside military chain of command).

(289) See Cha & Merle, supra note 279 (discussing possible misbehavior by loosely supervised civilian contractors interrogating Iraqis at Abu Ghraib prison).

(290) See supra notes 196, 234-47 and accompanying text.

(291) See supra notes 209-11 and accompanying text.

(292) Even this category may be subject to qualification because contractors are widely used in situations where they may need to use force for defensive purposes. See supra notes 204-06 and accompanying text.

(293) See supra notes 20-23 and accompanying text.

(294) See supra notes 100, 161-77 and accompanying text.

(295) See generally INT'L COMM. OF THE RED CROSS, DIRECT PARTICIPATION IN HOSTILITIES UNDER INTERNATIONAL HUMANITARIAN LAW ch. 4 (2003), available at http://www.icrc.org/Web/eng/siteeng0.nsf/iwpList74/ 459B0FF70176F4E5C1256DDEOO572DAA (noting consensus of experts participating in conference on need to research and clarify issue of what constitutes direct participation in hostilities, but lack of consensus on how this clarification should be achieved).

(296) Nine years passed from the time the International Committee of the Red Cross proposed the convention that became Protocol I in 1968 until it was opened for signature in 1977. See Park, supra note 87, at 68-86 (discussing drafting history of Protocol I).

(297) See supra notes 143-47 and accompanying text.

(298) See supra note 107 and accompanying text.

(299) See supra note 270-73 and accompanying text.

(300) See supra notes 283-88 and accompanying text.

(301) See RESTATEMENT (THIRD) OF FOREIGN RELATIONS 402 (1987) (noting bases for state jurisdiction to prescribe law).

(302) See AIR FORCE GENERAL COUNSEL GUIDANCE DOCUMENT, THE DEPLOYMENT OF CIVIL SERVICE EMPLOYEES 8 (2004) for a discussion on disciplinary issues and criminal and court-martial jurisdiction over civilian employees. This document asserts Reid v. Covert, 354 U.S. 1 (1957) may not

bar the military from asserting assert court-martial jurisdiction over civilian employees.

(303) See Marco Sassoli, State Responsibility for Violations of International Humanitarian Law, 84 INT'L REV. OF THE RED CROSS 401, 404 (2002) (noting indispensable predicate for assigning responsibility to a state for a breach of international law is being able to attribute the violation to it).

(304) See supra notes 165-67, 270-73 and accompanying text.

(305) See ROERS, supra note 77, at 9 ("If there is any hope that the law will be complied with, the rules must be as simple and straightforward as possible.").

(306) See DETTER, supra note 93, at 145; cf. Abraham Sofaer, Terrorism and the Law, FOREIGN AFFAIRS, Summer 1986, at 901.

(307) See DETTER, supra note 93, at 145.

(308) See AIR FORCE GENERAL. COUNSEL. GUIDANCE DOCUMENT THE DEPLOYMENT OF CIVIL SERVICE EMPLOYEES 8 (2004), Sassoli, supra note 303, at 405 (arguing state responsibility for military members).

(309) See supra notes 261-73 and accompanying text.

(310) See Park, supra note 87, n.402, for a discussion about what he terms quasi-combatants or quasi-civilians, civilians whose direct military contributions warrant their being targeted for attack. For a contrary position, see ROGERS, supra note 77, at 8-9.

(311) See supra notes 170-79 and accompanying text.

(312) See supra notes 274-79 and accompanying text.

(313) See DETTER, supra note 93, at 163-64.

(314) See supra notes 111-12 and accompanying text.

(315) See Vienna Convention on the Law of Treaties, May 23, 1969, art. 26, 8 I.L.M. 679, 690.

(316) See id. art. 30.

(317) See Protocol I, supra note 77, art. 85(3)(a) (making the targeting of civilians a grave breach of Protocol I). See also Rome Statute of the

International Criminal Court art. 8(2)(b)(i), July 17, 1998, U.N. Doc. A/CONF.183/9 (2002), available at http://www.un.org/law/icc/statute/english/romestatute(e).pdf (making intentional attacks against civilians not taking direct part in hostilities a war crime).

Major Ricou Heaton (B.A., English, University of North Carolina Chapel Hill (1990); J.D., Vanderbilt University Law School (1993); LL.M., International and Comparative for The George Washington University Law School (2004)) is the deputy staff judge advocate for the 48th Fighter Wing, RAF Lakenheath, England. This Article was submitted in partial satisfaction of the requirements for the degree of Master of Laws in International and Comparative Law at George Washington University Law School.

COPYRIGHT 2005 U.S. Air Force, Academy Department of Law
COPYRIGHT 2006 Gale Group